No. 11-70024

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

ALFRED BOURGEOIS,
*Petitioner-Appellant*,

v.

UNITED STATES OF AMERICA,
*Respondent-Appellee.*

_____

On Appeal from the Denial of Petition for Writ of Habeas Corpus by the
United States District Court for the Southern District of Texas
(CAPITAL CASE)

_____

**PETITIONER-APPELLANT'S APPLICATION FOR CERTIFICATE OF
APPEALABILITY AND BRIEF IN SUPPORT**

_____

Leigh Skipper
*Federal Defender*

Victor J. Abreu
Jennifer Givens
*Assistant Federal Defenders*
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Appellant

Dated: February 27, 2012

# Table of Contents

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Claim I.  THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY ON
THE ISSUE OF WHETHER THE DISTRICT COURT ERRED IN DISMISSING,
WITHOUT ALLOWING AN EVIDENTIARY HEARING, APPELLANT'S
CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
REASONABLY CHALLENGE JURISDICTION.. . . . . . . . . . . . . . . 12

  A.  The Trial Evidence for Jurisdiction. . . . . . . . . . . . . . . . 12

  B.  Proffer for the 2255 Proceeding. . . . . . . . . . . . . . . . . . 14

  C.  The District Court Erred. . . . . . . . . . . . . . . . . . . . . . 17

Claim II.  TRIAL COUNSEL WERE INEFFECTIVE AT BOTH PHASES OF TRIAL FOR
FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY TO REBUT THE
GOVERNMENT'S ASSERTION THAT JG1999 WAS SEXUALLY
ASSAULTED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  A.  The Testimony and Arguments Presented at Trial. . . . . . . . . . . 20

B. Trial Counsel Could Have Presented Compelling Evidence to Rebut the Allegation That Semen Was Detected and That JG1999 Was Sexually Assaulted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    1. **Trial Counsel's Deficient Performance.** . . . . . . . . . . . . . . . . 25

        a. Trial Counsel Failed to Present Expert Testimony to Rebut the Allegation That Semen Was Detected on the Rectal Swabs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        b. Trial Counsel Failed to Utilize the FBI's Own Serology Protocols to Rebut the Allegation That a Positive p30 Alone Confirmed the Presence of Semen.. . . . . . . . . . . 31

        c. Trial Counsel Failed to Present Readily Available Evidence to Rebut the Erroneous Testimony from Government Experts Concerning the Presence of p30 Protein in Substances Other than Semen and Concerning the Persistence and Survivability of Sperm. . . . . . . . . . 34

        d. Trial Counsel Failed to Present Expert Testimony to Rebut Dr. Benton's Alleged Observations of Sexual Trauma in the Autopsy Photos. . . . . . . . . . . . . . . . . . . . 37

    2. Mr. Bourgeois Was Prejudiced by Trial Counsel's Deficient Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C. The District Court Erred in Denying Relief on this Claim and Denying COA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    1. COA Is Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    2. The District Court Erred in Denying Relief. . . . . . . . . . . . . . 44

        a. Dr. Benton's alleged observations of sexual trauma. . . 45

b. Forensic Evidence of Semen. . . . . . . . . . . . . . . . . . . . 46

c. Cross-Examination of Government Experts Was Not an Adequate Substitute for the Presentation of Defense Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

d. Counsel's "strategy". . . . . . . . . . . . . . . . . . . . . . . . . . 50

Claim III. COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

A. Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

B. The Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

1. Government Presentation. . . . . . . . . . . . . . . . . . . . . . . 57

2. The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

C. The Unpresented Mitigation. . . . . . . . . . . . . . . . . . . . . . . . 61

1. Life history of abuse, neglect, and abandonment. . . . . . . . . . 62

2. Personality disorder. . . . . . . . . . . . . . . . . . . . . . . . . . 64

3. Cognitive deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

4. The combined impact of Mr. Bourgeois' mental health problems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

D. Trial counsel's failure to present the available mitigating evidence was unreasonable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

E. The Failure to Present Available Mitigating Evidence Prejudiced Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

F. The District Court's Ruling. . . . . . . . . . . . . . . . . . . . . . . . . . 78

1.  Strategies Offered by the District Court.. . . . . . . . . . . . . . . . 78

2.  The District Court Denied Relief Because Counsel Presented "Some" of the Available Evidence at Trial. . . . . . . . . . . . . . 81

3.  The Lower Court Improperly Discounted the Mitigating Value of Certain Categories of Evidence. . . . . . . . . . . . . . . . . . . . . . 85

4.  Improper Factual Findings. . . . . . . . . . . . . . . . . . . . . . . . . . . 86

5.  Improper Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

# TABLE OF AUTHORITIES

## FEDERAL CASES

Apprendi v. New Jersey, 530 U.S. 466 (2000). ........................................................... 16

Avila v. Quarterman, 560 F.3d 299 (5th Cir. 2009)..................................................... 5

Barefoot v. Estelle, 463 U.S. 880 (1983). ................................................................. 77

Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990). ................................................. 87

Epps v. Thaler, No. 08-70050, 2009 U.S. App. LEXIS 20098 (5th Cir. Sept. 9, 2009)............... 5

Franklin v. Lynaugh, 487 U.S. 164 (1988). ............................................................... 70

Hull v. Freeman, 932 F.2d 159 (3d Cir. 1991)............................................................. 87

Kimmelman v. Morrison, 477 U.S. 365 (1986). ....................................................... 19, 79

Miller-El v. Cockrell, 537 U.S. 322 (2003). ...................................................... passim

Penry v. Lynaugh, 492 U.S. 302 (1989)..................................................................... 70

Porter v. McCollum, 130 S. Ct. 447 (2009).......................................................... passim

Rompilla v. Beard, 545 U.S. 374 (2005). ............................................................ 76, 80

Sears v. Upton, 130 S. Ct. 3259 (2010). ......................................................... 80, 81, 82

Skinner v. Quarterman, 528 F.3d 336 (5th Cir. 2008). ................................................ 5

Slack v. McDaniel, 529 U.S. 473 (2000). ................................................................. 89

Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004)..................................................... 25, 40

Stevens v. Epps, 618 F.3d 489 (5th Cir. 2010). ......................................................... 5

Strickland v. Washington, 466 U.S. 668 (1984). ................................................... 25, 40

United States v. Bell, 993 F.2d 427 (5th Cir. 1993). ................................................ 16

United States v. Benson, 495 F.2d 475 (5th Cir. 1974). ............................................. 12

United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005)....................................................... 3, 41

United States v. Briggs, 939 F.2d 222 (5th Cir. 1991). ................................................................ 17

United States v. Perrien, 274 F.3d 936 (5th Cir. 2001). ............................................................... 16

United States v. Reff, 479 F.3d 396 (5th Cir. 2007). ................................................................... 16

Walbey v. Quarterman, 2009 WL 113778 (5th Cir. 2009). ............................................. 81, 82, 84

Wiggins v. Smith, 539 U.S. 510 (2003)............................................................................... passim

Williams v. Allen, 542 F.3d 1326 (11th Cir. 2008)....................................................................... 82

Williams v. Cain, 125 F.3d 269 (5th Cir. 1997). ......................................................................... 40

Williams v. Taylor, 529 U.S. 362 (2000)............................................................................. passim

In re Winship, 397 U.S. 358 (1970)........................................................................................... 16

## FEDERAL STATUTES

18 U.S.C. § 1111(b). ................................................................................................................ 12

28 U.S.C. §§1291........................................................................................................................ 1

28 U.S.C. § 2241........................................................................................................................ 1, 3

28 U.S.C. § 2253(c)(2)................................................................................................................ 5

28 U.S.C. § 2255......................................................................................................... passim

18 U.S.C. § 3236....................................................................................................................... 12

18 U.S.C. § 3592(c)(6).............................................................................................................. 42

18 U.S.C. § 3593(e). .................................................................................................................. 42

## MISCELLANEOUS

Fed. R. Civ. P. 26(a)(2)(B)(1)..................................................................................................... 18

## JURISDICTIONAL STATEMENT

The district court issued its final order in this case on May 19, 2011, and denied a certificate of appealability on all issues. The district court denied Mr. Bourgeois' Motion to Alter or Amend the Judgment on June 17, 2011. Mr. Bourgeois timely filed his notice of appeal on August 15, 2011. Upon the grant of a certificate of appealability, this Court will have jurisdiction under 28 U.S.C. §§ 1291 and 2253. The district court had jurisdiction under 28 U.S.C. §§ 2241 and 2255.

# ISSUES PRESENTED

Appellant asks this Court to grant a Certificate of Appealability ("COA") on

three claims for review. Thus, the Court must consider whether reasonable jurists

would debate the merits of the following constitutional questions:

1. Whether Appellant was entitled to an evidentiary hearing on his claim that the Government failed to prove federal jurisdiction in the case and trial counsel unreasonably failed to challenge jurisdiction.

2. Whether Appellant was denied his right to effective assistance of counsel where trial counsel failed to counter the Government's argument and evidence that Appellant sexually assaulted his two-year old daughter before her death.

3. Whether Appellant was denied his right to effective assistance of counsel where counsel failed to pursue and present mitigating evidence.

**STATEMENT OF THE CASE**

This is an appeal from the denial of a Motion to Vacate Conviction and Sentence pursuant to 28 U.S.C. § 2255 in a capital case.

In 2004, Alfred Bourgeois (Mr. Bourgeois or Appellant) was convicted of capital murder and sentenced to death in the United States District Court for the Southern of District of Texas for the 2002 death of his two-year old daughter, JG1999. On August 25, 2005, this Court affirmed on direct appeal. United States v. Bourgeois, 423 F.3d 501 (5th Cir. 2005). A petition for a writ of certiorari was denied on May 19, 2006.

On May 14, 2007, Mr. Bourgeois filed a Motion for Relief Pursuant to 28 U.S.C. § 2255 or in the Alternative Pursuant to 28 U.S.C. § 2241 (hereafter "2255 Motion") challenging his conviction and sentence of death. The district court granted a hearing on all but one of the claims in the 2255 Motion: the claim that trial counsel were ineffective for failing to challenge federal jurisdiction. On May 19, 2011, the district court denied the 2255 Motion and denied Mr. Bourgeois' request for a certificate of appealability. Bourgeois v. United States, No. Cr-C-02-216, DE 661 (S.D. Tex. May 19, 2011) (hereafter "Op."). ROA 5735-5959.[1] On

---

[1] Citations to the Record on Appeal are cited as "ROA" followed by the page number. Transcripts not included in the ROA are cited as "Tr." followed by the date and page number. All emphasis is added unless otherwise noted.

June 16, 2011, Mr. Bourgeois filed a Motion to Alter or Amend Judgment, ROA 5969, which the district court denied the next day, ROA 6062. Mr. Bourgeois filed a timely Notice of Appeal on August 16, 2011. ROA 6063.

**LEGAL STANDARD**

A COA must be granted if the petitioner makes "a substantial showing of the denial of a constitutional right." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); 28 U.S.C. § 2253(c)(2). In making this determination, Courts of Appeals need only conduct "threshold inquiry into the underlying merit" of the petitioner's claim. Miller-El, 537 U.S. at 327. A COA must issue if "reasonable jurists could debate whether. . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Id. at 336. "A claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." Avila v. Quarterman, 560 F.3d 299, 304 (5th Cir. 2009). See also, e.g., Skinner v. Quarterman, 528 F.3d 336, 340-341 (5th Cir. 2008) (granting a COA for ineffective assistance of counsel claim despite recognition that proof of prejudice would require "considerable speculation"); Epps v. Thaler, No. 08-70050, 2009 U.S. App. LEXIS 20098 (5th Cir. Sept. 9, 2009). "In a death penalty case, any doubts as to whether a COA should issue must be resolved in the petitioner's favor." Stevens v. Epps, 618 F.3d 489, 502 (5th Cir. 2010) (internal quotation, citations and alterations omitted).

5

For the reasons set forth below, Appellant submits that the district court's adjudication of his claims is, at a minimum, debatable among reasonable jurists.

## STATEMENT OF RELEVANT FACTS

The district court correctly characterized the facts presented at trial as "atrocious." The innocent 2-year-old victim, JG1999, was subjected to abuse and torture while in Appellant's care, ultimately resulting in her tragic death. Not only did Appellant's jury hear the awful details surrounding the victim's last weeks and her death, but Government witnesses also testified that Appellant had a history of violence against other women and children. Accordingly, it took very little effort on the Government's part to make Appellant look like a monster, undeserving of a meaningful defense or mercy.

Rather than challenge the Government's case, however, Appellant's trial counsel seemingly shrugged their shoulders and hoped for the best. There was evidence readily available to counsel that could have been used to 1) challenge federal jurisdiction in the case (where the medical evidence indicated that the fatal injuries were not inflicted on federal lands); 2) challenge the Government's highly prejudicial evidence alleging that Appellant sexually assaulted his 2-year old daughter before her death; and 3) mitigate the offense in this case by by presenting evidence of Appellant's history of abuse, neglect and significant deficits and impairments, thereby giving jurors a reason to consider life for this very damaged human being, rather than assuming death for a perceived monster.

7

Unfortunately, counsel failed to offer any such evidence or argument.

Rather than setting forth the relevant facts supporting each of these three claims here and repeating them during the discussion of the merits, Appellant has limited the recitation of specific facts (and the corresponding citations to the record) to where it is most needed – within the claims themselves.

## SUMMARY OF ARGUMENT

A court is required to issue a COA where Appellant establishes that reasonable jurists could disagree about the merit of the constitutional claims presented by Appellant. Appellant has appealed three claims for relief, and he submits that he is entitled to a COA on each of these claims. First, Appellant alleged that trial counsel unreasonably failed to challenge federal jurisdiction in the case. Despite a proffer of evidence indicating that the fatal injuries were inflicted prior to the victim's arrival at the Corpus Cristi Naval Air Station – and therefore outside of federal lands – the district court failed to grant an evidentiary hearing on the issue. The denial of a hearing was improper here, particularly in light of trial testimony from the Government's expert witness Dr. Rouse, who testified that the cause of death was a closed head injury sustained sometime *in the few days before death*. Tr. 3/8/04, 121-22, 133-34. The Government did not ask Dr. Rouse – or any other witness – whether the fatal injuries occurred at the Naval

Station.  Trial counsel failed to investigate or challenge jurisdiction, not because of any tactic or strategy, but simply because he labored under the false impression that federal jurisdiction was founded if the decedent was found unconscious on federal land.  Despite the factual proffer presented, and contrary to 28 U.S.C. § 2255, the lower court it failed to grant a hearing and limited discovery on this issue.  This Court should grant a COA and remand the case to the lower court for a full evidentiary hearing on the question of counsel's failure to challenge federal jurisdiction.

Next, this Court should also issue a COA to address the claim that counsel unreasonably failed to investigate and present readily available scientific evidence to counter the Government's highly prejudicial assertion that Appellant sexually assaulted his two-year old daughter before her death.  The Government's experts, including those from the FBI, testified that the victim suffered trauma to her vagina (consistent with sexual assault), and that swabs from her rectum were positive for a protein called p30 that indicated the presence of semen.

However, the available expert testimony that counsel failed to investigate and present would have established that 1) other experts, including the Government's own pathologist, indicated that there was no trauma to the victim's vagina or anus; 2) if the substance on the swabs was in fact semen, sperm would

9

have been detected, and it was not; 3) the protein p30 has been detected in multiple male and female bodily fluids other than semen; 4) the Government's p30 tests actually reflected "borderline," "very weak," and "weak" p30 activity; and 5) according to the FBI's own protocols, a "borderline" p30 result must be confirmed through the identification of sperm (and all test/examinations for sperm were negative).

While counsel attempted to argue that there was "no evidence of semen" and no sexual assault, he failed to present the testimony and evidence cited above and Appellant was undeniably prejudiced. The evidence and arguments set forth herein and the district court's opinion make clear that, at minimum, reasonable jurists would debate the underlying Sixth Amendment claim here. Accordingly, a COA should issue.

Finally, this Court should issue a COA and consider counsel's failure to investigate and present compelling mitigating evidence. While counsel argued that Appellant was abused as a child, he presented only a few unadorned statements from witnesses about the physical abuse. Additionally, despite the availability of such evidence (and counsel's knowledge of it), counsel failed to present *any* testimony regarding Appellant's history of sexual abuse or his lifetime struggles with borderline intellectual functioning, brain damage and psychological

impairments.  The district court denied relief by suggesting strategic reasons for counsel's failure that were never offered by counsel, and, in the case where counsel *did* offer a strategy, by crediting such strategies despite the fact that they were clearly contradicted by counsel's actions at trial.  Additionally, contrary to Supreme Court precedent, the lower court failed to consider the mitigating value of any evidence that it believed may also have an aggravating edge.  Accordingly, Appellant is, at a minimum, entitled to a COA from this Court.

**ARGUMENT**

**CLAIM I.    THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY ON THE ISSUE OF WHETHER THE DISTRICT COURT ERRED IN DISMISSING, WITHOUT ALLOWING AN EVIDENTIARY HEARING, APPELLANT'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO REASONABLY CHALLENGE JURISDICTION.**

"It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor." United States v. Benson, 495 F.2d 475, 481 (5th Cir. 1974). See also 28 U.S.C. § 2255 (habeas relief must be granted "[i]f the court finds that the judgment was rendered without jurisdiction"). In this capital habeas proceeding, despite Appellant's strong proffer that trial counsel ineffectively failed to investigate, develop, and present evidence refuting federal jurisdiction, the district court erroneously dismissed this claim without allowing an evidentiary hearing. This Court should grant a certificate of appealability and review this issue.

**A.    The Trial Evidence for Jurisdiction**

At trial, the Government had the burden of proving, as an essential element of the crime, that the murder occurred "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). This issue turned on "the place where the injury was inflicted . . . without regard to the place where the death occur[ed]." 18 U.S.C. § 3236. Thus, the Government had to prove that

12

Appellant inflicted the fatal injuries at the Corpus Christi Naval Air Station

(CCNAS) during the 1½ to 2 hour period on July 27, 2002, when he was there

with the decedent.

Before trial, the Government knew jurisdiction in this case was in question.

In his notes from his interview with Dr. Kagan-Hallet, the Government's

neuropathologist, the prosecutor wrote the following: "*If incident occurred off

mil base - NO Jurisdiction!*"  ROA 4453.

Government expert witness Dr. Rouse, who performed the autopsy, testified

to her conclusion that the cause of death was closed head injury sustained

sometime *in the few days before death*.  Tr. 3/8/04, 121-22, 133-34.  The

Government did not ask Dr. Rouse – or any other witness – whether the fatal

injuries occurred at CCNAS.

At trial, lay witnesses testified that the decedent suffered head injuries over

a period of weeks.  *Op.* 160 (ROA 5894).  The only evidence offered that could be

considered to support the Government's case for jurisdiction was the testimony of

the decedent's seven-year-old sister, AB1994.  AB1994 testified that, on July 27,

Appellant struck the decedent's head against the truck windshield four times, and

sometime thereafter the decedent "fell asleep."  Tr. 3/4-5/04, 39.  The Government

did not ask AB1994 whether this incident occurred at CCNAS.[2]

In its closing, the Government argued that the decedent died as a result of a "systematic execution" that occurred over time, not specifically from blows at CCNAS. Tr. 3/16/02, 13 ("Ladies and gentlemen, ten injuries a day [for 30 days], a systematic execution of a baby."), 16. The Government's full argument for jurisdiction was the following:

> The last element that we have to prove is that it happened on a Special Territorial or Maritime Jurisdiction of the United States and that was because it was on the Navy base. That's why we had the FBI investigating and the Naval Criminal Investigative Service, and the Medical Examiner came from the Army.

Tr. 3/16/02, 10. Trial counsel failed to object to this argument or the lack of proof of jurisdiction, and the court failed to correct the Government's jurisdiction argument or to provide a proper jury instruction.

## B.      Proffer for the 2255 Proceeding

Appellant's 2255 Motion alleged that trial counsel were ineffective in failing to investigate, develop, and present evidence that would have rebutted the Government's theory that Appellant inflicted the fatal injuries at CCNAS. Appellant proffered that effective counsel would have investigated and presented

---

[2] Appellant had also stopped at a non-federal loading dock earlier that morning.

the following evidence:

* Even if the Government established that the blows AB1994 described were delivered on the CCNAS, it still failed to prove jurisdiction because it did not present any evidence that those blows were fatal, and available medical evidence indicates that the fatal blows predated the CCNAS.

* Neuropathologist Dr. Elizabeth Kagan-Hallet, whose findings Dr. Rouse incorporated into the autopsy report, concluded that the subdural hematoma was approximately *10 days old at the time of the decedent's death*. ROA 5198-5199.

* Dr. Kagan-Hallet concluded that other significant head injuries, including contusion infarcts, were *over 7 days old at the time of the decedent's death*. Id.

* Independent defense neuropathology evidence supports Dr. Kagan-Hallet's finding that the fatal head injuries, including the subdural hematoma, were one to two weeks old. ROA 5079-5081.

* Government and defense experts agreed in post-conviction proffers that they could not time the fatal injuries to the period at CCNAS, ROA 5094-5097 (Dr. Leestma); ROA 5256 (Dr. Rouse: "I cannot say whether it was on the naval base or just off the base."), and at best they could confine the most recent injuries within a three-day window before death, *Op.* 127 (ROA 5861).

* Lay witness testimony about the decedent's impaired behavior and injured appearance in the days before she arrived at CCNAS supports the medical conclusion that the fatal injuries predate the CCNAS.[3]

---

[3] Tr. 3/5/04, 168-69 (Jason Dumas: the decedent sat motionless and unresponsive amid a crowd of people on June 26, the day before she entered CCNAS); Tr. 3/2-3/04, 36-42 (Robin Bourgeois: the decedent's head was "swollen like a football" after blows from a plastic bat days before her death); Tr. 3/9/04, 245-46 (Wiley Taylor: Appellant said the decedent's head got as big as a

Appellant proffered that counsel had no reasonable strategic or tactical reason for these failures. Trial counsel, Mr. Tinker, informed 2255 counsel that he never investigated or challenged jurisdiction because he misunderstood federal law regarding jurisdiction; he thought federal jurisdiction was founded if the decedent was found unconscious on federal land. ROA 5715. This evidence shows that Appellant could have proved his ineffective assistance of counsel claim at a hearing. At a hearing, Appellant would have would have shown that his Sixth Amendment right to effective counsel was violated because counsel did not reasonably investigate the jurisdiction issue, and there is a reasonable probability that jurisdiction would not have been found if trial counsel had developed and presented the evidence.[4]

---

watermelon after a fall days before her death).

[4] Due process requires the Government to prove every element of an offense beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466 (2000); In re Winship, 397 U.S. 358, 364 (1970). In the pre-Apprendi case of United States v. Bell, 993 F.2d 427, 429 (5th Cir. 1993), this Court held that the jurisdiction element of the federal homicide statute need only be proven by a preponderance. After Apprendi, however, this Court questioned Bell, stating, "We . . . doubt that a mere preponderance of the evidence on this could suffice to support a guilty verdict." United States v. Perrien, 274 F.3d 936, 939, n.1 (5th Cir. 2001). See also United States v. Reff, 479 F.3d 396, 400 (5th Cir. 2007). Here, Appellant contends that the Government cannot prove the jurisdiction element under either standard.

**C. The District Court Erred**

The district court erred when it denied a hearing. At the very least, it is "debatable" that the district court erred, which is all Appellant needs to show to obtain a COA.

A district court is required to grant a hearing "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). See also United States v. Briggs, 939 F.2d 222, 228 (5th Cir. 1991) ("Where . . . the allegations in the § 2255 motion are not negated by the record, the district court must hold an evidentiary hearing").

Taken in the light most favorable to the Government, at trial the Government presented evidence that the fatal injuries *might have* occurred at CCNAS. In 2255 proceedings, Appellant proffered evidence that the fatal injuries *did not* occur at CCNAS. Based on these competing proffers, the district court was required to grant a hearing. Instead, the court denied a hearing, limited discovery,[5] and ruled on the merits of the claim based on competing proffers from Appellant and the Government. This violated Section 2255 and Briggs.

---

[5] When Appellant attempted to secure discovery of the photographs seized from Appellant, which could shed light on whether the victim was showing signs of decompensation prior to entering federal lands, the Court denied that Motion. ROA 5447; *Op.* at 225 (ROA 5959) (denying outstanding motions).

In its premature merits ruling, the court relied extensively on the Government's "rebuttal proffer" from Dr. Rouse.[6] The Government presented Dr. Rouse in rebuttal via telephone on January 13, 2011, the same day as closing arguments on the 2255 claims for which a hearing had been granted. The court permitted the Government to present Dr. Rouse without having disclosed a statement of what opinions she would render. ROA 5044; ROA 5040. See also Fed. R. Civ. P. 26(a)(2)(B)(1). Consequently, Appellant was unable to prepare for or respond to Dr. Rouse's proffer.

The district court nonetheless credited Dr. Rouse's rebuttal proffer that the decedent's neurological status changed abruptly at the CCNAS. *Op.* 159-61 (ROA 5893-5895); ROA 5257. At a hearing, Appellant would have presented evidence, in addition to the evidence presented at trial, that the decedent manifested physical, neuropsychological, and behavioral indications of significant brain injury in the days before she entered CCNAS, and expert testimony interpreting that evidence.

The court also improperly discredited Appellant's proffered experts, without having heard them as required by Section 2255. See, e.g., *Op.* 152-59

---

[6] See *Op.* 154-55, 157-60, 161 n.129, 163-64 (ROA 5888-5889, 5891-5892, 5893 n.129, 5895-96).

(ROA 5886-5893).

Finally, the district court improperly speculated as to the reasons underlying trial counsel's failure to investigate, develop, and present the available evidence relevant to jurisdiction. The court's speculations contradicted Appellant's proffered evidence that trial counsel misunderstood the law of federal jurisdiction. The court had no evidentiary basis upon which to rest its finding that, if "trial counsel tried to argue insufficiency of the evidence showing jurisdiction, he might have lessened his credibility with jurors." *Op*. 165 (ROA 5899). The court's speculation about this essential fact runs contrary to Section 2255 and Supreme Court precedent. A court is not at liberty to create strategic reasons where counsel have offered their own. See Wiggins, 539 U.S. at 526-27; Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (under Strickland, courts cannot use hindsight to supply a strategy for counsel). If granted a hearing, Appellant would have proven that counsel's failures derived from an inexcusable misunderstanding of the law and an unreasonable failure to investigate the facts. Specifically, Appellant would have proven that trial counsel had no strategic or tactical reason for failing to present Dr. Kagan-Hallet and to cross-examine Dr. Rouse regarding evidence that the fatal injuries predated the CCNAS.

The district court discounted, without a hearing, Appellant's proffered

scientific evidence that the timing and location of the decedent's injuries placed her outside federal jurisdiction. It then speculated about counsel's strategy in contradiction of the proffered evidence. Because the facts required a hearing, a COA should issue and a hearing should be granted.

**Claim II.** **TRIAL COUNSEL WERE INEFFECTIVE AT BOTH PHASES OF TRIAL FOR FAILING TO PRESENT AVAILABLE EXPERT TESTIMONY TO REBUT THE GOVERNMENT'S ASSERTION THAT JG1999 WAS SEXUALLY ASSAULTED.**

The Government presented expert testimony and prosecutorial argument that Appellant's semen was detected during the post-mortem rectal examination of JG1999 and that she was sexually assaulted. Despite the extremely inflammatory and prejudicial nature of this evidence, and its unquestionable impact on the jury's deliberations at both the guilt/innocence and penalty phases of trial, defense counsel failed to present readily available expert testimony that would have eviscerated the Government's evidence that semen was present and JG1999 was sexually assaulted. Counsel's failures resulted in a violation of Appellant's Sixth and Eighth Amendment rights.

### A. The Testimony and Arguments Presented at Trial

The Government alleged that Appellant sexually assaulted his young daughter before he killed her, telling jurors that Appellant "put his filthy semen in

her little body." Tr. 3/24/04, 70. The Government alleged this highly prejudicial and aggravating fact in both phases of the trial.

In its opening statement, the Government told the jury that expert testimony would establish that semen was detected on post mortem rectal swabs of JG1999. Tr. 3/2/04, 42. In support of that allegation, the Government presented the testimony of Dr. Scott Benton, a pediatrician, FBI forensic serologist Caroline Zervos, and FBI forensic DNA examiner Anthony Onorato.

Dr. Benton testified that sexual assault in children can be difficult to detect. Tr. 3/5/04, 18-19. However, even in the absence of signs of trauma or a report of assault, evidence of male sexual assault can be proven through forensic testing. Id. at 22. The primary tests used are: the acid phosphatase test, the p30 assay, microscopic sperm searches, and DNA analysis. Dr. Benton described the p30 assay as a "confirmatory" test for semen because it detects the presence of the p30 protein, a protein that, according to him, is found only in the male prostate gland and in breast milk. Id. at 22-23, 53.

Dr. Benton also testified that it was not unusual to identify semen where no sperm are detected, id. at 23, in part because of the supposed low survivability and rapid degradation of sperm, id. at 51-52. According to Dr. Benton, because sperm rapidly lose their tails and die in a vaginal and rectal environment, "they're very

21

difficult to find, on a rape kit or trace forensic evidence" and "you could still detect semen, but not find sperm." Id.

Lastly, Dr. Benton testified that, based on his review of the autopsy photographs, JG1999 suffered trauma to her vagina, indicative of sexual assault. Id. at 44-46.

FBI forensic serologist Caroline Zervos testified that as part of the FBI's protocol, two tests, presumptive (acid phosphatase –AP) and confirmatory, are usually performed to determine the presence of semen or other serological substances. Tr. 3/5/04, 63-64. However, in this case, only a "confirmatory" p30 test for the presence of semen was conducted on the post-mortem rectal swabs taken from JG1999 (labeled Q5-Q7). Id. at 86-87. The test was, according to Ms. Zervos, positive for the presence of semen. Id.

On cross examination, Ms. Zervos testified that, in addition to the prostate gland, the p30 protein could be found in male blood and male urine. Id. at 103-04. According to Ms. Zervos, no female fluids contain the p30 protein. Id. at 105.

FBI forensic DNA examiner Anthony Onorato testified that the only DNA present on the rectal swabs, Q5-Q7, was female and belonged to JG1999. Mr. Bourgeois' DNA was not detected. Tr. 3/5/04, 118. Over the inexplicable objection of defense counsel, Mr. Onorato also testified that he suggested an

additional, more sensitive test for the presence of male DNA, Y chromosome DNA testing. This test was subsequently performed by Orchid-Cellmark Laboratories on behalf of the FBI, with a negative result for any male DNA. Id. at 119, 130-135. He also testified that it was not uncommon to find semen even where male DNA is not detected. Id. at 118.

On cross examination, Mr. Onorato testified that Ms. Zervos' report revealed that no sperm were found in a microscopic examination conducted by the FBI laboratory. Id. at 130. In addition, trial counsel again attempted to elicit testimony about other possible sources of the p30 protein but Mr. Onorato testified that the only place, outside of semen, where the p30 protein can be found is the blood of a male with prostate cancer. Id. at 128.

During closing arguments of the guilt/innocence phase of trial, the Government seized upon the testimony of Dr. Benton, Ms. Zervos and Mr. Onorato, arguing that "there was semen in that baby's bottom." Tr. 3/16/04, 20. The Government also emphasized the strength of the p30 results, and downplayed the negative results of the microscopic sperm search, stating, "the DNA specialist testified that the sperm is very delicate, that it degrades quickly. But when you get a confirmatory test for semen, you've got semen." Id.

After initially neglecting to discuss this evidence in his closing argument,[7] trial counsel attempted to counteract the highly prejudicial evidence of sexual assault by arguing that no evidence of semen or sexual assault existed. Tr. 3/16/04, 24, 41-42, 43. However, because trial counsel had not presented any evidence to support his argument that there was no semen found, the trial court sustained an objection to counsel's argument. Tr. 3/16/04, 43-45 ("Ms. Booth: Your Honor, I have to object. That is a mischaracterization of the evidence. The Court: That is sustained ... The test was positive for semen. They sent it off for an extra DNA test. That came back no DNA from your client.").

Subsequently, during its penalty phase closing argument, the Government used the alleged semen evidence as a basis for urging the jury to sentence Mr. Bourgeois to death.

> Was he laughing when he beat JG1999 to death? Was he laughing when he bit her, or he burns her, **or he put his filthy semen in her little body?**
>
> [ . . . ]
>
> Let's talk about lack of remorse. The Defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. **His**

---

[7]Tr. 3/16/04, 41 ("Your Honor, this is unusual, may I – something, I forgot to talk about. May I do that?").

**signature with his teeth marks and his semen is all in that baby**.

Tr. 3/24/04, 70, 75-76.

> **B.** **Trial Counsel Could Have Presented Compelling Evidence to Rebut the Allegation That Semen Was Detected and That JG1999 Was Sexually Assaulted**

> **1.** **Trial Counsel's Deficient Performance.**

In assessing whether counsel's performance was deficient under the Sixth Amendment, "the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." Strickland, 466 U.S. at 690. When a case involves significant forensic evidence, reasonable counsel seek out and utilize experts who will support their defense. See Soffar v. Dretke, 368 F.3d 441 (5th Cir. 2004) (counsel's performance deficient for failing to develop and present expert ballistics testimony that would have provided the jury with conflicting evidence bearing on the defendant's role in the crime, and had the potential to support an alternative version of the facts).

Here, as in Soffar, counsel "would not have had to look far," id. at 476-77, to find an expert. On the contrary, counsel was aware of expert testimony that would have completely undermined the Government's allegations of sexual abuse. Substantial scientific evidence was available to rebut the allegation that semen was

detected on the rectal swabs and that JG1999 was sexually abused.  In light of this

evidence, reasonable counsel would have:

- presented expert testimony to rebut the allegation that a positive p30 test, alone, was definitive for the presence of semen;

- presented evidence that the p30 testing results on the Q5-Q7 swabs were not "positive" but rather "very weak positive," "very weak positive," and "weak positive";

- questioned FBI experts about FBI protocol that required the observation of sperm (none were observed in this case) to confirm the presence of semen when a p30 test is, as it was in this case, borderline – i.e. "weak" to "very weak" positive;

- presented the protocols from other law enforcement crime labs and the manufacturer of the p30 test used by the FBI that preclude a conclusion that semen was detected on the basis of a positive p30 test alone – and certainly not from a "very weak" or "weak result";

- presented expert testimony stating that the "very weak" and "weak" p30 results could have been the result of rectal bacterial contamination on the swabs or even JG1999's own biology, not semen;

- presented expert testimony to rebut Dr. Benton's testimony that p30 is only found in semen and breast milk;

- presented expert testimony to rebut the testimony of FBI serologist Caroline Zervos that outside of semen p30 is only found in peripheral male blood and male urine;

- presented expert testimony to rebut the testimony of FBI

forensic DNA examiner Anthony Onorato that the only place, outside of semen that p30 could be found, is in the blood of males with prostate cancer;

- presented expert testimony that none of the swabs contained an enzyme, Acid Phosphatase (AP), prevalent in semen;

- presented expert testimony stating that even after three more specific and sensitive sperm searches were conducted, no sperm were detected on any of the swabs which allegedly contained semen;

- presented expert testimony stating that if the substance on the swabs was semen, sperm should have been detected;

- presented expert testimony to rebut Dr. Benton's testimony that no sperm may have been detected in this case because sperm cells easily die and degrade;

- challenged Dr. Benton's alleged observations of vaginal trauma in the autopsy photos;

- elicited from Dr. Rouse, who performed the autopsy and took the photos relied on by Dr. Benton, that she found <u>no</u> evidence of vaginal or anal trauma.

- presented the Sexual Abuse Nurse Examiner (SANE) reports that support Dr. Rouse's conclusion that there was no evidence of vaginal or anal trauma.

All of this could have been done if counsel had fulfilled his constitutional obligation. His failure to challenge this highly prejudicial aspect of the Government's case at both guilt and penalty phases of trial was ineffective.

27

### a. Trial Counsel Failed to Present Expert Testimony to Rebut the Allegation That Semen Was Detected on the Rectal Swabs

On October 20, 2003, the district court granted trial counsel's motion for the appointment of Dr. Elizabeth Johnson as a defense DNA expert. ROA 794-805. On January 16, 2004, counsel informed the Court that, contrary to the Government's assertion that all samples had been consumed during prior testing, Dr. Johnson had identified an additional biological sample that was available for serological and DNA testing. Tr. 1/16/04, 32-34. This remaining sample was then sent to Dr. Johnson. Id. at 34-36.

On February 25, 2004, after counsel repeatedly failed to provide the Government with a report from Dr. Johnson and several other defense experts, the district court ordered that all expert reports, including Dr. Johnson's, be turned over by the following day, or else counsel would be precluded from presenting the expert testimony. ROA 807-808. See also ROA 28 (DE187, Government's *Third Motion for Reciprocal Discovery*); Tr. 2/25/04, 130-48. Although counsel did receive a report of Dr. Johnson's laboratory findings on February 26, they never proffered it and she was not called as witness.

On March 2, 2004, the first day of trial testimony, and after several

unsuccessful attempts to reach counsel,[8] Dr. Johnson faxed trial counsel a two

page summary of her findings and conclusions which stated:

- The FBI did not test the rectal swab with AP [acid phosphatase] reagent or do a sperm search. They only did a p30 test with the ABA card and a DNA test. The ABA card was positive but there is no indication of male DNA found.

- Dr. Johnson did an AP test, obtaining a negative result, a p30 test, obtaining a weak positive result; and a microscopic sperm search, again obtaining a negative result.[9]

- The p30 weak positive result could be a false positive due to bacterial proteins found in the rectal swab. If the p30 positive result is due to the presence of semen, sperm should also be detectable.

- The tested sample would be expected to contain 500 sperm, enough to observe microscopically, even if a small portion is used to make a slide, and enough to produce a male DNA result on DNA testing.

P-Ex. 92; ROA 2414-2419. Dr. Johnson also provided counsel with

documentation establishing that p30 has been detected in bodily fluids other than

semen, including: amniotic fluid, breast milk, saliva, female urine and female

---

[8]See P-Ex. 168 (12/31/03 fax from Dr. Johnson to Mr. Tinker indicating she tried unsuccessfully to reach Mr. Tinker after completing her review of Mr. Bourgeois' case); ROA 2413-2414 (same). See also ROA 2445-2447 (Johnson)

[9]The FBI examined the smear slide made from the rectal swab for sperm and determined that none were present. Tr. 3/5/04, 130 (Onorato); ROA 2416 (Johnson). However, they did not do the more sophisticated microscopic analysis conducted by Dr. Johnson's laboratory, which also produced a negative result. ROA 2403-2404, 2416 (Johnson).

serum.  ROA 2419.

At the 2255 hearing, Dr. Johnson testified that had she been called as a trial witness, she would have testified consistently with her March 1, 2004, summary report.  ROA 2416-2420.

Most importantly, Dr. Johnson stated that had she been called at trial, she would have testified that despite the weak positive p30 result, "taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs."  ROA 2413, 2514-2515.

Similarly, post-conviction evidence from forensic criminologist Alan Keel was that 1) "there is no proof of semen being detected [ ] in the evidence that was presented at trial," ROA 2521; 2) if the positive p30 was caused from semen, sperm should have been detected, ROA 2527; 3) sperm cells die but can still be detected, ROA 2526; 4) the fact that there was no semen in JG1999's underpants is another "red flag" against a conclusion that semen was present, ROA 2563;[10] and

------

[10]If semen had been present in JG1999's rectum, semen and its components, including p30, would have presumably leaked onto her underpants.   However, the underpants worn by JG1999 when she arrived at the hospital were tested for the presence of p30 and none was detected.  See P-Ex. 88, 7-8.

5) that "there's no semen on these swabs." id at 169. See also P-Ex. 88 (9/24/07

Report of Forensic Science Associates).[11]  Because defense counsel failed to call

Dr. Johnson or any forensic expert as a witness at trial, none of the evidence

challenging the conclusion that semen was detected was presented to the jury.

> **b.      Trial Counsel Failed to Utilize the FBI's Own Serology Protocols to Rebut the Allegation That a Positive p30 Alone Confirmed the Presence of Semen**.

Dr. Johnson's and Mr. Keel's opinion that there was insufficient scientific

evidence to conclude that semen was present on the swabs is supported by the

FBI's own serological protocols for the identification of semen, which were in

effect and available at the time of trial.

Evidence presented at the 2255 hearing established that the p30 testing

results on the three rectal swabs (Q5-Q7) tested by the FBI were "very weak, very

weak and weak," respectively.  See P-Ex. 179; ROA 2635-2636.  These important

results were not presented at trial.

FBI Procedures for the Serological Identification of Biological Substances

on Evidentiary Materials (2002), indicate that

[a]ttempts to identify human semen in some categories of evidence

---

[11]In addition to Mr. Keel, Forensic Science Associates is comprised of Dr. Edward Blake and Mr. Peter Barnett.  ROA 2518.  Dr. Blake, who consulted with Mr. Keel on this case, was instrumental in first identifying the p30 protein.  Id.

> **MUST be approached through the identification of spermatozoa** rather than by the detection of human specific proteins, such as p30. These categories would include ... stain extracts that possess **borderline levels of p30**.

See P-Ex. 180. Thus, because the Government's actual p30 test results as set forth in Appellant's Hearing Exhibit 179 reveals "borderline levels of p30," (weak to very weak), the FBI was required, by their very own protocols, to confirm the presence of any alleged semen through the identification of spermatozoa. However, as set forth above, no sperm were ever detected in this case. Tr. 3/5/04, 130 (Onorato); ROA 2403-2404 (Johnson); G-Ex. 206.

Other law enforcement agencies and the manufacturer of the p30 test used by the FBI also caution against and even prohibit a conclusion that semen has been detected solely on the basis of a positive p30 test, let alone a "very weak" or "weak" positive result. See ROA 4461 (Texas Department of Public Safety, DNA-04-09) ("P30 Identification ... p30 is considered to be a presumptive test for semen. The presence of p30 indicates, but does not confirm the presence of semen. Semen can only be confirmed by the presence of spermatozoa")[12]; ROA

_____

[12]Texas DPS policy conforms with the evidentiary hearing testimony of Alan Keel, who stated that although a p30 test can be used in conjunction with other evidence to indicate the presence of semen, the only stand alone confirmatory test for semen was the identification of spermatozoa. See, e.g., P-Ex. 88, 20 (2007 Report of Forensic Science Associates) ("In the criminal justice context, the observation of sperm is the only definitive proof of the presence of semen from a

4477 (California Department of Justice Bureau of Forensic Services, Biology

Technical Procedures) ("Section 4 – Semen ... for p30 immunoassay cards, a

positive result alone (without sperm or AP results)[13] will allow you to make the

statement of 'p30 detected.'  However, your report should include a statement that

explains that the other body fluids may react with these test cards.  The

immunoassay cards are very sensitive and can detect p30 at very low levels that

may be present in body fluids other than seminal fluid"); ROA 4466 (2005 Seratec

Card Protocol) ("If the only positive test result obtained from the stain extract is

the Seratec PSA card, the conclusion for this situation would be 'seminal fluid

could not be confirmed.").[14]

---

forensic specimen").  In this case, all searches for the presence of spermatozoa
were <u>negative</u>.

[13]Acid phophatase (AP) and the sperm searches in this case were negative.

[14]The Seratec Card is now used by the FBI to test for p30 and was
substituted for the ABA card after accuracy problems, including "ghost bands"
were detected with the ABA card – the card used in this case.  ROA 2644-2646
(Conway).  Thus, even the protocols by the manufacturer of the presumably more
accurate Seratec test card now used by the FBI, caution that a positive test card
alone, does not confirm the presence of semen.  The other tests that Seratec
advises a forensic analyst should consider in conjunction with their test card (AP
test, microscopic sperm search, or male DNA), were <u>ALL NEGATIVE</u> in Mr.
Bourgeois case.  Moreover, the FBI's replacement of the ABA p30 test card (the
card used in this case by the FBI) because of accuracy problems also calls into
question Dr. Benton's testimony about the supposed reliability of the p30 testing
in this case.  <u>See</u> Tr. 3/5/04, 54-55 ("very low levels of false positives are ever

33

The FBI's <u>sole</u> reliance on the "very weak, very weak and weak" p30 results reflected in Appellant's Hearing Exhibit 179 would have supported an argument by trial counsel that, in the absence of detectable acid phosphatase, sperm or male DNA, the Government's allegation that semen was detected was scientifically unsupportable. Counsel, however, failed to cross examine Ms. Zervos or Mr. Onorato about the actual test results or to use the FBI's serological protocols to support his argument that "there was no semen."

        **c.     Trial Counsel Failed to Present Readily Available Evidence to Rebut the Erroneous Testimony from Government Experts Concerning the Presence of p30 Protein in Substances Other than Semen and Concerning the Persistence and Survivability of Sperm**

Had trial counsel presented testimony from Dr. Johnson, he could have presented evidence that, contrary to Dr. Benton's, Ms. Zervos' and Mr. Onorato's trial testimony, p30 had been detected in multiple male *and* female bodily fluids. <u>See</u> Section B.1.a, <u>supra</u>; ROA 2419, 2423-2427. This evidence would have permitted counsel to argue that the detected p30 may have been the function of something other than semen and his argument that "there was no evidence of

reported.").

semen" would not have been precluded by the court.[15]

Notably, the Government's expert at the 2255 hearing, FBI forensic examiner Jerrilyn Conway, conceded that at the time of Appellant's trial in 2004, studies had been published identifying the presence of p30, albeit at lower levels, in female fluids, and that the testimony presented at trial from Dr. Benton, Ms. Zervos and Mr. Onorato about the prevalence of p30 was incorrect. ROA 2607-2613.

Expert testimony could also have rebutted Dr. Benton's erroneous contention that the reason sperm were not found may have been because they die and degrade rapidly. Tr. 3/5/04, 50-51. During the 2255 hearing, Dr. Johnson testified that contrary to this contention, "sperm are incredibly tough and durable" and that sperm and male DNA can be detected "decades" after an offense. ROA 2408-2410.[16] Similarly, Mr. Keel opined that:

---

[15]Dr. Johnson also would have testified that the "weak positive" p30 test might have been the result of bacterial contamination on the rectal swab. ROA 2417. Mr. Keel opined that the p30 may be present in a toddler as a function of their own biology because "every cell in every person's body possesses two copies of the gene that produces p30," ROA 2523, and that the p30 assay may react to a protein which is not p30, ROA 2523-2524.

[16]In response to questioning by the district court Dr. Johnson stated:

Court:     And so someone testified at trial that sperm would have suffered degradation over that time period.

Dr. Benton testified that sperm degrade much more quickly than the fluid component of semen, especially in the rectal environment. This is diametrically untrue. As testified to by Benton, it is true that sperm will lose their motility and cease to respire as living cells within hours of ejaculation. They also easily "loose their little tails." But contrary to Benton's testimony, the persistence, as opposed to viability, of sperm cells is dramatically longer than that of the soluble constituents of semen, including acid phosphatase and p30.

---

| | |
|---|---|
| Witness: | I think that was Dr. Benton's testimony. |
| Court: | Yes. |
| Witness: | That was totally erroneous. |
| Court: | Okay. |
| Witness: | Sperm are very durable. They can be found in decomposing bodies 30 days after, you know – |
| Court: | Well, I read about how they, you know, the Innocence Project and what have you, and they come up with the old DNA from – but I guess I assume that that was stored like in a rape kit that was done pretty quickly or – |
| Witness: | there is evidence being analyzed in cold cases that are decades old. And again, decomposing bodies that have been burned, sperm have been detected in the vaginal canals of these bodies. |
| Court: | Okay. So days isn't old? |
| Witness: | Weeks, months – |
| Court: | Okay. |
| Witness: | – years. |
| Q: | ...Was [Dr. Benton's] testimony regarding the persistence of sperm accurate, in your estimation? |
| A: | No, it was not. |
| Q: | The survivability of sperm? |
| A: | No, it was not. |

ROA 2408-2410.

P-Ex. 92, 25 (9/24/07 Forensic Science Associates Report).[17]

Had counsel presented expert testimony to rebut Dr. Benton's erroneous testimony about the persistence of sperm, he could have argued, as Dr. Johnson and Mr. Keel opined, that if in fact the substance on Q5-Q7 was semen, sperm would have been observed.

### d. Trial Counsel Failed to Present Expert Testimony to Rebut Dr. Benton's Alleged Observations of Sexual Trauma in the Autopsy Photos.

Trial counsel also ineffectively failed to present available expert testimony, through the Government's own pathologist, to challenge Dr. Benton's testimony that the autopsy of JG1999 revealed vaginal trauma. See Tr. 3/5/04, 44-46. As part of the autopsy, Dr. Rouse performed a sexual assault examination on JG1999. Tr. 3/8/04, 59-60. In her report, Dr. Rouse specifically found that

---

[17]The parties agreed to expedite the proceedings by admitting Mr. Keel's report, subject to cross-examination, as the substantive evidence he would provide at the post-conviction hearing. ROA 2520. Mr. Keel also testified that Dr. Benton provided "either false or completely ignorant" testimony. ROA 2530. See also ROA 2543 (rebutting Dr. Benton's definition of "semen"); ROA 2544 ("Dr. Benton simply said that semen is the product of the prostate gland. And that's nowhere near the truth"); ROA 2549 ("the suggestion [from Benton] that you might be detecting only pre-ejaculate fluid in the environment from the rectum is just patently absurd"); ROA 2550 ("Dr. Benton is suggesting that something that comprises less than 1 percent of the total volume of semen is what was actually – might have been picked up on the rectal swab, and that's what the p30 result came from. And that's ridiculous. That's like taking a drink of coffee and not getting any caffeine").

> [t]he external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus.  The Hymen is present and appears atraumatic.  The back is straight and the anus is unremarkable and atraumatic.

P-Ex. 153; ROA 2427-2428.  Although Dr. Rouse's finding would have directly rebutted Dr. Benton's alleged observations, counsel failed to elicit this information from Dr. Rouse on cross-examination.  Tr. 3/8/04, 65-67.

Had counsel elicited this information from Dr. Rouse, he could have argued to the jury that her live, contemporaneous observations, as the person who actually performed the autopsy and took the autopsy photos, are more accurate and credible than Dr. Benton's conclusions made after examining those photos.  Had counsel questioned Dr. Rouse about the findings contained in her autopsy report, counsel could have argued that had Appellant, an adult male, actually raped JG1999, a two-year-old child, recently enough to supposedly find semen, evidence of trauma to her vagina or anus would certainly have been observed at autopsy.  Had counsel cross examined Dr. Benton with Dr. Rouse's conclusions, he could have argued that Dr. Benton's reliance of the autopsy photos as a basis for his testimony was at best mistaken, and at worse purposefully deceptive.  Moreover, counsel could have argued that Dr. Rouse's conclusion of no anal trauma was further proof that no semen was recovered from JG1999's rectum.  Thus, an effective cross-

38

examination of Dr. Rouse would have undermined all of the Government's evidence of alleged sexual assault. However, because trial counsel failed to elicit this evidence from Dr. Rouse, the jury never heard about Dr. Rouse's autopsy finding of <u>no</u> vaginal or anal trauma and never heard any of these arguments.

Further, the Driscoll Children's Hospital, Sexual Abuse Nurse Examiner's (SANE) reports also indicate that there was no evidence of sexual abuse. <u>See</u> P-Ex. 152, 4 ("Vulva Labia Majora – No trauma noted, Vulva Labia Minora – No trauma noted, Hymen – No trauma noted ... Perineum – No trauma noted, Anus – No sphincter tone, No trauma noted"); <u>id.</u> at 9 (sexual abuse examination was normal and showed no evidence of any sexual abuse). Although trial counsel briefly questioned SANE nurse McLaughlin about her findings, had counsel also elicited Dr. Rouse's findings, he could have argued that <u>two</u> experts, a forensic pathologist and a SANE nurse specifically trained to look for evidence of sexual abuse, who unlike Dr. Benton, actually examined JG1999 at the time of death, <u>both</u> had determined that there was no evidence of sexual trauma. This too would have undermined Dr. Benton's testimony and the allegations of sexual assault.

With regard to all the failures set forth above, counsel could have had no reasonable tactical or strategic explanation for failing to challenge the Government's evidence of sexual assault. Indeed, counsel's argument and

attempted cross examination show that this evidence was of concern to counsel. Due to their deficient performance, counsel were without the ammunition to effectively respond to the Government's allegations.

### 2. Mr. Bourgeois Was Prejudiced by Trial Counsel's Deficient Performance

To establish prejudice Appellant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694. Prejudice is <u>not</u> an outcome-determinative test. <u>Id.</u> at 693-94. The question is <u>not</u> whether representation by effective counsel would have actually changed the jury's ultimate verdict, nor even whether representation by effective counsel would "more likely than not" have changed the verdict. <u>Id</u>. Instead, prejudice is established when confidence in the outcome is undermined because of counsel's deficiencies. <u>Id</u>. at 694; <u>Williams v. Cain</u>, 125 F.3d 269 (5th Cir. 1997) (citing <u>Strickland</u>). Moreover, with respect to the penalty phase, prejudice is determined by the impact of counsel's deficient performance on at least one juror. <u>See</u> <u>Wiggins</u>, 539 U.S. at 535; <u>Soffar</u>, 368 F.3d at 479 ("Because of the ineffectiveness of Soffar's defense counsel, the jury never heard the contrary opinions of an available qualified [ ] expert. ... Had the jury been confronted with this considerable evidence favorable to Soffar, there is a

reasonable probability it would have reached a different result.").

Here, as in <u>Soffar</u>, because of counsels' ineffectiveness, the jury never heard the "contrary opinions of the available qualified expert[s]" that there was no semen present in the rectum of JG1999 and no physical evidence of sexual assault. The Government's extremely prejudicial and highly inflammatory evidence simply went unrebutted. It is difficult to imagine evidence more damaging than the allegations that Appellant anally raped his two year old daughter and that her vagina was traumatized. This evidence would have unquestionably turned the jury against Mr. Bourgeois. Indeed, this Court prominently cited the allegations of sexual abuse in its direct appeal Opinion. <u>Bourgeois</u>, 423 F.3d at 504.

In addition to the obvious inflammatory nature of such evidence, it prejudiced Appellant's guilt phase defense. Appellant's trial theory attempted to show that his wife Robin was the perpetrator. <u>See</u>, <u>e.g.</u>, Tr. 3/16/04, 34-35, 38, 40 (defense closing argument). This theory was effectively negated by the allegations of sexual assault and presence of semen, which could not have been attributable to Robin. Thus, the semen/sexual assault evidence all but doomed Appellant's defense.

There can be no question regarding the prejudicial effect of the sexual assault evidence on Appellant's sentencing. Again, in addition to the generally

inflammatory and highly prejudicial nature of such evidence, it also supported the

statutory aggravating circumstance that the killing was committed in a heinous,

atrocious or depraved manner. 18 U.S.C. § 3592(c)(6). This evidence was used

by the Government as a basis for arguing in favor of the death penalty. Tr.

3/24/04, 70, 75-76.

Moreover, in addition to its support for a specific aggravating

circumstances, any reasonable jury would have weighed this evidence in its

deliberative process. See 18 U.S.C. § 3593(e) (jury "shall consider whether all the

aggravating factor or factors found to exist sufficiently outweigh all the mitigating

factor or factors found to exist to justify a sentence of death"). Such evidence

likely made it impossible for jurors exercise mercy in the case. Accordingly,

Appellant was prejudiced because "had the jury been so confronted [with the

evidence that Appellant did not sexually assaulted his daughter], there is a

reasonable probability that at least one juror would have refused to return a verdict

of guilty," Soffar, at 479, or would not have sentenced Appellant to death.

### C. The District Court Erred in Denying Relief on this Claim and Denying COA

### 1. COA Is Appropriate

The COA inquiry is "whether a 'substantial showing of the denial of a

constitutional right' had been proved. ... The question is the debatability of the *underlying constitutional claim*, not the *resolution* of that debate." <u>Miller-El</u>, 537 U.S. at 342 (quoting 28 U.S.C. § 2253(c)(2)).

In this case, the district court acknowledged that "[c]ross examination did not challenge Dr. Benton's observation of possible vaginal trauma," *Op.* 167 (ROA 5901), "expert testimony *certainly* could have provided some benefit to the defense" in challenging the p30 and alleged semen evidence, <u>id.</u> at 176 (ROA 5910), and, that "*certainly* similar information [semen and vaginal trauma] could unduly inflame a jury in other circumstances," *Op.* 181 (ROA 5915). The district court also found that "[t]he possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case," *Op.* 165 (ROA 5899), but, in an apparent contradiction, also acknowledged that "[t]he forensic evidence allowed the Government to prove that the murder was only the culminating event in a barrage of abuse that also contained a sexual component." <u>Id.</u>

At a minimum, the evidence presented above and the district court's own opinion establish that reasonable jurists could disagree about the merits of this claim, namely counsel's deficient performance and the prejudice to Appellant due to counsel's ineffective handling of the evidence of sexual assault at trial. This

Court should grant COA.

**2.  The District Court Erred in Denying Relief.**

The district court concluded that Appellant cannot succeed on this claim without showing that trial counsel could have presented expert testimony to "eviscerate the effect" of both Dr. Benton's conclusion upon review of the autopsy photos, and the positive p30 test results. *Op.* 170 (ROA 5904). The district court also concluded that Appellant was not prejudiced by counsel's ineffectiveness because "the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois sexually assaulted his daughter." *Op.* 181 (ROA 5915). The Court's reasoning is flawed in two ways.

First, the district court applied the wrong standard by imposing on Appellant a higher bar to prove prejudice than required by Strickland and its progeny. Far from having to show that counsel could have "eviscerate[d]" or "completely eliminate[d]" the Government's evidence of sexual assault, Appellant need only show that, absent trial counsel's ineffectiveness, there is a "a reasonably probability that... the result of the proceeding would have been different." Strickland at 694; Williams, 529 U.S. at 405-06 (requirement that the prisoner establish by a preponderance of the evidence that the result of his criminal proceeding would have been different... "would be 'diametrically different,'

44

'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in <u>Strickland</u> that the prisoner need only demonstrate a 'reasonable probability that ... the result of the proceeding would have been different.' ").

Second, as described above and herein, there was expert testimony available to trial counsel to "eviscerate the effect" of the p30 results and Dr. Benton's allegations of sexual trauma in the autopsy photos. <u>See</u> Section B.1.a-d, <u>supra</u>. Counsel simply failed to present that evidence.

### a. Dr. Benton's alleged observations of sexual trauma

The district court asserted that Appellant relied solely on the discredited opinion of Dr. Spitz, and presented no post-conviction evidence to rebut Dr. Benton's "specialized knowledge." *Op.* 170-71 (ROA 5904-).[18] The district court erred.

However, in light of the overwhelming evidence rebutting Dr. Benton's testimony, which Appellant presented from (1) Dr. Rouse's autopsy report, (2) Dr. Elizabeth Johnson and Technical Associates, (3) Alan Keel and Forensic Science Associates, (4) Driscoll Children's Hospital records, (5) the FBI's own protocols,

---

[18]Dr. Spitz's declaration was proffered as part of the evidence in support of Appellant's 2255 motion, but he was not presented or relied upon at Appellant's 2255 hearing.

(6) other law enforcement forensic manuals, (7) p30 test manufacturers, and even (8) Government FBI expert Jerrilyn Conway, the Court's finding that Appellant relied solely on Dr. Spitz and presented no other evidence is plainly wrong.[19]

Moreover, Dr. Benton's supposed "specialized knowledge" about sexual abuse in living children did not make him an expert in post-mortem identification of sexual trauma to the vagina or anus – particularly from photographs. That was, however, Dr. Rouse's area of expertise, and she made no observations during the autopsy of trauma to the vagina or anus.

### b.  Forensic Evidence of Semen

The court discounted the importance of of Dr. Johnson because, according the court, the only value of her testimony regarding the "weak positive" p30 test result she obtained "would have been in showing that the evidence should have compelled the Government to perform the more-confirmatory sperm search."  Op.

---

[19]Contrary to the district court's opinion, Appellant need not have presented Dr. Rouse's testimony at the post-conviction hearing to establish that evidence from her autopsy report was available to trial counsel and that Dr. Rouse, had she been questioned at trial, would have testified consistent with her own autopsy report.  Indeed, if she had not, Dr. Rouse, who the Government so heavily relied on, and continues to rely on, to establish cause of death; age, timing, extent, nature and location of injuries; intent; and the alleged "barrage of abuse," *Op.* 165 (ROA 5899), would have been impeached and her credibility undermined.  Accordingly, counsel could have had no tactical or strategic basis for failing to elicit the extremely helpful findings of no observable sexual trauma from Dr. Rouse's autopsy report to rebut Dr. Benton.

176-77 (ROA 5910-5911).  Additionally, because Dr. Johnson also obtained a positive p30 test result, albeit a 'weak positive", the district court found that "Dr. Johnson's testimony [ ] did not completely discount the possibility that Bourgeois sexually assaulted his daughter." Id. At 177 (ROA 5910).  The district court's failure to recognize the value of Dr. Johnson's proposed testimony was error.

First, the **primary** value of Dr. Johnson's testimony is not solely related to what additional testing it would have prompted the Government to undertake.  The primary value in Dr. Johnson's testimony is derived from the fact that Dr. Johnson conducted additional testing not undertaken by the Government, (acid phosphatase and microscopic sperm search), all of which was negative, and that in conjunction with the FBI's negative results on the smear slide sperm search, autosomal DNA and the extremely sensitive Y chromosomal DNA search, she would have testified that there was an insufficient basis to conclude that the "weak positive" p30 test result was the result of semen – thus, there was no semen.  ROA 2514-2515.  See also ROA 2521 (Mr. Keel) ("there is no proof of semen being detected [ ] in the evidence that was presented at trial").[20]

_____

[20]The district court credited trial counsel for arguing that there was "no evidence of semen." Op. 169 (ROA 5903) ("The defense's closing argument responded by pointing out weaknesses in the evidence of sexual assault: . . . There's no evidence of semen, I suggest to you, being found on this child."). However, the court failed to acknowledge that it sustained the Government's

47

Second, the significance of the more confirmatory sperm search the FBI would be compelled to undertake with a "weak positive" p30 test cannot be overstated. As set forth above, because the Government' testing revealed "borderline" p30 results – <u>very weak</u>, <u>very weak</u> and <u>weak</u> – the Government was <u>required</u> to confirm the presence of semen through the observation of sperm. <u>See</u> Section B.1.b, <u>supra</u>.[21] And, despite multiple tests by multiple sources in this case, <u>no</u> sperm were ever detected. Thus, because the additional testing Dr. Johnson's testimony would have compelled was negative, had counsel presented Dr. Johnson, he could have argued that the Government's very own protocols prove, as he unsuccessfully attempted to argue, that there was "no evidence of semen."[22]

---

objection and rebuked counsel for making this argument because counsel **failed to present evidence that there was no semen.** Tr. 3/16/04, 43-45. <u>See also</u> Section A, <u>supra</u>.

[21]For this reason the district court erroneously credited the Government's post-conviction expert, Jerrilyn Conway's testimony that "a week positive result means there is limited PSA [p30] present, which means there is a limited amount of semen present." <i>Op.</i> 177 (ROA 5911).

[22]The district court also found it "problematic" that unlike the Government's expert, Ms. Conway, Dr. Johnson did not, allegedly, discuss the levels at which p30 occurs in substances other than semen. <i>Op.</i> 178 (ROA 5912). Here, again, the court ignored the actual record. <u>See</u> ROA 2419-2420, 2512-2514.

### c. Cross-Examination of Government Experts Was Not an Adequate Substitute for the Presentation of Defense Experts

The district court cited trial counsel's cross-examination of Dr. Benton, Ms. Zervos and Mr. Onorato, regarding substances where p30 has been detected, and elicitation of DNA results as a basis to conclude that counsel was not ineffective for failing to present expert testimony. See *Op.* 175 (ROA 5909) ("Without calling an expert witness, trial counsel's cross-examination touched on the issues raised in Bourgeois' Motion to Vacate); id. at 169 (ROA 5903) ("Also, Mr. Tinker emphasized that the FBI testing was negative for sperm and for male DNA"). However, each of the Government witnesses' testimony regarding where p30 has been detected was demonstrably <u>wrong</u>, and counsel could have proven it through testimony from their own expert. See Section B.1.c, <u>supra</u>.[23]

Moreover, the record reflects that trial counsel <u>objected</u> when the

---

[23]Moreover, contrary to the district court's opinion, trial counsel's use of Dr. Johnson's report during cross-examination of Government witnesses actually supports Appellant's claim of deficient performance. Indeed, counsel's "use" of Johnson's report shows that counsel considered the information she provided him in her report, which she could have provided at trial, valuable to the defense. Thus, because his cross-examination of Government witnesses failed to elicit the helpful information contained in her report, Dr. Johnson should have been presented at trial. See *Op.* 175 (ROA 5909) ("respondents persuasively argue that, although trial counsel did not call Dr. Johnson as a witness, the flow of his questioning suggests that he used her report to prepare for cross-examination").

49

Government sought to elicit testimony from Mr. Onorato that additional, more sensitive Y chromosomal DNA testing had been performed by Orchid Cellmark on behalf of the Government and that those results were <u>negative</u> for male DNA. Tr. 3/5/04, 132-34. Indeed, after the court rightfully asked counsel, "[d]on't you want that evidence. What harm could it be for your client?" Mr. Tinker responded, "I didn't think about that." <u>Id.</u> at 133. Clearly, counsel had either never seen the Orchid Cellmark results, even though they were provided in pre-trial discovery, or had failed to understand their beneficial significance. In either scenario, counsel's objection to the Y chromosome DNA results highlights his poor performance – the jury learned that Y chromosome DNA testing was negative <u>in spite of</u>, not because of counsel's cross-examination or performance.[24]

### d. Counsel's "strategy"

The court's *post hoc* creation of a strategic basis for counsel's failure to present expert testimony does not comport with counsel's actual, stated basis for his inaction. In his interrogatories propounded by the Government, Mr. Tinker stated that he did not "utilize [Dr. Johnson's] services" because he had trouble "getting her to return phone calls," "she did not have her own lab," and she "did

---

[24]This too contradicts the district court's finding that counsel did not need to present expert testimony because his "questioning manifested a familiarity with the issues presented in Dr. Johnson's report..." *Op.* 176 (ROA 5910).

not do the testing I requested in a timely fashion." P-Ex. 82, 14.

However, just as the record does not support the district court's stated strategy for Mr. Tinker's failure to call Dr. Johnson or any expert at trial, Mr. Tinker's reasoning is also not supported by the record. Although Dr. Johnson's report was submitted to counsel after the court-imposed deadline for disclosing expert reports, this fact only highlights counsel's deficient performance. Indeed, it was counsel's responsibility to insure that all expert reports were submitted in a timely manner and Dr. Johnson was not the only expert for which counsel neglected to obtain a timely report. See Tr. 2/25/04, 135-48 (discussing counsel's failure to secure and disclose expert reports from Dr. Rupp, Dr. Holder and Dr. Weiner). See also ROA 28 (DE187, Government's *Third* Motion for Reciprocal Discovery) (requesting expert summaries from Dr. Joseph Rupp, Dr. Elizabeth Johnson, Dr. George Holden, Dr. Daniel W. Davis, Dr. Linda Norton, and Dr. Donald Weiner). It is highly unlikely that all of these experts were being derelict in the preparation of their reports.

Moreover, any allegation that Dr. Johnson is at fault for the late disclosure because she was uncommunicative with counsel is belied by the record. On January 16, 2004, just a month and half before she submitted her report to counsel, Mr. Tinker expressly told the court that Dr. Johnson had been prompt in her work

and good at communicating with counsel. Tr. 1/16/04, 34-35 ("As soon as she gets it and has an opportunity to test it, and I think she'll be prompt. She's been good about talking to me about issues"). Indeed, Dr. Johnson testified about her documented and repeated phone conversations with trial counsel. ROA 2445-2447.

Dr. Johnson also testified that Mr. Tinker never made her aware of the court-imposed deadline for expert reports and if he had, she would have complied. ROA 2421. See also P-Ex. 168 (12/31/03 fax from Dr. Johnson to trial counsel indicating she tried unsuccessfully to reach him after completing her review of Mr. Bourgeois' case); ROA 2412-2413 (same). See also ROA 2597, 2599-2530; G-Ex. 206 (Technical Associates report faxed from Dr. Johnson to trial counsel on 2/26/04, the date of the court's deadline for the production of expert reports).[25]

More importantly, regardless of why Dr. Johnson's report was obtained so close to trial, counsel should have requested leave of the court to present her critical testimony. Dr. Johnson's summary report was obtained just **two business days** after the court-imposed deadline, **one day before** the presentation of the

---

[25] The fact that Dr. Johnson did not "have her own lab" should not have been preclusive. The Government's experts also do not complete their own testing, but only analyze the results. This separation between technician and analyst is typical of laboratories in most fields of forensic science. ROA 2400 (Johnson).

Government's case in chief, and **thirteen days before** the presentation of any defense evidence.[26] Counsel also notified the Government and the court of the substance of Dr. Johnson's testimony as early as February 25, 2004, **four days before** the start of the Government's case and **seventeen days before** the presentation of defense evidence. Tr. 2/25/04, 145 ("Well the issue, the main issue, is whether or not their findings were of seminal fluid, whether that was seminal fluid"). Moreover, the record reflects that the trial court was prepared to grant the Government additional time to address any of Dr. Johnson's conclusions with its own experts or, if needed, even hire new experts. Tr. 2/25/04, 122-33.

Under these circumstances, where: the court had voiced a willingness to accommodate the Government in anticipation of a last-minute or late submission of Dr. Johnson's report, the court had authorized expenditures for this expert and despite the production of her report a scant two days after the deadline, there was simply no prejudice to the Government, there really can be no legitimate excuse for counsels' failure to seek permission to use this important witness.

Certainly, Appellant has presented ample evidence to raise a doubt about the

---

[26]The Court imposed deadline for the production of expert reports was Thursday, February 26, 2004. Dr. Johnson's report was prepared on Monday, March 1 and faxed to counsel on Tuesday, March 2, 2004. The Government's presentation of evidence began on Wednesday March 3, and the defense presentation of evidence commenced on March 15, 2004.

presence of sexual assault in this case.  It is hard to believe that the specter of the

sexual assault of a two year old did not have a significant impact on the jury's

determination at both the guilt and penalty phases of trial.  In light of trial

counsel's failures here, there can be no doubt that Appellant has established, at a

minimum, an entitlement to a COA.

**CLAIM III.  COUNSEL PROVIDED INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE.**

> *I do not believe that the jury in this case was provided with an accurate and complete picture of Mr. Bourgeois' mental health profile.  I do not come to this conclusion lightly.  But, he was presented only as an unrepentant and evil man.  While his actions were unquestionably "evil," it is equally unquestionable that there exists a reasonable and not particularly controversial mental health explanation for his actions.  Had I been given the information that I now have, and had I been asked at the time of trial, I would have shared my opinions as contained in this Declaration.*

Declaration of Carlos R. Estrada, M.D., May 14, 2007.  ROA 613.

### A.    Introduction

As the above excerpt from the post-conviction declaration of Dr. Estrada

shows, the jury in this case was not provided with the true, accurate and available

mitigating evidence regarding Mr. Bourgeois' social history and mental health.

Dr. Estrada's views in this regard should be accorded great weight.  After all, he

was the Government's expert, observed the entire trial, and for at least some of

the proceedings, he functioned as the court's expert (i.e., for competency to proceed and sanity).

As set forth in the remainder of Dr. Estrada's 2255 testimony, and in the remaining mental health evidence discussed below, Mr. Bourgeois' "mental health profile" shows him to be a highly disturbed and impaired individual. Although a smattering of evidence was presented to the jury showing that Mr. Bourgeois was abused as a child (evidence that was disputed by the Government), an overwhelming quantity of abuse evidence was not presented. The jury never heard firsthand, detailed accounts of how young Alfred Bourgeois was subjected to merciless, chronic and long-standing physical abuse. The jury never heard that he was subjected to sexual abuse. And, perhaps most importantly, the jury was never provided with any mental health testimony about how such abuse caused psychological damage to Mr. Bourgeois as he grew into adulthood and how it effected his adult behavior.

In addition to not hearing that the type of abuse suffered by Mr. Bourgeois can damage an individual, the jury similarly did not hear about the actual mental health conditions from which he suffers. Appellant herein presents the unanimous opinions of a number of experienced and skilled forensic evaluators (including the Government's trial expert, Dr. Estrada, and both of the Government's 2255

experts, Dr. Randall Price and Dr. Roger Moore) who have concluded that Appellant suffers from Borderline Personality Disorder, which can cause psychotic breaks when the individual experiences sufficient stressors, such as those experienced by Mr. Bourgeois in the weeks leading up to the death of his daughter.

In addition to his impaired psychological makeup, the jury was also not presented with the available evidence showing that Mr. Bourgeois suffers from significant cognitive impairments, i.e., brain damage. Testing available at the time of trial conducted by Dr. Donald Weiner shows that Appellant has, at best, an IQ that is in the range of borderline intellectual functioning. The Government's expert does not disagree. In addition to his low IQ, Appellant suffers from organic brain deficits that impact his ability to control his impulses and engage in executive decision making.

The lower court provided defense counsel with the tools to present all of the above information to the jury. Yet, for reasons that defy understanding, and in advocacy that fell far below what is expected of counsel in capital sentencing, trial counsel ineffectively failed to present this evidence. As shown below, it was available and it was powerful mitigation. It was the kind of mitigating evidence that counsel is required to present, yet counsel, without reasonable tactic or

strategy, failed to present it. Counsel were ineffective in violation of Appellant's right to counsel secured by the Sixth Amendment to the United States Constitution.

### B. The Penalty Phase

#### 1. Government Presentation

The Government presented fourteen of Appellant's ex-wives, girlfriends, acquaintances, children and jail-house informants to testify to his abusive and violent history. This aggravating evidence went on for over two hundred transcript pages. Tr. 3/22/04, 25-250; Tr. 3/23/04, 81-87.

The Government capped its presentation with Dr. Estrada. Tr. 3/22/04, 269. He told the jury that he had observed the entire trial, had observed Mr. Bourgeois throughout, and had conducted an evaluation of him. Id. at 252, 272. Dr. Estrada opined that Appellant "has a much higher tendency toward violence than an ordinary person," id. at 285, and would pose a risk of future violence, id. at 278-286. He further opined that Appellant was a person who would be enraged at "minor provocations" or who would have difficulty controlling his impulses. Id. at 283. Dr. Estrada went on to diagnose Appellant as having a Narcissistic Personality Disorder, which is present in "an individual whose basic motivation in life is the aggrandizing of his self-esteem." Id. at 284.

Prior to the commencement of the cross examination, defense counsel told

the court:

> It's my attitude, and not necessarily the rest of our group, that we're going to rest depending on how Dr. Estrada goes when – when we question him. . . that's not the consensus, particularly of [defense psychologist] Dr. Cunningham, and it's – and it's I don't think maybe of John [Gilmore] or Mr. Bourgeois. . . I met with Dr. Cunningham last night and kind of hinted around, and of course that's what he does and so he wants to do it.

Tr. 3/23/04, 4-5.

Counsel started out his cross examination attempting to elicit from Dr.

Estrada that Appellant suffered childhood abuse, neglect and rejection.    Tr.

3/23/04, at 23-24.  The Government objected, seeking clarification as to the

sources of Dr. Estrada's information regarding Appellant's abuse.  Id. at 25.

When Dr. Estrada indicated that he was relying on information obtained by Dr.

Cunningham and Dr. Weiner, the defense nueropsychologist, the court conducted

a side bar conference outside the jury's presence.  Id. at 25-31.  The court

explained to Dr. Estrada that: "no witness here has testified that Mr. Bourgeois

was sexually – physically abused or neglected in any way, so we want to know

where – where you got that information exactly, and where you got Dr.

Cunningham's information."  Id. at 27-28.  When Dr. Estrada began to respond

that he had heard some witnesses discussing these topics, the court emphatically

and accurately corrected him: "No. You didn't hear that – you didn't hear that here." Id. at 28-29. When Dr. Estrada indicated that he may have read it in Dr. Weiner's report, the court pointed out that Dr. Weiner and his report had been "excluded for all purposes." Id. at 29.[27] After further discussion, defense counsel advised the court that "None of my questions will be asking [Estrada] to discuss Dr. Cunningham or Dr. Weiner's reports." Id. at 31-32.

Without any recourse to elicit through this witness that Appellant was abused, counsel was left only asking whether "people who commit that kind of offense [referring to Appellant's murder conviction] generally were abused themselves." Tr. 3/23/04, 35. Dr. Estrada explained that he believed Appellant had been abused as a child because "the way we discipline our children is highly determined by the way we were disciplined ourselves when we were raised as children," Id. at 47. See also id. at 48 (that Appellant was harshly disciplined is "one of my impressions").

On re-direct examination, the Government immediately challenged the basis for Dr. Estrada's impression that Appellant had an abusive childhood. The Government elicited that Appellant had told Dr. Estrada that he was well cared for

_____

[27] Since counsel did not turn over Dr. Wiener's test data and announced that they would not call him, the court excluded the witness and his report. See Tr. 3/17/04, 24-49; Tr. 3/19/04, 14-16.

in childhood.  Tr. 3/24/04, 54-57.  Moreover, the Government did not at any time concede that Appellant had suffered from an abusive childhood.  Rather, it argued to the contrary.  See Tr. 3/24/04, 68.

### 2. The Defense Case

Rather than present any expert testimony, trial counsel presented only three witnesses who addressed some aspect of Appellant's social history.  Michelle Armont, Appellant's half-sister, (who did not live with him through his childhood),  testified that 1) there was a "little problem" between Appellant and his mother, so Appellant lived with an elderly woman for a few years; 2) Appellant had a temper; 3) his only problem in school was tardiness; and 4) her nephew has ADD, and Appellant acted similarly.  Tr. 3/23/04, 98-101.

Appellant's cousin Carl Henry testified that 1) Appellant's mother picked at his nose frequently in an attempt to clean it, whipped her children, and once threw a telephone receiver at Appellant's head; 2) Appellant was chastised by his mother and was teased by his siblings about the fact that his father was not in his life; and 3) Appellant was forced to live with an elderly neighbor, but that he liked living with her because she cared for him better than his mother.  Tr. 3/23/04, 113-116.

Finally, the jury heard from Reverend Herman Clayton, Jr., who grew up in the same neighborhood as Appellant.  Clayton testified that 1) he and Appellant

lived in a poor black neighborhood; 2) Appellant lived with Clayton's grandmother Mary for a time; and 3) he did not witness any abuse, but he (Clayton) was told that Appellant's mother whipped her children, sometimes for things they did not do. Tr. 3/23/04, 121-23.

This, along with the cross-examination of Dr. Estrada, was the entire defense case. Despite having at their disposal both expert and lay witnesses who could have put Appellant's violent background into a mitigating context, counsel rested after putting on a mere 18 pages of direct testimony. Counsel failed to construct a case sufficient to provide jurors with the truth about their client. Accordingly, as evidenced by their sentencing phase verdict sheets, jurors did not find that Appellant was abused as a child, nor did they find *any* "factors in the Defendant's background or character that mitigates against the imposition of the death penalty." See ROA 45 (DE299 at 6, 7).

### C.    The Unpresented Mitigation

Counsel had all the tools necessary to conduct a thorough mitigation investigation and present a strong case for life. The district court had granted them the assistance of a mitigation investigator, Lisa Milstein,[28] and a psychologist, Dr.

---

[28] Ms. Milstein was originally retained by counsel. However, due to health problems, and a resulting low quality of work product noticed by her partner, Gerald Bierbaum, Mr. Bierbaum had to take over the investigation shortly before

Mark Cunningham.  Through subsequent requests, counsel also retained a neuropsychologist, Dr. Donald Wiener, and a psychologist with expertise in parenting and child abuse, Dr. George Holden.[29]

Unfortunately, counsel failed to effectively utilize their assistance.  The defense experts testified at the 2255 hearing that they were asked to conduct their evaluations on the eve of trial; were not provided with any background materials; and had no substantive conversations with counsel about the case.

Despite counsel's lack of communication, these experts did uncover significant mitigating evidence that counsel ineffectively failed to present.  Appellant summarizes the available mitigating evidence below.

### 1. Life history of abuse, neglect, and abandonment.

Appellant grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans.  His community, called "the Bend," consisted of a one lane dirt road connecting about twenty

---

trial.).  ROA 4107, 4113-4115.

[29] Dr. Holden, Ph.D., was retained by defense counsel pre-trial as an expert in developmental psychology, parenting, and child abuse.  His opinion that the killing was not premeditated was precluded from the guilt phase of trial, but the district court pointed out that he may testify at the penalty phase.  Tr. 3/1/04, 69-70.  Counsel never called him to testify.  Dr. Holden provided Appellant with an affidavit regarding his experience working with trial counsel, which was accepted as evidence at the 2255 hearing, along with his testimony.  ROA 3862-2863.

homes, representing two or three different family units.  The neighborhood was surrounded by sugar cane fields, and hemmed in on one side by the river.  ROA 3411.  The families of the Bend had all lived there for five generations or more, and could trace their lineage back to "slave time."  Most of the homes had been lived in for generations.  ROA 3797.  The Bend was not connected to a sewage line.  ROA 3543.

The Bourgeois family was chaotic and dysfunctional.  Appellant's mother, Eunice was an alcoholic.  ROA 3534-3536; ROA 3999.  Alfred was the fifth of seven children.  All seven children were born in a time span of under nine years.  ROA 3408-3409; ROA 492.  His next older brother, Anthony, was born with cerebral palsy, was profoundly retarded, and required significant extra care, for which the family received no outside services.  ROA 3412.  Eunice was overwhelmed by the number of children in her care.  ROA 3535-3537.

Young Alfred suffered serious physical abuse at the hands of his mother.  Claudia Williams, Mr. Bourgeois' oldest sister, testified that their mother whipped Alfred "constantly."  ROA 3416.  She described how her mother would whip Alfred with an extension cord while he stood naked in the tub, leaving  him bruised and bloody.  Id.  Alfred's mother even *used a meat cleaver to cut off the tip of his finger while the family ate dinner*.  ROA 3416.  See also ROA 3529

(Beverly Frank witnessed whippings with a belt); ROA 3799 (Murray Bourgeois witnessed abuse and saw bruises on Alfred).

By the time Alfred was six or seven years old, an elderly neighbor, Miss Mary, had taken Alfred in to save him from the abuse he was experiencing at home. ROA 3499. While in this supposedly "safe" home, Alfred was raped for many years by Miss Mary's son. ROA 3544-3546. Moreover, Miss Mary's home was only a few hundred yards away from his mother's home, and he continued to be exposed to physical abuse at the hands of his mother even after he went to stay with Miss Mary. ROA 3494, 3521. The proximity of his mother's home and Miss Mary's also served as a constant and devastating reminder of his mother's abandonment. ROA 2986-2987.

### 2. Personality disorder

The Government has conceded that Mr. Bourgeois suffers from Borderline Personality Disorder (BPD). ROA 3085. All of the mental health experts in the case, including the Government's 2255 experts Dr. Price and Dr. Moore, agreed that Mr. Bourgeois was abused, neglected, and abandoned as a child, and that this childhood maltreatment contributed to the development of a profound personality disorder. See, e.g., ROA 3309-3310 (Dr. Price: suffers from a long standing and pervasive personality disorder); ROA 3336-3337 (Dr. Price: personality disorder

64

stems from his early childhood experiences); ROA 4314, 4330 (Dr. Moore: borderline personality disorder); ROA 4321-4322 (Dr. Moore: abused as a child); ROA 4325-4326 (Dr. Moore: behavior is driven by his Borderline Personality Disorder); P-Ex. 164, 21-23 (Dr. Estrada: same); ROA 2994-2997 (Dr. Toomer: same). Notably, the Government doctors agreed that Mr. Bourgeois did not meet the criteria of anti-social personality disorder or sociopathy. ROA 3381 (Dr. Price); ROA 4323 (Dr. Moore); P-Ex. 164, 18-19 (Dr. Estrada).

Borderline Personality Disorder is a pervasive disorder marked by unstable intimate relationships. Individuals with BPD are "extremely vulnerable to stress," see P-Ex. 164, 24 (Dr. Estrada), and tend to experience dissociative and psychotic episodes in which they are unaware of their actions and unable to control their behavior, ROA 4193 (Dr. Price); ROA 2996-2997 (Dr. Toomer). This explanation for Mr. Bourgeois' behavior contrasts greatly from the prosecution's theory at trial, which was that he acted with premeditation when he killed his child in anticipation of some sort of gain. P-Ex. 164, 27-28 (Dr. Estrada does not agree with the prosecution's theory at trial, and instead believes that Mr. Bourgeois' behavior was not premeditated but was a rage reaction, triggered by stress, stemming from his personality disorder.).

### 3. Cognitive deficits

Additionally, in the habeas proceedings, both the Government and the defense agreed that Mr. Bourgeois has "borderline intellectual functioning." Mr. Bourgeois' full scale IQ was tested both pre- and post-trial, with results including, respectively, a 75 on an outdated WAIS-R examination and a 70 on the WAIS-III. Dr. Price, retained by the Government to review Mr. Bourgeois' intelligence testing, agreed that the tests were properly administered, and demonstrate that Mr. Bourgeois has borderline intellectual functioning. ROA 3343-3339. Defense experts testified that Mr. Bourgeois' IQ, when combined with his adaptive deficits, indicate that he is more accurately described as mentally retarded. However, at a minimum, he functions at the level of borderline mentally retarded. ROA 2229 (Dr. Gelbort).

Mr. Bourgeois also presented evidence of his organic brain damage. As discussed above, before trial, defense nueropsychologist Dr. Weiner found organic brain damage. ROA 2936. Dr. Gelbort's testing for the 2255 hearing showed results consistent with those obtained by Dr. Weiner. ROA 2229. While the Government's expert, Dr. Price, at first contested whether those results were accurate, given the failure to apply the so-called "Heaton norms," he later admitted that even applying the Heaton norms, Dr. Weiner's testing showed brain damage.

ROA 4890-4891, 4894.[30]

### 4. The combined impact of Mr. Bourgeois' mental health problems.

At the time of the incident, Mr. Bourgeois was experiencing stress from many spheres. Kerry Brown, Esq., Mr. Bourgeois' lawyer in Louisiana, testified at the 2255 hearing that Mr. Bourgeois was exceedingly distressed by the knowledge that his wife had had an adulterous affair. In addition, Mr. Bourgeois was overwhelmed by financial pressures, which included a burdensome lease on a truck, threat of foreclosure on his home, and legal difficulties, including recently filed charges against him. ROA 4088-4090; ROA 3011(Dr. Toomer); ROA 515 (Dr. Cunningham's proposed testimony).[31]

Multiple experts testified at the 2255 hearing that Mr. Bourgeois' layered deficits resulted in an inability to respond appropriately to stressful and emotionally triggering situations. As discussed above, an inability to deal

---

[30]The lower court mistakenly states that "Applying the Heaton norms for African-Americans to Dr. Weiner's testing places Bourgeois outside the range of the impaired range." *Op.* 141 (ROA 5875). Although Dr. Price originally made this statement, he later admitted that he had made an error, and that even if the Heaton norms for African Americans were applied to Dr. Weiner's testing, Appellant would still be found impaired. ROA 4891; ROA 4890-4891 (Dr. Price Dep.).

[31]Prior to trial, Dr. Cunningham summarized his proposed trial testimony in the form of a power point presentation. ROA 492-517.

appropriately with stress is a trademark symptom of Borderline Personality Disorder. Likewise, experts reported that Mr. Bourgeois' specific brain damage leaves him less able to cope with stress and to control his impulses and reactions. ROA 2935 (Dr. Weiner); ROA 2250 (Dr. Gelbort); ROA 505 (Dr. Cunningham).

The experts explained that victims of childhood abuse carry the effects of that abuse into their relationships with their own children, often identifying with their abuser, P-Ex. 184, 32 (Dr. Estrada), becoming emotionally triggered when faced with similar familial patterns that existed in their own childhood, ROA 2990-2991 (Dr. Toomer re: abandonment, out-of-wedlock child), and unfortunately repeating the same abuse that was inflicted on them as a child, ROA 2409-2411; ROA 631 (Dr. Holden Decl.) (accepted in place of testimony, ROA 4030-4031).

Finally, the experts explained that Mr. Bourgeois' low intelligence exacerbated his inability to cope with the stressors around him. As Dr. Gelbort explained, Mr. Bourgeois' personality disorder made it harder for him to deal with his organic brain damage. ROA 2277. Dr. Holden explained that Appellant's deficits made Appellant "less able to problem solve." ROA 632. Likewise, Dr. Toomer explained that Mr. Bourgeois' multiple psychological deficits made it impossible for Mr. Bourgeois to deal with the stress in his life and that he was, as

a result, "a time bomb waiting to happen."  ROA 3015-3016.  As the experts

explained, there was a relatively straightforward and non-controversial

psychological explanation for Mr. Bourgeois' behavior.  ROA 606-614 (Dr.

Estrada Decl.); ROA 3016 (Dr. Toomer).

### D.     Trial counsel's failure to present the available mitigating evidence was unreasonable

At the 2255 hearing, defense counsel provided an overarching, yet

unreasonable, explanation for why they did not present the powerful mitigating

evidence that they had in their possession: that the mitigation would have

contradicted the defense theory that their client was innocent.  ROA 4030; P-Ex.

83, 3 (Gilmore Aff.).[32]

---

[32] Specifically, Mr. Gilmore stated, "Mr. Tinker and I asked the Court to appoint a mitigation expert to assist us in the punishment phase of the trial. The Court appointed Dr. Mark Cunningham and Lisa Milstein to act as mitigation specialists.... I believe an accurate summary of Dr. Cunningham's proposed testimony to be that **Mr. Bourgeois had numerous factors exerting influence on him at the time of the killing, which explained and somewhat mitigated his actions.** Among the factors, were **his upbringing as a child**; **his mental problems**; his economic situation and the instability of his marriage, caused by the discovery that he had a child out of wedlock, which he was ordered to pay child support for; taking the family on the cross-country trip, forcing them to spend long periods of time in a confined space. All of these issues supposedly came to a boil, causing Mr. Bourgeois to commit the murder. **The problem, in our perspective, was that Mr. Bourgeois denied that he had committed the crime and throughout the trial, including his allocution to the jury. Dr. Cunningham's explanation conflicted with Mr. Bourgeois' defense.**  P-Ex. 83, 2-3 (Gilmore Aff.).

This *post hoc* explanation, however, contradicted the strategy counsel actually followed at the penalty phase. Counsel did not argue innocence, but argued childhood mitigation. They simply failed to marshal supporting evidence. An innocence strategy moreover would have been unreasonable because it was unsupported by the law. At the time of trial, it was well understood that the Eighth Amendment does not allow a "right to reconsideration by the sentencing body of lingering doubts about ... guilt." Franklin v. Lynaugh, 487 U.S. 164, 187 (1988) (O'Connor, J., concurring). At penalty phase, counsel must accept the jury's verdict and seek to persuade the jury that there are factors that lessen the defendant's culpability.

Evidence that seeks to explain (at least in part) the commission of the offense can powerfully and directly reduce the defendant's culpability:

> If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, evidence about the defendant's background and character is relevant because ... defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (quotation marks omitted).

It was unreasonable for counsel simply to cast aside such powerful mitigating evidence; their decision to do so shows a profound misunderstanding of

the law and of their duty in a capital case.

In addition, even if trial counsel's stated strategy were reasonable, it was not the strategy actually embraced at trial. First, as discussed above, counsel actually presented some (albeit woefully truncated) evidence of a difficult childhood. Counsel also elicited on cross-examination from Dr. Estrada his opinion that those who abuse others were often victims of abuse, suggesting that this could explain Mr. Bourgeois' actions.

Second, counsel stated that they chose not to present Dr. Cunningham's testimony because it "conflicted with Mr. Bourgeois' defense," P-Ex. 83, 3 (Gilmore Aff.). In the same affidavit, however, counsel also explained that they believed they could "be more effective **developing mitigation evidence** through Dr. Estrada than through Dr. Cunningham." Id. Thus, counsel's purported reasoning contradicts itself. Counsel did in fact desire to present mitigation evidence; they just failed to use the wealth of evidence they had at their disposal to do so.

Counsel's alleged strategy is also belied by counsel's actions at trial, where counsel clearly attempted to argue (without presenting sufficient evidentiary support) that Appellant's childhood history of abuse should be considered mitigating by the jury. In closing, counsel explained that:

71

with the lingering effects of childhood and stress swirling around him, Bourgeois just 'snapped' and 'it got out of hand and ended up killing her. That's not to excuse his behavior; it's to – in an attempt to try to explain what happened."

Op. 5847 (ROA 5847) (quoting Tr. 3/24/04, 50). See also 3/24/04, 61 ("Poor JG1999 ended up the victim of that, the victim of what Alfred Bourgeois had been becoming, the victim of who he ended up because he started out getting abused himself.").

In addition, counsel asked the jury to find mitigating factors that would have been supported by the lay and expert witness testimony they failed to present, including: Appellant's capacity to appreciate the wrongfulness of his conduct was significantly impaired; he suffered from extreme mental or emotional disturbance; he was abused as a child; he was under stress from family and economic factors; and he was driving cross country in a truck with four other individuals. Tr. 3/24/04, 93-95. As was all but guaranteed by counsel's sparse presentation, the only mitigation found was that he was under stress from family and financial matters (six jurors found); and that he was driving cross country in the cab of the truck (all jurors found ). Id. at 115; ROA 45 (DE299 at 6, 7).

Finally, counsel made no argument and requested no instruction in support

72

of their purported strategy (that Appellant was innocent) at sentencing.[33]  In fact,

counsel stated in closing:

> And it's difficult for me to come up here and argue to you about this punishment and what you're going to do him knowing that Alfred maintains his innocence, and *knowing that you don't believe that.* That you've already decided that he's guilty of this crime. I'm not going to rehash the evidence of the guilty/innocence phase; this is a different phase of the trial. *And I'm not going to argue with your decision, because I know why you made the decision that you made.*

Tr. 3/24/04, 45.

There can be no question that counsel offered childhood abuse and stress as

part of an explanation for Appellant's conduct, and in so doing, counsel implicitly

acknowledged Appellant's commission of the crime.  Counsel's failure to present

expert testimony in support of the very theory they argued to the jury was

unreasonable.  Given that counsel did present limited evidence and argument

acknowledging that Appellant had been convicted and seeking to explain his

commission of the offense, the claim that they refrained from presenting

*persuasive* evidence to that effect because it would have conflicted with the guilt

phase defense is belied by the record.  "When viewed in this light, the 'strategic

decision' invoke[d] to justify counsel's limited pursuit of mitigating evidence

resembles more a *post-hoc* rationalization of counsel's conduct than an accurate

---

[33] For instance, counsel did not request an instruction on residual doubt.

description of their deliberations prior to sentencing." <u>Wiggins</u>, 539 U.S. at 526-27.

Contrary to counsel's testimony regarding their strategic decision, it appears from the record that trial counsel's failure to present powerful available evidence in mitigation was the result of a simple lack of preparation.

Indeed, Dr. Cunningham testified that counsel failed to review the reports he provided to counsel, and failed to communicate with him about the mitigation strategy. According to Dr. Cunningham, counsel failed to consult with him in any substantive way until the night before his scheduled testimony. ROA 3657-3659. At that meeting, it became apparent that counsel had not read through Cunningham's proposed presentation. ROA 3658-3659, 3632-3633, 3646 (Dr. Cunningham had only "rudimentary," not "case specific" conversations with counsel prior the night before his testimony).

In addition to rejecting a case for mitigation because it contradicted their trial theory, counsel also now stated that they were "not impressed" with Dr. Cunningham. ROA 4055. At that time – when it was too late to chart a different path – they instead rejected the entire mitigation presentation. Had counsel conducted their investigation in a timely manner, they would have discovered and addressed any concerns regarding Dr. Cunningham's testimony. Moreover,

counsel made no efforts to work with Dr. Cunningham to improve his presentation.  Dr. Cunningham was ready and willing to do so.  ROA 3676-3677.

With respect to Dr. Weiner, there is the allegation that counsel supposedly decided not to present his testimony when they learned from the Government that Mr. Bourgeois had inaccurately reported a coma following a head injury.  ROA 2939 (Dr. Weiner).  This, too, demonstrates counsel's ineffectiveness.  Counsel had Dr. Weiner evaluate Appellant on February 28, 2004, just two days prior to the start of trial.  ROA 2901 (Dr. Weiner).  Counsel never spoke with Dr. Weiner about the coma issue, nor did they provide Dr. Wiener with any records, including medical records that documented other head injuries.  ROA 2901-2902.  Finally, they failed to consult with Dr. Weiner about the substance and basis of his conclusions.  Had they done so, he would have told them that whether Mr. Bourgeois had gone into a coma was not crucial to his findings, which were based on neuropsychological testing and "that regardless of what the cause was, [Mr. Bourgeois] has some brain damage."  ROA 2941.

Counsel's interrogatories and testimony display a lack of knowledge about the evidence they had in their own file, including the neuropsychological report that revealed brain damage and a very low IQ, further evidence that counsel's case at sentencing suffered due to their own lack of preparation.  See, e.g., P-Ex. 82, 8

(Tinker: "I do not recall the exam resulting in any information that would have been helpful at trial."); id. at 10 ("Based on the information we had, from experts and family members, we were unaware that Mr. Bourgeois was mentally retarded, or near retardation level."); id. at 2 (Gilmore: "I do not recall any information from ... any expert witness which indicated that Mr. Bourgeois was retarded, or near retardation level.").

With respect to counsel's alleged decision not to present their mental health experts due to potential problems with their testimony, the relevant question is "whether the investigation supporting counsel's decision not to introduce [mental health] mitigating evidence ... *was itself reasonable*." Wiggins, 539 U.S. at 523 (emphasis original). It was not. Here, the "unreasonableness of attempting no more than [counsel] did was heightened by the easy availability of the [information]." Rompilla v. Beard, 545 U.S. 374, 389 (2005). Counsel failure to present readily available mitigating evidence was deficient.

E.     **The Failure to Present Available Mitigating Evidence Prejudiced Appellant.**

To assess prejudice under Strickland, the reviewing court must "consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the

76

evidence in aggravation." <u>Porter v. McCollum</u>, 130 S.Ct. 447, 453-54 (2009) (per curium). The evidence adduced above shows that Appellant endured a childhood of devastating abuse, neglect and abandonment; suffers from cognitive deficits and psychological impairments; and that his history and impairments are directly related to his commission of the offense. With respect to prejudice, this case is similar to <u>Porter</u>, where the Supreme Court found as follows:

> The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.... Had Porter's counsel been effective, the judge and jury would have learned of the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability."... Instead, they heard absolutely none of that evidence, evidence which "might well have influenced the jury's appraisal of defendant's moral culpability."

130 S. Ct. at 454 (quoting <u>Wiggins</u>, 539 U.S. at 535; <u>Williams</u>, 529 U.S. at 398). The record makes clear that the jury did not get anything like a complete and accurate picture of Alfred Bourgeois from the evidence presented at trial. Especially in a case as aggravated as this one, the jury should have heard about the very humanizing and tragic circumstances of Appellant's life history and mental health. Counsel's failure to offer the jury evidence that would explain and humanize Mr. Bourgeois was ineffective.

**F.     The District Court's Ruling**

As set forth at the outset of this brief, granting a COA "does *not* require a showing that the appeal will succeed."  Miller-El v. Cockrell, 537 U.S. at 337. Instead, the Court must grant a COA if the issue is "debatable among jurists of reason"; or "a court could resolve the issue[] [in a different manner]"; or "the question[] [is] adequate to deserve encouragement to proceed further."  Barefoot, 463 U.S. at 893 n.4.  The COA inquiry is "whether a 'substantial showing of the denial of a constitutional right' had been proved. . . .  The question is the debatability of the *underlying constitutional claim*, not the *resolution* of that debate."  Miller-El, 537 U.S. at 342 (quoting 28 U.S.C. § 2253(c)(2)).

Based on the facts and the law set forth above, Appellant submits that he has established that the merit of the underlying constitutional claim is, at a minimum, worthy of debate.  Nonetheless, in light of the significant errors committed by the district court in its analysis of the claim, Appellant addresses the lower court's ruling below.

**1.     Strategies Offered by the District Court**

First, the court erred in accepting counsel's stated strategy – that mitigating evidence would conflict with their defense theory of innocence – where such a strategy is clearly unreasonable at the penalty phase of trial.

In addition, the lower court ascribed strategic reasons to counsel's failure to pursue and present certain categories of mitigating evidence. Such strategies, however, were either 1) never endorsed by trial counsel themselves; or 2) contrary to the evidence in the record.

The court first defended counsel's failure to present psychological testimony regarding the effects of Appellant's abusive and traumatic background (through the testimony of, *inter alia*, Dr. Cunningham) by crediting counsel's proffered strategy. The Court explained that, "[i]n the end, trial counsel said that he decided not to call Dr. Cunningham because his theory of the case conflicted with Bourgeois' chosen defense [that he did not commit the crime]." ROA 5859. However, as explained above, this alleged strategy is belied by counsel's actions at trial, and therefore the court erred by crediting such testimony.

None of the other strategic reasons offered by the district court for counsel's failures were actually offered or embraced by trial counsel. The lower court's invocation of a strategic reason where none existed violates Supreme Court precedent. A court is not at liberty to create strategic reasons where counsel has offered their own. See Wiggins, 539 U.S. at 526-27 ("[T]he 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a *post hoc* rationalization of counsel's

conduct than an accurate description of their deliberations prior to sentencing."); Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (under Strickland, courts cannot use hindsight to supply a strategy for counsel).

Next, with regard to counsel's failure to present evidence of Borderline Personality Disorder, the court then held that "a reasonable attorney . . . could rationally decide not to present evidence of borderline personality disorder" (ROA 5871), in light of its "aggravating edge." ROA 5869. Again, counsel never offered any such explanation. Also, the court simply ignored the critical fact that because counsel failed to provide Dr. Estrada (or any expert) with sufficient information about his client, counsel was never able to consider the option of a borderline personality disorder diagnosis in the first instance.[34]

Next, the court speculated about the basis of counsel's failure to present evidence of brain damage, suggesting that "neurological conditions [are] double edged." ROA 5875.[35] Counsel, however, never offered the "double-edged sword"

_____

[34] The Supreme Court has found personality disorders to have mitigating value regardless of any potential aggravating edge. Sears, 130 S.Ct. 3264.

[35]The court also cited concerns regarding the Government's contention that Appellant inaccurately reported his history of head injuries to Dr. Weiner. ROA 5875. Counsel did not offer such concerns as an explanation for failing to present evidence of brain damage. And if they had, such concerns would have been unreasonable in light of the record. Had counsel asked, Dr. Weiner, they would have learned that regardless of the cause was he has some brain damage.

theory as an explanation for their failure to present evidence of brain damage. Nor

could they, as counsel failed to prepare and consult with their expert about his

findings and conclusions, they were unable to render an informed decision about

the pros and cons of his testimony.[36] ROA 2939-2940.

### 2. The District Court Denied Relief Because Counsel Presented "Some" of the Available Evidence at Trial

In denying the claim, the district court relied on the fact that *some* testimony

regarding Appellant's physical abuse and neglect was presented to the jury. The

court concluded that "[t]rial counsel presented the same type of evidence relating

to child abuse that Bourgeois has adduced in these [2255] proceedings." ROA

5852. See also ROA 5853 ("trial evidence largely followed the same themes and

allowed for the jury to arrive at the same conclusions as they would if they had

before them the entirety of the mitigating evidence developed after trial"); ROA

---

ROA 2941.

[36]In any event, evidence of brain damage can be mitigating regardless of any potential aggravating edge. Sears v. Upton, 130 S.Ct. 3259 (2010) (discussing significant mitigating value of organic brain damage); Porter v. McCollum, 130 S.Ct. 447, 451 (2009) ("Porter presented an expert in neuropsychology [] who had examined Porter and administered a number of psychological assessments [and] concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior."); Rompilla v. Beard, 545 U.S. 374 (2005) (Rompilla "suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.").

5881-5882.  In so doing, the district court misconceived the appropriate prejudice inquiry.  See Sears v. Upton, 130 S.Ct. 3259, 3266 (2010) ("We have certainly never held that counsel's effort to present *some* mitigating evidence should foreclose an inquiry into whether a facially deficient mitigation investigation may have prejudiced the defendant.") (emphasis in original).

As demonstrated by the facts set forth above, the lower court erred in concluding that the evidence of abuse presented at trial was similar in any meaningful way to the evidence presented in 2255 proceedings.  The district court improperly discounted the value of additional compelling and detailed evidence of Appellant's history of physical abuse.  See, e.g., Walbey v. Quarterman, 2009 WL 113778, *7 (5th Cir. Jan. 19, 2009) (unpublished per curium opinion) (counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented, particularly where that evidence is "general and conclusional"); Williams v. Allen, 542 F.3d 1326, 1331 (11th Cir. 2008) (bare assertions of abuse do not have the same impact on a jury as "stark details about the nature and extent of abuse" suffered by the petitioner).  As this Court and its sister circuit court have made clear, counsel must present the full and complete story, the  "details," (Walbey, at *23), of their client's life, not a scattered narrative that is "inaccurate" (Walbey, at *20), "incomplete and misleading," (Williams, 542 F.3d at 1340), or

"scant, bereft in scope and detail." (<u>Walbey</u>, at *23).

Also, the Supreme Court has recognized that in a capital sentencing phase, where the goal of defense counsel is to humanize someone jurors know only as a killer, details matter.  In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court held that counsel's deficient investigation prejudiced Williams because the information that was not presented to the jury, specifically the "*graphic description of Williams childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded' might well have influenced the jury's appraisal of his moral culpability.*"  <u>Williams</u>, 529 U.S. at 398.  The Supreme Court addressed a similar claim in <u>Wiggins v. Smith</u>, 539 U.S. 510, and found that had the jury heard the "nature and the extent," <u>id.</u> at 535, of the abuse suffered by Wiggins and had the jury been able to put the details of Wiggins' "excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."  <u>Id.</u> at 537.

In <u>Porter v. McCullum</u>, the Supreme Court concluded that counsel's failure to investigate and present mitigating evidence that "described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity" was prejudicial.  <u>Porter</u>, 130 S. Ct. at 449.  The evidence the Court found

persuasive included lengthy descriptions of his "horrible family life" and detailed

testimony regarding Porter's military service in the Korean War. Porter's jury,

however, did not hear this detailed and descriptive testimony. The Supreme Court

therefore concluded that jurors "heard almost nothing that would humanize Porter

or allow them to accurately gauge his moral culpability." Id. at 454.

And, as this Court has emphasized, the duty to humanize one's client is even

more important when the facts of the offense, as the court has found here, are

"atrocious." In Walbey, 2009 WL 113778, this Court stated that

> Texas's next argument – that Walbey suffered no prejudice because
> the brutality of his crime eclipses any mitigating evidence – is a non-
> starter. ... To permit a jury to impose the death sentence solely
> because the facts are heinous and egregious would be to return to the
> days of inflicting capital punishment based on emotion and revenge
> .... Almost without exception, the cases we see in which conviction of
> a capital crime has produced a death sentence arise from extremely
> egregious, heinous, and shocking facts. But, if that were all that is
> required to offset prejudicial legal error and convert it to harmless
> error, habeas relief ... would virtually never be available, so testing
> for it would amount to a hollow judicial act.

Id. at *8.

Trial counsel presented a small fraction of Appellant's life story and omitted

any compelling or descriptive details. Counsel failed to convey the nature and

extent of the trauma, neglect and privation Appellant suffered and they failed to

present any testimony regarding Appellant's significant mental impairments,

84

including borderline intellectual functioning and brain damage. The lower court's conclusion that counsel was not ineffective because, although the testimony was lacking in detail, the jury heard some evidence that Appellant was abused as a child, stands in direct conflict with the relevant decisions of the United States Supreme Court. To be sure, "[t]his is not a case in which the new evidence 'would barely have altered the sentencing profile presented [to the jury].'" <u>Porter</u>, 130 S. Ct. 447, 454.

### 3. The Lower Court Improperly Discounted the Mitigating Value of Certain Categories of Evidence

The lower court improperly refused to weigh the mitigating value of particular categories of mitigating evidence. For instance, with regard to the available testimony that Appellant was the victim of sexual abuse, the lower court quickly dismissed the mitigating value of such evidence because it was not satisfied that Appellant had definitively proven the facts surrounding the abuse. ROA 5854. The lower court, however, failed to ask the right question here. The appropriate inquiry under <u>Strickland</u> and its progeny is whether a reasonable trial attorney would have presented such evidence in a capital sentencing proceeding.

The lower court also discounted the value of Dr. Weiner's testimony regarding Appellant's neurological impairments because the Government alleged

problems with Dr. Weiner's methodology.  The Supreme Court's recent decision

in <u>Porter v. McCullum</u>, 130 S. Ct. 447 (2009), makes clear that the district court

erred.  In <u>Porter</u> the Court explained that "[w]hile the State's experts identified

perceived problems with the tests that Dr. Dee used and the conclusions that he

drew from them, it was not reasonable to discount entirely the effect that his

testimony might have had on the jury or the sentencing judge."  <u>Id.</u> at 455.

### 4.  Improper Factual Findings

Appellant offered testimony regarding his low intellectual and adaptive

functioning.  In response the district court concluded that "a reasonable attorney

could weigh the probable benefit against the possible loss of credibility and decide

not to focus the defense on Bourgeois' low intelligence."  ROA 5856.  The court

surmised that, upon hearing Appellant's "cogent, descriptive testimony that lacked

any sign of mental impairment," as well as his "interaction with counsel and his

ability to follow the course of the legal proceedings," and his career as a truck

driver, jurors would have necessarily rejected testimony concerning his intellectual

limitations.  ROA 5855-5856.  The lower court's conclusions are erroneous, not

only because such conclusions are based on its subjective view of Appellant's

testimony and the meaning or significance of Appellant's behavior during the

course of the trial, but also because such conclusions are belied by even the

Government's mental health expert who acknowledged that, despite Appellant's ability to testify and to drive a truck, Appellant functions in the borderline level of intelligence. ROA 3343-3344 (Dr. Price). Miller-El v. Dretke, 545 U.S. 231, 265 (2005) (error to make a "dismissive and strained interpretation"). See also Bouchillon v. Collins, 907 F.2d 589, 593-94, 597 (5th Cir. 1990) ("existence of even a severe psychiatric defect is not always apparent to a layman;" counsel "cannot depend on his or her own evaluation"); Hull v. Freeman, 932 F.2d 159, 168 (3d Cir. 1991) (not reasonable to "reject[] psychiatric diagnoses in favor of ... untrained observations" by laypersons.)

Next, with regard to counsel's failure to present evidence of Appellant's Borderline Personality Disorder, the court acknowledged that "[n]one of the experts questioned the diagnosis of borderline personality disorder. All agreed that the disorder caused Bourgeois to be emotionally unstable, impulsive, and to have difficulties in his interpersonal relationships." ROA 5865-5866. In defending counsel's failure to present such evidence, the district court found that "counsel suppl[ied] Dr. Estrada with sufficient information to allow him to come to a diagnosis of borderline personality disorder [at trial]." ROA 5866. This finding is without support in the record. In fact, the court's analysis is devoid of any examination of counsel's interaction with Dr. Estrada. Instead, the court

simply stated that Dr. Estrada examined Appellant before trial (for competency and sanity) and that Dr. Estrada sat through the sentencing proceeding, therefore he possessed enough information about Appellant. ROA 5866.

The district court failed to acknowledge that 1) Dr. Estrada was the Government's expert at trial (ROA 5838); and 2) Dr. Estrada was only able to speculate about Appellant's abusive background, and was not able to refer to Appellant's brain damage at all, because although at trial defense counsel provided him with the reports of Drs. Cunningham and Weiner, Dr. Estrada was not allowed to rely on those reports as they were hearsay. Thus, counsel took absolutely no steps to ensure that Dr. Estrada, who was retained and instructed by the Government, possessed adequate information about Appellant. Finally, as mentioned above, Dr. Estrada believed that any testimony he offered regarding Appellant at trial was incomplete in light of all the information he lacked at the time. P-Ex. 164, 18. There can be no question that the district court erred when it ignored Dr. Estrada's 2255 testimony and concluded that trial counsel "plac[ed] the building blocks for the [appropriate] diagnosis before the expert witnesses. . . ." ROA 5868.

### 5. Improper Legal Standard

Finally, the district court failed to apply the correct legal standard in

assessing prejudice under <u>Strickland</u>.  The lower court concluded Appellant failed to establish prejudice because "the jury would not respond more favorably" to the unpresented evidence.  ROA 5881.  This is not the test set forth by <u>Strickland</u> and its progeny.  While the district court paid lip service to <u>Strickland</u> by subsequently stating that it found "no reasonable probability of a different result," (ROA 5882), it clearly failed to actually assess whether there was a reasonable probability that the new evidence – when considered in its totality – would have caused at least one juror to strike a different balance.  <u>Williams</u>, 529 U.S. at 397-98.  Instead, the court simply concluded that the jury (in its entirety) would not have responded favorably to such evidence.

Appellant is entitled to a COA based on the allegations set forth above.

<strong>CONCLUSION</strong>

For the reasons set forth above, Appellant respectfully requests that the Court grant a Certificate of Appealability, which requires a showing (1) that reasonable jurists would find the district court's "assessment of the constitutional claims debatable or wrong," or (2) that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000).  Appellant has met these requirements.

## Certificate of Service

I, Victor Abreu, hereby certify that the foregoing brief was served on Assistance United States Attorney Renata Gowie, Counsel for Respondent-Appellee, by providing electronic service through ECF on February 27, 2012.

/s/ Victor Abreu
Counsel for Alfred Bourgeois

## Additional ECF-Related Certifications

I hereby certify (1) that required privacy redactions, if any, have been made, (2) that the electronic submission is an exact copy of the paper document, and (3) that the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Victor Abreu
Counsel for Alfred Bourgeois

## Certificate of Compliance with Rule 32(a)

1. This proposed Application for Certificate of Appealability and Brief in Support contains 19,653 words. He files this proposed brief along with a motion for leave to exceed the word limit set forth in Fed. R. App. P. 32(a).

2. The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using **Word Perfect 12.0 in 14 point Times New Roman**.

/s/ Victor Abreu
Counsel for Alfred Bourgeois