**11-70024**

———————————————————

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

ALFRED BOURGEOIS
Petitioner-Appellant

v.

UNITED STATES OF AMERICA
Respondent-Appellee,

———————————————————

On Appeal from the Denial of Petition for Writ of Habeas Corpus
by the United States District Court For the Southern District of Texas
Corpus Christi Division, C.A No. 2:07-cv-223 (Crim. No. 2:02-cr-00216)

———————————————————

BRIEF OF RESPONDENT-APPELLEE

———————————————————

KENNETH MAGIDSON
United States Attorney

RENATA GOWIE
Chief, Appellate Division

TONY R. ROBERTS
Assistant United States
Attorney

Attorneys for Appellee
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9810

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1.    Whether the district court properly refused to hold a full evidentiary hearing on Bourgeois's challenges to the evidence establishing a federal jurisdictional link, and properly refused to hold a full evidentiary hearing on Bourgeois's claim that trial counsel was ineffective in failing to challenge the jurisdiction element. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.    Whether the district court properly held that trial counsel was not ineffective in how they challenged the evidence of semen in this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3.    Whether the district court properly concluded that trial counsel was not ineffective in how they pursued and presented mitigation evidence available to the defense at the time of trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Course of Proceedings and Disposition Below. . . . . . . . . . . . 3

    B.    Standard of Legal Review for Issuance of a Certificate of Appellability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.    Statement of the Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

## TABLE OF CONTENTS

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.    THE DISTRICT COURT PROPERLY REFUSED TO HOLD A FULL EVIDENTIARY HEARING ON BOURGEOIS' CHALLENGE TO THE JURISDICTIONAL EVIDENCE, AND PROPERLY CONCLUDED THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO CHALLENGE JURISDICTION .... . . . . . . . . . . . . . . . . . . . 22

II.    BOURGEOIS HAS NOT DEMONSTRATED THAT HIS TRIAL DEFENSE COUNSEL WERE CONSTITUTIONALLY DEFICIENT IN HOW THEY HANDLED THE SEMEN EVIDENCE IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III.    BOURGEOIS HAS NOT DEMONSTRATED THAT HIS TRIAL DEFENSE COUNSEL WERE CONSTITUTIONALLY DEFICIENT IN HOW THEY HANDLED MITIGATION EVIDENCE DURING THE PENALTY PHASE OF THIS CASE, NOR HAS HE SHOWN THAT REASONABLE JURISTS WOULD DISAGREE WITH THE DISTRICT COURT'S CONCLUSIONS ON THIS ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

CERTIFICATE OF SERVICE.. . . . . . . . . . . . . . . . . . . . . . . . . 92

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . 93

## **TABLE OF AUTHORITIES**

**CASES** **PAGE(S)**

*Andrews v. Collins*, 21 F.3d 612 (5th Cir.1994). . . . . . . . . . . . 52, 78, 89

*Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994),
  *cert. denied* 514 U.S. 1071, 115 S.Ct. 1709 (1995).. . . . . . . . . . . 37

*Baldwin v. Maggio*, 704 F.2d 1325 (5th Cir.1983). . . . . . . . . . . . . . . 53

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000). . . . . . . . . . . . . 10

*Bell v. Lynaugh*, 828 F.2d 1085 (5th Cir.1987). . . . . . . . . . . . . . . . . 53

*Bell v. Thompson*, 545 U.S. 794 (2005). . . . . . . . . . . . . . . . . . . . . . 80

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011). . . . . . . . . . . . . . . . . . 11

*Bobby v. Van Hook*, 130 S.Ct. 13 (2009). . . . . . . . . . . . . . . . . . . 50, 67

*Bouchillon v. Collins*, 907 F.2d 589 (5th Cir.1990). . . . . . . . . . . . . . 52

*Bower v. Quarterman*, 497 F.3d 459 (5th Cir. 2007). . . . . . . . . . . . . . 42

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir.1996),
  *cert. denied*, 519 U.S. 1120, 117 S.Ct. 968 (1997). . . . . . . . . . . . . 53

*Burton v. United States*, 237 F.3d 490 (5th Cir. 2000). . . . . . . . . . . . 44

*Callahan v. Campbell*, 427 F.3d 897 (11th Cir.2005).. . . . . . . . . . . 49, 50

*Cardenas v. Cockrell*, 2003 WL 24057305 (S.D.Tex., 2003). . . . . . . . . . 87

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009). . . . . . . . . . . . . . . . . 84

## TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE(S)**

*Cavazos v. Smith*, 132 S.Ct. 2 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Clark v. Mitchell*, 425 F.3d 270 (6th Cir. 2005). . . . . . . . . . . . . . . . . . 71

*Conklin v. Schofield*, 366 F.3d 1191 (11th Cir.2004),
    *cert. denied*, 544 U.S. 952, 125 S.Ct. 1703 (2005). . . . . . . . . . . . . 49

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir.2000). . . . . . . . . . . . . . . . 79

*Drew v. Collins*, 964 F.2d 411 (5th Cir.1992). . . . . . . . . . . . . . . . . . . . 51

*Florida v. Nixon*, 543 U.S. 175 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 49

*Galloway v. Thaler*, 344 Fed.Appx. 64 (5th Cir. 2009). . . . . . . . . . . . . 65

*Glass v. Blackburn*, 791 F.2d 1165 (5th Cir.1986). . . . . . . . . . . . . . . . 90

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1998). . . . . . . . . . . . . . . 36

*Harris v. Vasquez*, 949 F.2d 1497 (9th Cir. 1990). . . . . . . . . . . 68, 70, 72

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000). . . . . . . . . . . . 11, 13

*Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366 (1985). . . . . . . . . . . . . 38, 40

*Johnson v. Cockrell*, 306 F.3d 249 (5th Cir. 2002). . . . . . . . . . . . . . 65, 81

*Jones v. Johnson*, 171 F.3d 270 (5th Cir.1999). . . . . . . . . . . . . . . . . . 89

*King v. Puckett*, 1 F.3d 280 (5th Cir.1993). . . . . . . . . . . . . . . . . . . . 51, 90

*Kitchens v. Johnson*, 190 F.3d 698 (5th Cir.1999). . . . . . . . . . . . . . . . 79

## TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838 (1993). . . . . . . . . . . 36

*Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758 (1986). . . . . . . . . . . 78

*McCoy v. Lynaugh*, 874 F.2d 954 (5th Cir. 1989). . . . . . . . . . . . . . . 51, 52

*McDaniel v. Brown*, 130 S.Ct. 665 (2010). . . . . . . . . . . . . . . . . . . . . . 25

*McMann v. Richardson*, 397 U.S. 759. . . . . . . . . . . . . . . . . . . . . . . . . 50

*Miller-El v. Cockrell*, 537 U.S. 322 (2003). . . . . . . . . . . . . . . . . . . 10, 11

*Miller-El, at 336*, 123 S.Ct. 1029. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Moody v. Polk*, 408 F.3d 141 (4th Cir. 2005). . . . . . . . . . . . . . . . . 65, 73

*Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999). . . . . . . . . . . . . . . 51, 81

*Moore v. Maggio*, 740 F.2d 308 (5th Cir.1984). . . . . . . . . . . . . . . . . . . 53

*Neal v. Puckett*, 286 F.3d 236 (5th Cir. 2002). . . . . . . . . . . . . . . . . 49, 82

*Neal v. Puckett*, 239 F.3d 683 (5th Cir.2001). . . . . . . . . . . . . . . . . . . . 53

*Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006). . . . . . . . . . . . . . 83

*Parr v. Quarterman*, 472 F.3d 245 (5th Cir. 2006). . . . . . . . . . . . . . . . 82

Penalty Phase, Day 2, p. 24. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Penry v. Lynaugh*, 532 U.S. 782 (2001). . . . . . . . . . . . . . . . . . . . . . . . 10

*Poyner v. Murray*, 964 F.2d 1404 (4th Cir.1992). . . . . . . . . . . . . . . . . 73

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Prejean v. Smith*, 889 F.2d 1391 (5th Cir.1990). . . . . . . . . . . . . . . . . . 79

*Pruett v. Thompson*, 996 F.2d 1560. . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Ransom v. Johnson*, 126 F.3d 716 (5th Cir.),
    *cert. denied*, 522 U.S. 944, 118 S.Ct. 361 (1997). . . . . . . . . . . . . . 51

*Robertson v. Johnson*, 234 F.3d 890 (5th Cir. 2000). . . . . . . . . . . . . . 10

*Robertson v. Johnson*, 533 U.S. 901 (2001). . . . . . . . . . . . . . . . . . . . 10

*Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029 (2000). . . . . . . . . . 67

*Sharp v. Johnson*, 107 F.3d 282 (5th Cir.1997). . . . . . . . . . . . . . . . . . 89

*Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990). . . . . . . . . . . . . . . . . . . 72

*Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000). . . . . . . . . . . . . . . . . . 71

*Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595 (2000). . . . . . . . . 10, 15

*Smith v. Dretke*, 422 F.3d 269 (5th Cir. 2005). . . . . . . . . . . . . . . 10, 11

*Smith v. Quarterman*, 515 F.3d 392 (5th Cir. 2008). . . . . . . . . . . . . . 49

*Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004). . . . . . . . . . . . . 44, 45, 46

*Soria v. Johnson*, 207 F.3d 232 (5th Cir.2000). . . . . . . . . . . . . . . . . . 65

*Stevens v. Epps*, 618 F.3d 489 (5th Cir. 2010). . . . . . . . . . . . . . . . . . 11

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). . passim

# TABLE OF AUTHORITIES

**CASES**                                            **PAGE(S)**

*Thomas v. Taylor*, 170 F.3d 466 (4th Cir.1999). . . . . . . . . . . . . 66, 74, 76

*Woods v. Thaler*, 399 Fed. Appx. 884 (5th Cir. 2010). . . . . . . . . . . . . . . 51

*United States v. Bell*, 993 F.2d 427 (5th Cir. 1993). . . . . . . . . . . . . . . . 25

*United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005),
   *cert. denied*, 126 S.Ct. 2020 (2006). . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Colon-Padilla*, 770 F.2d 1328 (5th Cir. 1985). . . . . . . 24

*United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984). . . . . . . . 37

*United States v. Garza*, 165 F.3d 312 (5th Cir. 1999). . . . . . . . . . . . . . 10

*United States v. Hall*, 455 F.3d 508 (5th Cir. 2006). . . . . . . . . . . . . 10, 11

*United States v. Jones*, 287 F.3d 325 (5th Cir. 2002). . . . . . . . . . . . . . . 10

*United States v. Kimler*, 150 F.3d 429 (5th Cir. 1998). . . . . . . . . . . . . . 10

*United States v. MacDonald*, 456 U.S. 1 (1982). . . . . . . . . . . . . . . . . . . 24

*United States v. Perrien*, 274 F.3d 936 (5th Cir. 2001). . . . . . . . . . 25, 29

*United States v. Samples*, 897 F.2d 193 (5th Cir. 1990). . . . . . . . . . . . 36

*United States v. Youngblood*, 116 F.3d 1113 (5th Cir. 1997). . . . . . . . . . 9

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004). . . . . . . . . . . . . 11

*Waye v. Murray*, 884 F.2d 765 (4th Cir.1989). . . . . . . . . . . . . . . . . . . . 73

# TABLE OF AUTHORITIES

**CASES**                                                                                            **PAGE(S)**

*West v. Johnson*, 92 F.3d 1385 (5th Cir.1996). . . . . . . . . . . . . . . . . . . . 65

*Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527 (2003). . . . . . . . . . . . . 67

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir.1992). . . . . . . . . . . . . 51, 52

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . 87, 88

*Wilson v. Greene*, 155 F.3d 396 (4th Cir. 1998). . . . . . . . . . . . . . . 72, 74

*Wilson v. Ozmint*, 352 F.3d 847 (4th Cir.2003). . . . . . . . . . . . . . . . . . 79

## RULES AND STATUTES

Fed. R. App. P. 4(a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. App. P. 22(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3591(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 3591(a)(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3592 (c)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 3592 (c)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 3592 (c)(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# TABLE OF AUTHORITIES

## RULES AND STATUTES                                    PAGE(S)

28 U.S.C. § 2241. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2253(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2253(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 9

## OTHER AUTHORITIES

Texas Penal Code, Section 22.04(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**11-70024**

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

ALFRED BOURGEOIS
Petitioner-Appellant

v.

UNITED STATES OF AMERICA
Respondent-Appellee,

_____

On Appeal from the Denial of Petition for Writ of Habeas Corpus
by the United States District Court For the Southern District of Texas
Corpus Christi Division, C.A No. 2:07-cv-223 (Crim. No. 2:02-cr-00216)

_____

BRIEF OF RESPONDENT-APPELLEE

_____

The United States of America, Respondent-Appellee ("United States"), through the United States Attorney for the Southern District of Texas, files this brief in response to that of Petitioner-Appellant, Alfred Bourgeois ("Bourgeois").

## STATEMENT OF JURISDICTION

On May 19, 2011, the district court issued a 225-page Memorandum and Order, and a Final Judgment denying Bourgeois relief under 28 U.S.C. § 2255. The district court denied all issues raised in Bourgeois' petition and denied him a certificate of appealability (COA). On June 17, 2011, the district court denied Bourgeois' Motion to Alter or Amend the Judgement. Bourgeois filed his notice of appeal on August 15, 2011. The district court had jurisdiction under 28 U.S.C. § 2255. Appellate jurisdiction turns on compliance with 28 U.S.C. § 2253 - this Court granting a certificate of appealability.

## STATEMENT OF ISSUES

Bourgeois requests this Court to grant a certificate of appealability on three issues that he claims reasonable jurists would find debatable or wrongly decided:

1. Whether the district court properly refused to hold a full evidentiary hearing on Bourgeois's challenges to the evidence establishing a federal jurisdictional link, and properly refused to hold a full evidentiary hearing on Bourgeois's claim that trial counsel was ineffective in failing to challenge the jurisdiction element.

2. Whether the district court properly held that trial counsel was not ineffective in how they challenged the evidence of semen in this case.

3.    Whether the district court properly concluded that trial counsel was not ineffective in how they pursued and presented mitigation evidence available to the defense at the time of trial.

## STATEMENT OF THE CASE

### A.    Course of Proceedings and Disposition Below

On July 25, 2002, the Grand Jury for the United States District Court for the Southern District of Texas, returned a two-count indictment, cause No. 2:02-cr-216, charging Bourgeois with murder (unlawful killing with malice aforethought) in violation of 18 U.S.C. §§ 7 and 1111, and injury to a child in violation of 18 U.S.C. § 13 and Texas Penal Code, Section 22.04(a)(1). (R-COA 6078; Dkt 1; 5 DAR. 930-31).[1] On August 5, 2002, Bourgeois entered a plea of not guilty. (Dkt 7; 5 DAR. 920). The grand jury returned a two-count superceding indictment on April 9, 2003,

---

[1] The appellate record for the instant Certificate of Appealability is cited as "R-COA" and the page number is the "USCA5" stamp in the lower right corner of the document. "Dkt" refers to the district court docket sheet. (See R-COA 6077-6114). The number following is the docket entry number. "TT" refers to a trial transcript, followed by the date of the hearing with the numbers following referring to the pages. "DAR" refers to the Record on Appeal from the Direct Appeal containing transcripts and documents. The number preceding the record reference is the volume and the number following is the page. Because the Record on Appeal often differs from the records maintained by the district court, the Government will use multiple citations to ensure accurate reference to the various records.

alleging premeditated murder with malice aforethought and injury to a child to which Bourgeois pleaded not guilty. (R-COA 6082; Dkt 43; 5 DAR. 859-861).

At a status conference on July 16, 2003, the United States announced that the United States Attorney General had authorized seeking the death penalty. (R-COA 6085; Dkt 74, 111 - TT of July 16, 2003; 5 DAR. 782; 19 DAR. 3). On July 22, 2003, the grand jury returned a second superceding indictment alleging a single count of premeditated murder with malice aforethought and alleging special findings including all four of the statutory intent elements[2] and three statutory aggravating factors.[3] (Dkt 78; 5 DAR. 774-76). On July 23, 2003, the United States

---

[2] The indictment alleged the following statutory intent elements: Bourgeois (A) intentionally killed the victim, (B) intentionally inflicted serious bodily injury that resulted in the death of the victim, (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, [other than one of the participants in the offense], who died as a direct result of the act; and (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, [other than one of the participants in the offense], and constituted a reckless disregard for human life and the victim died as a direct result of the act. (Dkt 78 , p.2; 5 R. 775); *See* 18 U.S.C. § 3591(a)(2).

[3] The three alleged statutory aggravating factors were that Bourgeois: (1) committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim; (2) committed the offense after substantial planning and premeditation to cause the death of a person; and (3) that the victim was particularly vulnerable due to youth or infirmity. (Dkt 78, pp. 2-3; 5 R. 775-

filed the Notice of Intent to Seek the Death Penalty ("Death Notice")
which alleged the four statutory intent elements, three statutory
aggravating factors, and two non-statutory aggravating factors.[4] (Dkt 79;
5 DAR. 769-773). Bourgeois pleaded not guilty to the second superceding
indictment on July 25, 2003. (R-COA 6086; Dkt 81; 5 DAR. 767).

The district court commenced jury selection on February 9, 2004,
with initial juror qualification and completion of the extensive jury
questionnaire. (R-COA 6098; Dkt 188, 190, 192, 193, 196, [334, 349, 351-
356 – TT of jury selection]; 3 DAR. 420, 427-462; *see also* Volumes 24-28
of Record of Trial). Voir dire began February 19, 2004, and ended
February 25, 2004, with the selection of 12 jurors and four alternates. (R-
COA 6116-18; Dkt 334, 349, 354-356 – TT of jury selection; 3 DAR. 356-
365; *see also* Volumes 29-34 of Record of Trial).

The guilt/innocence phase of the capital trial began on March 2,
2004, and ended on March 16, 2004, with a guilty verdict for first degree
premeditated murder with malice aforethought. (R-COA 6116-17; Dkt

---

776); *See* 18 U.S.C. § 3592 (c)(6), (c)(9) and (c)(11).

[4] The two alleged non-statutory aggravating factors were: (1) future
dangerousness of the defendant, and (2) victim impact evidence. (Dkt 79; 5 R. 771-
772).

335-339, 344-346 – TT of guilt phase of jury trial; 2 DAR. 174, 185, 186, 204, 205, 246, 247, 256, 257; *see also* Volumes 36-48 of Record of Trial). The capital trial resumed with the punishment phase on March 22, 2004, and ended on March 24, 2004, with a unanimous jury verdict that Bourgeois be sentenced to death. (R-COA 6116-17; Dkt 341-343, 348 – TT of punishment phase of jury trial; Dkt 299 – Special Findings Form; 1 DAR. 82, 84-94, 126,130; *see also* Volumes 54-56 of Record of Trial). The district court entered the judgment and order implementing the judgment on March 25, 2004, sentencing Bourgeois to death with a special assessment of $100 for count one. (R-COA 6114; Dkt 303; 1 DAR. 76-81; Volume 57 of Record of Trial).

Bourgeois appealed raising four issues: (1) a Fifth Amendment claim that the United States failed to allege the required statutory intent elements and aggravating factors in the indictment; (2) an Eighth Amendment claim challenging the application of the intent element under 18 U.S.C. § 3591(a)(2)(D); (3) a due process claim regarding this Court's delegation of ministerial powers in how and where the sentence of death will be carried out; and (4) a claim that the aggravating factors alleged in

his case were vague and ambiguous and violated the Eighth Amendment. *See United States v. Bourgeois*, 423 F.3d 501, 502 (5th Cir. 2005), *cert. denied*, 126 S.Ct. 2020 (2006). (R-COA 94-107). Finding that "[t]his is not a close case," this Court concluded that Bourgeois failed to prove any error in any aspect of his trial. *Id.* at 512 (R-COA 117). Bourgeois petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court denied the petition on May 15, 2006. *United States v. Bourgeois*, 126 S.Ct. 2020 (2006).

On May 14, 2007, Bourgeois filed a 142-page motion to vacate his judgment under Section 2255, or alternatively under 28 U.S.C. § 2241. (R-COA 338-474). His petition included an Appendix comprised of 63 supporting documents. On October 5, 2007, in accordance with an Order of the district court permitting the subsequent pleading, Bourgeois filed a 142-page supporting Memorandum of Law and a Supplemental Appendix containing eight additional supporting documents. (R-COA 928-1165). It was timely filed and gave the district court jurisdiction under 28 U.S.C. § 2255.

On October 15, 2008, the United States filed a 143-page response to

Bourgeois's pleadings. (Sealed Event, COA Record Docket Entry 442 and 443 - Sealed because pleading and attachment contained mental health information regarding Bourgeois). The district court held an evidentiary hearing in September 2010 to address a number of issues raised in Bourgeois' 2255 Motion. The court initially limited the hearing to four days – two and a half days for Bourgeois and one and half days for the government – and excluded some issues from the evidentiary hearing because those issues could be adequately decided on the record.

However, the district court generously and repeatedly expanded the time and manner in which Bourgeois could present evidence and make a complete record. The court permitted Bourgeois to depose a number of witnesses both before and after the evidentiary hearing. Moreover, after concluding that Bourgeois' challenge to the original jurisdiction of the underlying prosecution did not warrant or necessitate an evidentiary hearing, the court went out of its way to permit Bourgeois to make a record of his challenge to the jurisdiction. The court allowed Bourgeois to depose Dr. Leestma on January 10, 2011; a deposition focused solely on the jurisdictional issue.

On May 19, 2011, the district court issued its detailed and thorough denial of Bourgeois' Motion and denied him a COA.  (R-COA 5735-5959).  The court issued its final judgment on the same day.  (R-COA 5960).  On June 16, 2011, Bourgeois filed a Motion to Alter or Amend Judgment.  (R-COA 5969-6061).  On June 17, 2011, the district court denied the Motion To Alter or Amend the Judgment.  (R-COA 6062).  Bourgeois filed a Notice of Appeal on August 15, 2011, asking this Court to grant a COA on the three issues identified above. (R-COA 6063-6064).  Notice of appeal must be filed within 60 days after the judgment or order appealed from is entered.  FED. R. APP. P. 4(a)(1)(B).  Thus, Bourgeois' notice of appeal is timely filed.

**B.    <u>Standard of Legal Review for Issuance of a Certificate of Appellability.</u>**

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner seeking to appeal from a denial of collateral relief under 28 U.S.C. § 2255, must first secure a COA.  *United States v. Youngblood*, 116 F.3d 1113, 1115 (5th Cir. 1997); 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b).  To obtain a COA, a petitioner must "make a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Slack v.*

*McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000); *see also United States v. Hall*, 455 F.3d 508, 513 (5ᵗʰ Cir. 2006) (citing *United States v. Garza*, 165 F.3d 312, 314 (5ᵗʰ Cir. 1999) and *United States v. Kimler*, 150 F.3d 429, 431 n.1 (5ᵗʰ Cir. 1998)); *Robertson v. Johnson*, 234 F.3d 890, 896 (5ᵗʰ Cir. 2000)(citing *Barrientes v. Johnson*, 221 F.3d 741, 771 (5ᵗʰ Cir. 2000))[5]. To meet this standard, Bourgeois must demonstrate that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Robertson,* (quoting *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct. 1595 (2000)); *see also United States v. Jones*, 287 F.3d 325, 329 (5ᵗʰ Cir. 2002).

In determining whether to grant a COA, this Court's inquiry is limited to a threshold examination that requires an overview of the claims and a general assessment of their merits. *Hall*, 455 F.3d at 513-14 (citing *Smith v. Dretke*, 422 F.3d 269, 273 (5ᵗʰ Cir. 2005)(quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)). *See also, United States v. Webster*, 392

---

[5]Certiorari was granted in *Robertson v. Johnson*, 533 U.S. 901 (2001) and the case was remanded for reconsideration in light of *Penry v. Lynaugh*, 532 U.S. 782 (2001).

F.3d 787, 791 (5th Cir. 2004) ("This threshold inquiry [into the underlying merit of Bourgeois's claims] does not require full consideration of the factual and legal bases adduced in support of the claims. *Miller-El*, at 336, 123 S.Ct. 1029. Instead, [this Court's] determination is based on 'an overview of the claims in the habeas petition and a general assessment of their merits.'"). Where a case involves a sentence of death, "any doubts as to whether a COA should be issued must be resolved" in the petitioner's favor. *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (citing *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010)); *Hall*, 455 F.3d at 514 (citing *Smith*, 422 F.3d at 273 (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000))).

## C.   Statement of the Facts[6]

The victim in this case was a two-year old female, JG, who was born on October 5, 1999. A paternity test established that Bourgeois was the biological father. At that time, Bourgeois was married to a woman (Robin)

---

[6] The Statement of Facts in the government's response to Bourgeois's original 2255 Motion is 50 pages in length with references to the original record on direct appeal. The facts underlying Bourgeois's murder of his two-year old daughter are set forth in detail in that sealed pleading. (R-COA 60 - pages 7 - 57 of docket entry 442 and 443). Likewise, the District Court's Final Order Denying the Motion to Vacate contains a factual summation of the crime. (R-COA 5742-48). The instant pleading contains a very short summary of those tragic facts.

who was not JG's biological mother.  At the time of the paternity test, Bourgeois and Robin had two children between them who were seven years old and one year old.  After a court ordered Bourgeois to pay child support for JG, Bourgeois demanded visitation rights for the summer of 2002.  Medical evidence established that JG was a very healthy baby with no substantial injuries when Bourgeois took physical control of her.

The evidence at trial established that Bourgeois developed a scheme to systematically torture JG and did so from the time of obtaining possession of her until he murdered JG while present on Corpus Christi Naval Station on June 27, 2002.

Circumstantial evidence, together with the testimony of Bourgeois' then-7-year-old daughter and subsequent medical evidence, established that Bourgeois murdered JG by slamming the back and side of her head against the inside of his tractor-trailer while seated in the drivers seat. Additional evidence established Bourgeois' callous attitude toward JG during her dying moments. The medical evidence established that JG had over 300 injuries, including a multitude of pattern injuries which appeared to be whip marks, human bite marks, a burn mark on her foot,

12

extensive trauma and hemorrhaging in her eyes, and approximately 10 separate head contusions.  The medical examiner found the ultimate cause of death to have been "an impact to the head resulting in a devastating brain injury."  (Dtk 345; 44 DAR. 170).  The location of the impact which likely caused death was consistent with the eyewitness testimony:  Bourgeois held JG by the shoulders and slammed the right and back of her head into the front and side area of the window, frame, and dashboard of his truck cab.  *Id.*

After Bourgeois was arrested and confined in jail, he wrote a large number of letters to his wife discussing how she poorly handled the police. He also made multiple telephone calls to relatives and friends making incriminating statements.  He also made many incriminating statements to other inmates while confined and even attempted to hire one inmate to kill some of the witnesses.

At trial, the jury heard all the above evidence and several expert witnesses.  Bourgeois testified.  During cross examination, he attempted to explain away all of the injuries and lay blame on his wife for many of the injuries.  During his testimony, he stated that JG was alive when he

13

drove onto the Naval Station and claimed that he did not fatally injure her. The jury did not believe him and found him guilty of murder.

Thereafter, the jury heard evidence of Bourgeois' violent acts toward other individuals. They heard evidence from psychologist Carlos Estrada regarding Bourgeois' ability to manipulate others and his violent nature. During cross examination, defense counsel effectively brought out various positive aspects of Bourgeois' past and personality. In addition, counsel located and called three family witnesses to discuss mitigating factors. Bourgeois then addressed the jury a second time and said he was "sorry for the pain and suffering, [sic] that I've been wrongfully accused for the death of my baby, and I did not kill my baby." (Dkt 342, 56 DAR. 24). The jury was not persuaded and sentenced him to death.

## SUMMARY OF ARGUMENT

## A. General Application of Standard of Review to the Issues Raised.

Bourgeois has not established that reasonable jurists would disagree with the district court's decisions on the issues raised during the habeas process. Importantly, the district court held an extensive evidentiary

hearing as demonstrated by the more than 6,000 pages of the appellate record generated for the purpose of appealing the court's denial of Bourgeois' Section 2255 motion. The district court carefully reviewed each and every issue Bourgeois raised and made comprehensive credibility and factual findings that would not be disputed by reasonable jurists. In this Court's limited examination of the issues, *see Slack*, 529 US at 481, a "threshold inquiry" of the underlying claims firmly establishes that the district court properly limited the evidentiary hearing to only those issues deserving such. Moreover, even for the jurisdictional issue, the district court ultimately permitted Bourgeois to present evidence for consideration. Bourgeois seeks a much more thorough review than that required by a "threshold inquiry." This Court is not required to fully consider the entire factual or legal basis supporting Bourgeois's claims. However, even if this Court does proceed beyond the "threshold inquiry" required in this matter, the exhaustive record contains more than sufficient evidence to refute Bourgeois's claims that his Constitutional rights have been denied.

**B.    The Jurisdictional Challenge:**

Bourgeois has not demonstrated any debatable issue in the district court's decision to forego a full evidentiary hearing on Bourgeois' challenge to the federal jurisdictional element in his prosecution.  Bourgeois' focus on this issue rests upon one short phrase from a neurological report referenced in the medical examiners autopsy report - "approximately 10 days' duration."  (R-COA 5884).  However, that phrase was a general reference to multiple head and brain injuries suffered by the victim. Moreover, there was substantial evidence presented at trial establishing that Bourgeois killed JG while on a naval station which is within federal jurisdiction.

At trial, eyewitness testimony, statements from the Bourgeois himself, circumstantial evidence, and the testimony of Medical Examiner Elizabeth Rouse, cumulatively proved the fatal blows which caused death occurred on the Naval Station.  Federal jurisdiction was never in question for this murder prosecution.

The district court's Order meticulously identifies the relevant evidence noting that Dr. Rouse's testimony established the cause of death

16

as "a devastating brain injury." (R-COA 5583-86). Importantly, Dr. Rouse confirmed that the medical evidence was consistent with the eyewitness testimony and "could certainly explain the injuries that were seen on the child." (R-COA 5586). Bourgeois asks this Court to ignore all the evidence establishing federal jurisdiction and permit a COA based upon the phrase "approximately 10 days duration" appearing in the neurological report.

Bourgeois presented this request to the district court. The district court evaluated Bourgeois' argument in the context of the evidence. Although the district court did not conduct an extensive evidentiary hearing, the district court allowed Bourgeois to develop an evidentiary record on this issue through the deposition of Dr. Jan Leetsma. The court closely analyzed and compared the expert testimony of Dr. Leetsma with that of Dr. Rouse. (R-COA 5886-94). The court identified areas of agreement and areas of disagreement in the testimony. The fact that Dr. Leetsma refused to consider any evidence other than the medical evidence rendered his conclusions less credible. In it's Order, the district court recites the extensive evidence establishing that the fatal blow occurred on

17

the naval station, including Bourgeois' own statements that the victim was singing her ABC's with him after he entered the naval station prior to the fatal blow. (R-COA 5894-98). Reasonable jurists would not debate the district court's decision to limit the evidentiary hearing on the jurisdictional issue. Likewise, reasonable jurists would not debate or disagree with the district court's conclusion that defense counsel were not ineffective in failing to challenge the jurisdictional issue in the face of the strong and convincing evidence establishing federal jurisdiction.

## C.    The challenge regarding the evidence of semen.

Bourgeois has not established that reasonable jurists would debate or disagree with the district court's conclusions regarding the manner in which trial defense counsel strategically approached the semen evidence in this case. First, the district court correctly held that the "possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case." (R-COA 5899). Second, the district court reviewed Bourgeois's expert testimony and reports on the semen issue, compared those positions with the manner in which trial defense counsel attacked the government's evidence during trial, and

18

reasonably concluded that trial defense counsel made a strategic decision to use the expert's conclusions during the cross-examination of government witnesses rather than directly calling its own experts to testify. (R-COA 5899-5914). As the district court noted, "Trial counsel did not leave forensic testimony about sexual assault unrebutted." (R-COA 5909). While reasonable jurists might debate in hindsight whether trial defense counsel's strategy was the best strategy, no reasonable and unbiased jurists would disagree with the district court's conclusion that the trial strategy was constitutionally sufficient. This is particularly so where a more aggressive challenge to the sexual-assault evidence could have opened the door to additional prejudicial evidence that was otherwise not admitted due to counsel's chosen strategy. (R-COA 5914).

## D.    The challenge to defense counsel's representation during punishment.

Bourgeois has failed to show that reasonable jurists would debate whether defense counsel provided reasonable assistance of counsel in regards to pursuing and presenting available mitigation evidence. On this issue, Bourgeois appears to cross the "threshold" of this issue and seeks

19

a full retrospective review of the actions and decisions of trial counsel. While Bourgeois claims there were many family members and experts "available" to defense counsel as demonstrated by the evidence presented during the evidentiary hearing, the entire record clearly and undeniably demonstrates either that the same type of evidence was presented, or that some evidence was not readily available at the time of the trial. Where additional evidence was available through additional witnesses, the district court held that defense counsel made strategic decisions to attack the government's evidence through cross-examination rather than calling unreliable experts and witnesses who were impeached when presented at the evidentiary hearing in this case. Indeed, the district court found that the lay witnesses who testified about Bourgeois' personal history at the evidentiary hearing failed to provide some information to mitigation experts prior to trial and some were not willing to present that testimony during the trial in 2004. (R - COA 5844-45, 5851-55).

Regarding the alleged defense experts presented during the evidentiary hearing, the district court accurately concluded that they were unreliable and biased at best. The district court compared the veracity

and trustworthiness of the defense lay witnesses and defense experts with the witnesses presented by the United States and consistently concluded that the defense witnesses were not credible. The fact that a volume of witnesses were paraded through the courtroom during the habeas process does not establish that the original trial defense counsel rendered constitutionally infirm assistance in failing to call the same witnesses. Trial defense counsel chose to utilize a few lay witnesses and chose to utilize the input of various experts in an effort to cross examine government witnesses with the hope of showing that the government's evidence was weak and insufficient. In truth, a retrospective review of this strategy demonstrates it was as reasonable and constitutionally sufficient as the strategy employed by Bourgeois during the habeas process. The district court was "not convinced that a reasonable attorney would encourage the jury to choose a life sentence based on Bourgeois' intellectual limitations." (R-COA 5855). Reasonable jurists would not debate or disagree with that conclusion when viewing the trial and the habeas process as a whole. This is particularly true from the "threshold" perspective. Bourgeois has not made a substantial showing of the denial

21

of his constitutional right to effective assistance of counsel.  His request for a COA on this issue should be denied.

## E.    Conclusion with regard to application of Standard of Review.

Bourgeois has not made a substantial showing that any of his constitutional rights were denied.  Jurists of reason would not disagree with the district court's resolution of the issues in this case, nor would reasonable jurists conclude that the issues presented deserved any encouragement to proceed beyond that permitted by the court at the evidentiary proceedings.  Bourgeois has not demonstrated that reasonable jurists would find the district court's assessments of his issues debatable or wrong.  As such, this Court should deny Bourgeois' request for a COA.

## ARGUMENT

### I

THE DISTRICT COURT PROPERLY REFUSED TO HOLD A FULL EVIDENTIARY HEARING ON BOURGEOIS' CHALLENGE TO THE JURISDICTIONAL EVIDENCE, AND PROPERLY CONCLUDED THAT TRIAL COUNSEL WERE NOT INEFFECTIVE IN FAILING TO CHALLENGE JURISDICTION .

Bourgeois claims that the district court erroneously dismissed this claim without allowing an evidentiary hearing.  He argues that he gave

a "strong proffer that trial counsel ineffectively failed to investigate, develop, and present evidence refuting federal jurisdiction." (Pet. Br. at 12). However, the "strength" of Bourgeois' proffer rests upon a solitary statement that Bourgeois wrenches out of context from the medical examiner's report while excluding consideration of all the other evidence in the case. When placed in context, Bourgeois' "strong proffer" collapses like a house of cards. Fortunately, the district judge was present at the entire trial and was fully cognizant of the fact that the evidence establishing federal jurisdiction went beyond the medical evidence and included a very credible eyewitness as well as evidence from the Bourgeois' in-court testimony. The district court properly refused to hold a full evidentiary hearing on an issue that was clearly established by the evidence as a whole. Likewise, the district court properly denied Bourgeois' claim that trial defense counsel's failure to challenge the federal jurisdiction was unreasonable. No reasonable jurist would disagree or debate the district court's conclusions.

Section 1111(b) of Title 18, United States Code, contains the language establishing federal jurisdiction for murder in the first degree:

23

"within the special maritime and territorial jurisdiction of the United States."   Section 7 of Title 18, United States Code, defines "special maritime and territorial jurisdiction of the United States" to include lands reserved or acquired for the use of military facilities. *United States v. Colon-Padilla*, 770 F.2d 1328, 1331 (5th Cir. 1985) (citing *United States v. MacDonald*, 456 U.S. 1 (1982) (holding that a federal district court had proper jurisdiction over crimes committed on military property)).

The Corpus Christi Naval Air Station is a place within the special maritime and territorial jurisdiction of the United States.  Thus, federal jurisdiction exists if the evidence established that Bourgeois committed the fatal injuries on that facility.  To attack the element of jurisdiction on a habeas challenge, Bourgeois must challenge the sufficiency of the evidence on that element retrospectively.  A sufficiency of the evidence challenge is reviewed to determine whether a reasonable trier of fact could have found that the evidence established the essential elements of the crime beyond a reasonable doubt. *Cavazos v. Smith*, 132 S.Ct. 2 (2011); *McDaniel v. Brown*, 130 S.Ct. 665 (2010); *United States v. Perrien*, 274 F.3d 936, 939 (5th Cir. 2001) (citations omitted).  The case law in this

24

Circuit appears to require that the jurisdictional element be established by a preponderance of the evidence. *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993).[7] Nevertheless, a court reviewing a sufficiency of the evidence challenge is entitled to draw all inferences from the evidence in the light most favorable to the verdict and need not exclude every reasonable hypothesis of innocence because a jury is free to choose among reasonable interpretations of the evidence. *Id.* at 939-940. At a minimum, Bourgeois would have to convince the court that the evidence gave equal or nearly equal circumstantial support to his theory that the fatal blows occurred prior to Bourgeois entering the naval station. *See generally Perrien*, 274 F.3d at 940 (holding that the party challenging sufficiency of evidence must show convincing evidence that the circumstances support a finding of innocence to the same degree as guilt).

Bourgeois myopically rests his claim upon one statement in Dr. Kagan-Hallet's neuropathology consultation report provided to the

---

[7] The jury instructions in this case instructed the jury to determine jurisdiction beyond a reasonable doubt. (Jury Instructions, page 6-7). As such, the finding of guilt establishes that sufficient evidence existed to establish federal jurisdiction, so the question of which burden of proof applies need not be resolved for purposed of the instant case. *See generally United States v. Bailey*, 169 Fed. Appx. 815, 821 (5th Cir. 2006).

medical examiner, Dr. Rouse, and included as part of Dr. Rouse's autopsy report.  (R-COA 5198-99).  The report says "approximately 10 days' duration" in describing the history of head trauma.[8]  Bourgeois' request for an evidentiary hearing and claim of ineffective assistance of counsel relies wholly on this one statement which Bourgeois isolates and views outside of the totality of the evidence.

Importantly, the medical evidence constitutes but a portion of the evidence in this case.  While it was an important part in showing the extent of the trauma to the victim, in and of itself, it did not establish the date, time, or location of the fatal blow.  The medical evidence did establish that many of the serious injuries were recent and were consistent with having occurred while Bourgeois was on the naval station.

---

[8] In support of his challenge to jurisdiction, Bourgeois erroneously attempts to use notes from the prosecutor (R-COA 4435) taken during a witness interview of Dr. Rouse.  (Pet. Brief, at 13).  First, Bourgeois is incorrect in attributing these notes to an interview of Dr. Kagan-Hallet.  The government never interviewed Dr. Kagan-Hallet.  Those notes were taken during an interview of Dr. Rouse.  Secondly, the notes were provided to Bourgeois' habeas counsel in an effort of full disclosure.  When Bourgeois' counsel attempted to improperly use these notes during the evidentiary hearing, the district court sustained an objection to their use.  (R-COA 5271-76).  Those notes are not properly before this Court, and even if the notes are properly part of the Record, this Court should reject Bourgeois's misuse of the government's notes taken during the witness interview of Dr. Rouse.  Those notes establish nothing more than what the author of the notes thought or perceived or interpreted.  They are not a written record of any witness and should not be accepted as evidence of such.

26

Other than this one isolated statement in the medical examiner's report, Bourgeois can point to no evidence tending to support a conclusion that the fatal blows happened prior to Bourgeois' entrance onto the naval station, particularly in a "threshold inquiry."

Dr. Rouse testified at trial that JG had several severe head injuries including some very recent ones. (Dkt 224 - TT of March 8, 2004, pp. 130-131). Although she was unable to separate all the injuries and effectively assess when each and every head injury occurred, she did testify that there were recent injuries with "fresh hemorrhage." As the district court recalled, Dr. Rouse testified that the fatal injuries were consistent with AB1994's version of the events" which killed the child victim. (R-COA 5886).

Dr Akhtar, the emergency room doctor, saw the seriousness of the injuries first hand after responding to the emergency room. He realized immediately that JG would not live long. (Dkt 344 - TT of March 9, 2004, pp. 85-93). Dr. Kuffel, a local ophthalmologist, testified that he observed a large amount of blood in JG's eyes consistent with a severe head injury. This additional medical evidence was consistent with a finding that JG

had suffered the life-threatening injuries on June 27, 2002, when Bourgeois was on the navel station. The child's death was not a result of lingering injuries inflicted 10 days earlier.

In addition to the medical evidence, the testimony regarding the events just before JG was transported to the emergency room overwhelmingly established that the fatal injuries occurred on the naval base and were definitely not 10 days old. First, Robin Bourgeois testified that the family had stopped at their residence a couple of days before driving to Corpus Christi. There was no evidence or indication that JG had suffered any fatal injury prior to them arriving at or departing from their Louisiana residence. Robin testified that she drove all night and slept when they arrived in Corpus Christi. (Dkt 244 – TT of March 2-3, 2004, pp. 113-117). There was testimony by employees on Ingleside Naval Station who corresponded with Bourgeois during his stop on Ingleside Naval Station without any inference that JG had suffered the fatal injuries. The evidence is undisputed that Bourgeois departed Ingleside Naval Station and arrived at Corpus Christi Naval Station in about the time it would take to drive directly there. After entering Corpus Christi

Naval Station, the evidence established that the engine on Bourgeois'

tractor-trailer stopped working.    He corresponded with two local

employees asking for directions and obtaining assistance in getting his

tractor started without even a hint suggesting that JG had already been

fatally assaulted.

Moreover, Bourgeois' own testimony firmly established that JG was

still alive and had not suffered the fatal injury at the time his truck was

broken down on Corpus Christi Naval Station. During cross-examination,

the government asked Bourgeois about JG's location and actions while he

was on Corpus Christi Naval Station.  Bourgeois testified that JG was

actively playing and singing her ABCs with him and AB1994.  (Dkt #338;

TT of March 15, 2004, p. 50).  Bourgeois testified that when he pulled up

to Building 1218, JG was sitting on her potty.  *Id*. at 52-54.  Thus, based

solely on the testimony of Bourgeois, the jury had sufficient evidence to

conclude that the fatal assault on JG occurred while Bourgeois and JG

were on Corpus Christi Naval Station.

Additional evidence established that it was only subsequent to the

vehicle being re-started and Bourgeois arriving at the warehouse for

29

unloading that AB1994 observed Bourgeois deliver the fatal blows. Although AB1994 was a minor, she was extremely articulate, and her unrebutted testimony established that the fatal blows occurred after Bourgeois stopped the truck at his destination for unloading. The events after the fatal blows unfolded rather quickly. After Bourgeois slammed JG into the window and dashboard area of the truck, he placed JG in the seat beside AB1994 and exited the vehicle. AB1994 also exited the vehicle. The evidence is void of any suggestion that the vehicle moved again after the fatal injury. When Robin awoke and found JG essentially lifeless, they were parked at the warehouse on Corpus Christi Naval Station.

Since Robin drove to Corpus Christi and did not observe JG in her lifeless form, the jury could reliably conclude that the fatal injuries occurred after they arrived in Corpus Christi. AB1994's testimony, together with the events of the truck's engine stopping and Bourgeois's own testimony, provided crucial support for concluding that Bourgeois committed the fatal assault after entering Corpus Christi Naval Station. Thus, as a whole, the evidence only established one possible location for

30

the fatal injuries – Corpus Christi Naval Station.  Thus, Bourgeois has not demonstrated any serious question regarding the sufficiency of the evidence establishing special maritime and territorial jurisdiction, particularly when viewed in the light most favorable to the verdict from a "threshold inquiry."

While the district court did not permit a full evidentiary hearing for Bourgeois' habeas motion, the court ultimately permitted Bourgeois to make an evidentiary record on this issue even though his proffer challenging this issue was unavailing.[9]    The court permitted the deposition testimony of Dr. Jan Leetsma.  (R-COA 5047-5149).  Notably, consistent with Bourgeois' approach to this issue from beginning, Dr. Leetsma's opinion regarding when and where the fatal blows occurred focused solely on the medical evidence to the exclusion of eyewitness

---

[9] Bourgeois initially relied upon an affidavit of Dr. Werner Spitz to challenge the jurisdiction issue.  The district court address Dr. Spitz' conclusions in its Order and found that Dr. Spitz lacked credibility because he simply dismissed the eyewitness testimony of AB1994.  (R-COA 5886-87).  The district court had observed AB1994's testimony and found her "highly credible."  (R-COA 5887).  Moreover, the court was persuaded by the fact that other judges had concluded that Dr. Spitz lacked credibility. *Id* at footnote 121.  Thus, Bourgeois' "proffer" on this issue was weak from the beginning.

testimony and other circumstantial evidence. (R-COA 5113).[10]   At best,

from the medical evidence alone, Dr. Leetsma could only conclude that it

is very difficult to ascertain the exact time or date of when a certain injury

occurred because the child victim had both recent and dated injuries and

a large number of injuries. (R-COA 5135). In light of the timing of Dr.

Leetsma's deposition, the district court also received telephonic testimony

from Dr. Rouse to address issues raised by the deposition testimony. (R-

COA 5226-78).

Dr. Rouse agreed with Dr. Leetsma's statement that the medical

evidence could not be used by itself to determine the exact date of a given

injury, including the fatal brain injury. (R-COA 5255). For that reason,

Dr. Rouse stated that is was necessary to "[put] it together with the

witness reports ... that corresponds with the injuries that we saw in

autopsy" to determine "what caused her death." (R-COA 5257-58). Thus,

during the limited presentation that the district court permitted on this

issue, the best that Bourgeois could show is that the medical evidence was

---

[10] "Q: (Prosecutor) You're not considering what an eyewitness [sic], you're just looking at the medical evidence?
    A. (Dr. Leetsma)  That's right.  Just looking at the medical evidence."

unable, by itself, to date the time of the fatal blow.  What Dr. Rouse added, and what the district court probably already concluded in deciding not to hold a full evidentiary hearing, was the following: federal jurisdiction in this case was established by considering the medical evidence together with the witness testimony and other relevant evidence which, when viewed as a whole, clearly established by any evidentiary standard that the fatal blows occurred on the naval station therein providing federal jurisdiction in this case.  (R-COA 5886).

The district court observed the evidence at trial and considered the evidence Bourgeois presented through Dr. Spitz and Dr. Leetsma.  The court found that Bourgeois' witnesses were not credible and ultimately held that he did not adduce credible evidence to challenge the jurisdictional element in this crime.  (R-COA 5898-99).  Trial defense counsel were fully aware of the evidence and likely realized that an attack on the jurisdiction would have been as futile as that established by the evidence adduced during the habeas proceedings.  The district court reasonably concluded defense counsel would have lost credibility with the jury if they had attacked the jurisdiction in this case.  Bourgeois has not

33

made a substantial showing of a denial of a constitutional right with regard to his challenge to the jurisdictional element or his claim of ineffective assistance on this issue.

**II**

BOURGEOIS HAS NOT DEMONSTRATED THAT HIS TRIAL DEFENSE COUNSEL WERE CONSTITUTIONALLY DEFICIENT IN HOW THEY HANDLED THE SEMEN EVIDENCE IN THIS CASE.

The evidence at trial established that the two-year old victim had over 300 injuries, including head injuries, bite marks, whip marks, burn marks, and semen in her anus. The evidence at the punishment phase also established that Bourgeois had been violent toward prior spouses, and other children. He had bitten a relative during a fight and had sought to hire another inmate to kill several people involved in this case. Notwithstanding that extremely aggravating evidence, Bourgeois claims that trial defense counsel's handling of the semen evidence was ineffective and warrants either a new trial or at least a new punishment proceeding.

Bourgeois argues that trial defense counsel failed to present "readily available expert testimony that would have eviscerated the Government's evidence that semen was present and JG1999 was sexually assaulted."

34

(Pet. Br. at 20). This was a murder case, not a rape case, and the district court correctly concluded that the "possibility that Bourgeois sexually assaulted his daughter was an inflammatory, but not essential, part of the Government's case." (R-COA 5899). The court added, "trial defense counsel did not leave the forensic testimony about sexual assault unrebutted." (R-COA 5909). Indeed, they chose to attack the evidence on cross-examination of the government's witnesses using the information provided by the "available experts" rather than calling those experts and drawing additional attention to the sexual assault evidence. Considering the fact that the "available experts" were not able to completely discount the possibility that Bourgeois sexually assaulted the minor victim, the district court reasonably concluded that this trial strategy was not constitutionally unreasonable.

Ineffective assistance of counsel claims are reviewed under the now well-established *Strickland* standard: "Whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064 (1984).

35

To succeed on such a claim, a Bourgeois must first show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 1064. The reasonableness of counsel's challenged conduct must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct" and the reviewing court "must strongly presume that counsel has exercised reasonable professional conduct." *United States v. Samples,* 897 F.2d 193, 196 (5th Cir. 1990)(citations omitted). Second, the Bourgeois must show that he was prejudiced by counsel's ineffective assistance. The prejudice prong, however, is more than just an outcome determinative test; it requires the Bourgeois to demonstrate that the result of the proceeding was fundamentally unfair or unreliable. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 843-44 (1993); *Goodwin v. Johnson*, 132 F.3d 162, 174 (5th Cir. 1998).

To prevail on this claim, a movant must identify the acts or omissions that are outside the wide range of professionally competent

36

assistance and then demonstrate that but for counsel's unprofessional errors the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. A reviewing court must endeavor to eliminate the distorting effects of hindsight and evaluate the facts from counsel's perspective at the time of trial. To this end the court will indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Id.* The burden falls on the movant to prove a violation of constitutional standards. The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984). Moreover, as this is a motion for a certificate of appelability, this Court is only required to make a "threshold inquiry" into the issue at this stage.

In *Armstead v. Scott*, 37 F.3d 202 (5th Cir. 1994), *cert. denied* 514 U.S. 1071, 115 S.Ct. 1709 (1995), this Court reaffirmed that the defendant must affirmatively prove prejudice; a mere allegation of prejudice is not sufficient. This assessment, in turn, will depend in part on a prediction of what the outcome of the trial might have been. *Id.* (citing *Hill v.*

37

*Lockhart*, 474 U.S. 52, 56-58, 106 S.Ct. 366, 369-370 (1985)).

Bourgeois reaches well beyond the "threshold inquiry" and asks this Court to conduct a detailed review of the minute facts supporting his claim. That detailed analysis was already conducted by the district court and is not required by this Court. However, even if this Court conducted a review of the detailed facts, the record as a whole reveals that trial defense counsel were not ineffective in how they handled the semen evidence.

Trial counsel obtained a court appointed DNA expert after an October 2003 motion seeking such. The expert, Dr. Elizabeth Johnson, claimed that she was able to locate a sufficient sample of evidence on a swab to perform serological and DNA testing. On March 1, 2004, Dr. Johnson provided trial defense counsel with a two page hand-written note setting out her review of the semen evidence. (*See* R-COA 810-811).[11]

Although retained in October 2003, Dr. Johnson failed to provide defense counsel with a summary of her analysis until the first day of trial

---

[11] For the habeas proceeding, instead of a two-page hand-written note, Dr. Johnson provided habeas counsel with a type-written report dated September 26, 2007. (R-COA 1082-1085). Trial defense counsel was not provided with this type of comprehensive report.

in March 2004, adversely impacting counsel's ability to utilize Dr. Johnson as a witness.  Indeed, Mr. Gilmore notes in his affidavit that Dr. Johnson "had a great deal of problems" communicating with the trial team and was essentially unavailable.  (*See* Mr. Gilmore's Affidavit submitted in Response to Court Order; Attachment B, p.3 to Government's Reply to Bourgeois's 2255 Motion - Sealed; DKT # 442-443).  The court had required expert reports be turned over by February 26, 2004.  Otherwise, the expert's testimony would be excluded.  While the government was not privy to the discussions and arrangements between Mr. Doug Tinker and Dr. Johnson, it is clear that Dr. Johnson's analysis was tardy, and her notes indicate she was in Colorado when she prepared them and faxed them.  The date of Dr. Johnson's September 2007 statement is revealing considering that Bourgeois' habeas counsel were able to obtain and submit most of their other expert witness' declarations by May 2007. Circumstances of this sort support the conclusion that Mr. Tinker and Mr. Gilmore made efforts to obtain a timely formal "report" from Dr. Johnson only to have Dr. Johnson prove to be unable to provide anything until after February 26, 2004.  Moreover, Mr. Tinker observed in his answers

to interrogatories that because Dr. Johnson did not have her own lab and did not do the testing he requested in a timely fashion, the trial team was not able to fully utilize her services. (*Id*, at Attachment A, p.14, answer to Question 6).

In any event, the March 2004 notes are illuminating. The notes indicate that they were created for the purpose of assisting Mr. Tinker in his "cross exam of FBI witnesses (both Carolyn [Zervos] and Anthony [Onorato])." (R-COA 810). The notes also <u>confirm</u> that the P30 test was a "weak positive" with a negative result for sperm. *Id.* It is quite clear that Mr. Tinker utilized the notes in his cross-examinations. However, to whatever extent that Dr. Johnson's live testimony would have assisted in further limiting the impact of the presence of semen, Dr. Johnson would have had to acknowledge the presence of some semen. Indeed, the district court concluded that Bourgeois' experts during the habeas proceeding "could question but not conclusively eliminate the possibility of sexual assault." (R-COA 5913). Thus, it was a reasonable tactical decision for trial counsel to utilize Dr. Johnson's expertise in assisting on cross-examination without calling her as a witness to confirm the presence of

semen.

Dr. Johnson failed to provide a more detailed report to trial defense counsel and certainly did not provide as thorough a declaration as the September 2007 declaration. Thus, trial defense counsel was not privy to Dr. Johnson's full opinion that "there was insufficient scientific evidence to conclude that the substance contained on the tested swabs was semen." If Dr. Johnson had conveyed that opinion to trial defense counsel, then it is possible that trial defense counsel might have made a different tactical decision at the time of trial. Defense counsel is not required to be clairvoyant as to what an expert might say in a more detailed report submitted three years after trial. Defense counsel must make decisions based upon the information available at the time of trial. Dr. Johnson's March 2004 handwritten notes did not supply a reasonable basis to support a decision to call her as a live witness.

Dr. Johnson testified at the evidentiary hearing (R-COA 2395-2515). The district court considered her testimony and concluded that Dr. Johnson and the other defense expert, Mr. Alan Keel,[12] "would not [have

---

[12] Mr. Keel testified at the evidentiary hearing. (R-COA 2516-67).

41

been] persuasive witnesses before the jury." (R-COA 5913).  Indeed, the district court's Memorandum and Order addressed the evidence on this issue with an extensive analysis.  (R-COA 5899-5915).[13]  As the district court noted, this Court has concluded that a trial defense counsel's decision to utilize cross-examination to attack a government' s expert witness instead of presenting testimony from additional experts "can be reasonable performance." (R-COA 5910; *citing Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007)).  The district court concluded that the evidence Bourgeois provided at the evidentiary hearing from Dr. Johnson, Mr. Keel, and Dr. Werner U. Spitz, did not establish that trial defense counsel's representation was unreasonable.  (R-COA 5905, 5913).

Bourgeois also claims that his counsel should have challenged Dr. Benton's testimony about vaginal trauma.  Bourgeois submitted a

---

[13] Bourgeois argues that the FBI failed to use their own serological protocols for identifying semen. (Pet. Br. for COA at p.31-34).  This argument was not raised in the original 2255 Motion.  It is attempt to amend the Motion and should not be permitted. The government objected to the attempt to amend during the evidentiary hearing. (R-COA 2647-48).  In any event, each of Bourgeois' arguments about the application of the FBI protocols were aptly renounced through the testimony of FBI Forensic Examiner Jerrilyn Conway. (R-COA 2569-2662).  Conway specifically testified that the p30 test alone can be used to confirm the presence of semen.  (R-COA 2599).  The district court noted in a footnote that Ms. Conway disagreed with the Bourgeois' experts on various aspects of identifying semen and sperm.  (R-COA 5913, footnote 143).

statement by Dr. Werner Spitz who took issue with Dr. Benton's conclusions and suggests that Dr. Benton was wrong. Again, it is within the wide range of reasonable performance for counsel to rely on the expertise of Dr. Johnson and decide that there was no need to keep searching for additional experts who might eventually provide an opinion that would support an argument that there was no trauma. Indeed, the case law does not require counsel to continue such a search. Additionally, the district court found that Dr. Spitz' affidavit did not "necessarily eviscerate Dr. Benton's interpretation of the evidence." Rather, Dr. Spitz only established that a medical examiner would be in a better position to evaluate whether a bruise was present during an autopsy than a medical doctor later reviewing photographs of the autopsy. The district court noted that Dr. Rouse, the medical examiner, might have deferred to Dr. Benton's observations if asked. (R-COA 5905). More to the point, the district court simply found Dr. Spitz not a credible expert. *Id* at footnote 136.

Even the evidence Bourgeois provided during the habeas process in support of his 2255 motion did not conclusively eliminate the possibility

43

that he sexually assaulted JG.  Reasonable jurists would not debate the district court's conclusion that defense counsel provided reasonable and constitutional representation in how they approached the semen evidence where counsel during the habeas process were no more effective at removing the possibility that Bourgeois sexually assaulted JG than were the trial counsel.

With regard to prejudice, this Court has held that a failure to obtain and present evidence that would undermine part of the evidence of guilt is not ineffective assistance of counsel where the evidence is so strong that "there is no reasonable probability that production of the [evidence] would have affected the outcome of [the] trial." *See generally Burton v. United States*, 237 F.3d 490, 494 (5th Cir. 2000) (failing to obtain a vehicle lease to disprove a drug trafficking charge).  Bourgeois relies upon the holding in *Soffar v. Dretke*, 368 F.3d 441, 472 (5th Cir. 2004) where this Court held that failure to obtain a ballistics expert to discredit the defendant's confession was ineffective assistance of counsel. While *Soffar* is factually similar to Bourgeois' claim, it is important to recognize that the Court found that the conviction was "based indispensably" on the defendant's

44

confession in *Soffar*.  368 F.3d at 443.

Applying *Burton* and *Soffar* requires an analysis of how important the evidence of the semen was to Bourgeois' conviction for murder and sentence to death for brutally killing a defenseless two-year-old baby. This was not a sexual assault case.  While the presence of semen certainly added to the egregiousness of Bourgeois' conduct, the gravamen of the murder was the brutality of the six-weeks of beatings culminating in the crushing and fatal blows to the baby's head.  The photographs of the process of abuse was undeniable.  Bourgeois' callousness was demonstrated by his comments to other inmates and the threats he made to various witnesses and participants during the trial.  All of this evidence culminated in the ultimate result.  The evidence of premeditation demonstrated by Bourgeois' calls to Family Protective Services, the post cards sent to JG's biological mother, and the stated plans of Bourgeois when questioned by Robin about what he will do if he kills JG, are together such strong evidence of premeditated murder and so concretely support the sentence of death, that there is no reasonable probability that testimony from Dr. Johnson or any of the other evidence Bourgeois

45

presented during the habeas process would have affected the outcome of the conviction and sentence.

The district court specifically addressed the prejudice prong of Bourgeois' ineffective assistance claim regarding the semen evidence. The district court noted that if trial defense counsel had taken a more aggressive approach to challenging the semen evidence, the issue may have become "a much more prominent feature in the jury's deliberation." (R-COA 5913-14). As Judge Jack correctly recalled, she had excluded other evidence that the government wanted to present at trial including evidence that Bourgeois "french kiss[ed] AB1994" and had her sit on his lap inappropriately. *Id* This evidence would have enabled the jury to conclude that Bourgeois was not just sexually molesting the daughter he ultimately killed, but was also sexually molesting his older daughter and was therein much more of a public threat. The district court reasonably concluded the prejudice inuring to Bourgeois' detriment exceeded any benefit to be gleaned from Dr. Johnson's testimony.

At best, the evidence deduced by Bourgeois during the habeas process did not eliminate the evidence establishing that semen was found

46

in the anus of the minor victim.  Because  Bourgeois has not established

that a reasonable jurist would question or debate the district court's

conclusions that Bourgeois failed to demonstrate deficient performance

and failed to demonstrate any prejudice on the claim related to the semen

evidence, this Court should deny his request for a certificate of

appealability on this issue.  Bourgeois has not made a substantial showing

of the denial of a constitutional right.

### III

BOURGEOIS HAS NOT DEMONSTRATED THAT HIS
TRIAL DEFENSE COUNSEL WERE CONSTITUTIONALLY
DEFICIENT IN HOW THEY HANDLED MITIGATION
EVIDENCE DURING THE PENALTY PHASE OF THIS
CASE, NOR HAS HE SHOWN THAT REASONABLE
JURISTS WOULD DISAGREE WITH THE DISTRICT
COURT'S CONCLUSIONS ON THIS ISSUE.

Bourgeois challenges trial defense counsel's representation during

the penalty phase of his case.  Interestingly, and somewhat representative

of Bourgeois' entire approach in challenging trial defense counsel's actions

in this case, Bourgeois begins his claim with a partial quote from Dr.

Carlos Estrada.  (Pet. Br. at 54).  The selected quote from Dr. Estrada's

post-trial Declaration provides only a small part of Dr. Estrada's post-trial

47

overall analysis of Bourgeois' mental condition – but this part of his opinion is where habeas counsel chose to focus. Likewise, certain parts of Dr. Estrada's pre-trial analysis revealed certain perspectives of Bougeois' mental conditions that were very important to trial counsel – prior to trial, Dr. Estrada concluded that Bourgeois was "above average intelligence," was manipulative, and had violent tendencies. (Dr. Estrada Deposition p. 46).[14]   These initial evaluations of Bourgeois' intelligence and nature guided the focus and scope of the mitigation investigation and trial counsel's development of strategy.

While Bourgeois argues that his trial defense counsel should have presented many more witnesses as represented by the evidence presented during the habeas process, his perspective is tainted by hindsight. It is true, as the district court recognized, that capital defense counsel should identify and develop evidence to mitigate against a sentence of death. (R-COA 5830; *citing Florida v. Nixon*, 543 U.S. 175, 191 (2004)). However,

---

[14] Dr. Estrada was deposed and his deposition testimony is supposed to be a part of the COA Record on Appeal. The district court acknowledged reviewing the two-hour deposition of Dr. Estrada. (R-COA 2622). However, the government has not been able to identify where Dr. Estrada's full deposition appears in the instant record on appeal. Dr. Estrada's original pre-trial report which contains his finding of Bourgeois's "above average intelligence" was submitted as an attachment to the United States' Response to Bourgeois's 2255 Motion.

it is equally true that a failure to present mitigating evidence that is discovered by subsequent habeas counsel is not per se ineffective assistance, so long as trial defense counsel conducted "a reasonably substantial, independent investigation into potential mitigating circumstances. *See generally, Smith v. Quarterman*, 515 F.3d 392 (5th Cir. 2008); *Neal v. Puckett*, 286 F.3d 236 (5th Cir. 2002).

Evaluating an attorney's performance by reading a sterile record never provides a full understanding of the attorney's efforts. Appellate courts concede the limitation of the written record in making credibility determinations, which they leave to the jury or the trial court, because the appellate court was not able to observe the presentation of the witnesses. There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. *See generally Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir.2004), *cert. denied,* 544 U.S. 952, 125 S.Ct. 1703 (2005). "The presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." *Callahan v. Campbell,* 427 F.3d 897, 933 (11th Cir.2005).

49

Importantly, each case, and each counsel's performance is judged on its own merits. Counsel may well be justified in not introducing "mitigating" evidence. "The Sixth Amendment entitles criminal defendants to the "'effective assistance of counsel'"-that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441 (1970)). That standard is necessarily a general one. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (2009) (quoting *Strickland*, 466 U.S., at 688-689, 104 S.Ct. 2052). "There is no checklist for judicial evaluation of attorney performance. Instead, the performance inquiry is on "whether counsel's assistance was reasonable considering all the circumstances" because no checklist for counsel's conduct "can take into account ... the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to

50

represent a criminal defendant." *Woods v. Thaler*, 399 Fed. Appx. 884, 891 (5th Cir. 2010) (quoting *Strickland,* at 688-89). Notwithstanding the constitutional stature of appropriate mitigating evidence in a capital case, counsel's failure to develop or present mitigating background evidence is not per se deficient performance. *Moore v. Johnson*, 194 F.3d 586, 615-22 (5th Cir. 1999); *see also Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir.), *cert. denied*, 522 U.S. 944, 118 S.Ct. 361 (1997); *King v. Puckett*, 1 F.3d 280, 284 (5th Cir.1993).

To the contrary, a considered strategic or tactical decision not to present mitigating evidence that is made after a thorough investigation of the law and facts relevant to all plausible lines of defense is presumed to be within the wide range of professionally reasonable assistance defined by *Strickland*, 104 S.Ct. at 2066; *Drew v. Collins*, 964 F.2d 411, 422 (5th Cir.1992); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir.1992); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989) (counsel's decision not to present mitigating evidence is entitled to deference when based upon an informed and reasoned practical judgment). Stated differently, *Strickland* requires that we defer to counsel's decision not to present mitigating

evidence or not to present a certain line of mitigating evidence when that decision is both fully informed and strategic, in the sense that it is expected, on the basis of sound legal reasoning, to yield some benefit or avoid some harm to the defense. *See Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir.1994) (counsel's strategic decision entitled to deference because supported by an adequate investigation which included contact with at least 27 people); *Drew*, 964 F.2d at 423 (counsel's strategic decision entitled to deference because counsel made "reasonable inquiries" into Drew's mental state); *Wilkerson*, 950 F.2d at 1064-65 (affording strategic decision deference where record established the counsel retained an investigator to explore whether mitigating evidence relating to defendant's background or mental ability was available); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir.1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *McCoy*, 874 F.2d at 964 (finding scope of investigation reasonable where counsel investigated possibility of mitigating evidence by interviewing everyone on a list provided by the capital defendant and determined none of them had anything good to say about the defendant).

Similarly, *Strickland* does not require deference to those decisions of counsel that, viewed in light of the facts known at the time of the purported decision, do not serve any conceivable strategic purpose. 104 S.Ct. at 2061 ("Counsel may not exclude certain lines of defense for other than strategic reasons."); *Boyle v. Johnson*, 93 F.3d 180 (5th Cir.1996) (explaining basis for counsel's strategic decision not to offer mitigating evidence identified by the defendant), *cert. denied*, 519 U.S. 1120, 117 S.Ct. 968 (1997); *Bell v. Lynaugh*, 828 F.2d 1085, 1090 (5th Cir.1987) (when counsel makes an informed and considered decision not to present mitigating evidence, the issue becomes whether the decision was reasonable ); *Moore v. Maggio*, 740 F.2d 308, 315-19 (5th Cir.1984) (explaining basis of counsel's considered decision to limit investigation by excluding implausible lines of mitigating evidence).

In a capital sentencing proceeding, "defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett,* 239 F.3d 683, 688 (5th Cir.2001) (quoting *Baldwin v. Maggio,* 704 F.2d 1325, 1332-33 (5th Cir.1983)). Like any claim of ineffective assistance of counsel, we

scrutinize the reasonableness of counsel's investigation in light of all relevant circumstances and give deference to counsel's decision to pursue a sound trial strategy. But in explaining how to assess investigation choices, the Supreme Court noted: "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins,* 539 U.S. at 521-22 (quoting *Strickland,* 466 U.S. 690-91).

It is important to recognize that trial defense counsel in the instant case relied upon the mitigation investigators and experts hired to assist in identifying and ultimately presenting reliable evidence during the punishment phase of this case. The record establishes Counsel moved

54

quickly to initiate a mitigation investigation.  Counsel initially contacted Dr. Mark Cunningham (mitigation expert) on June 30, 2003. (R-COA 3588, 4025).    Trial Counsel were not permitted to actually hire a mitigation expert until after the government announced they were seeking the death penalty. (R-COA 3591).  The government first gave that notice on July 16, 2003. (R-COA 3608).   Dr. Cunningham recommended Lisa Milstein (Milstein) as a mitigation investigator. (R-COA 3599).  Milstein brought Gerald Bernstein on to assist her. (R-COA 3600).

As Dr. Cunningham's curriculum vitae demonstrates, he is a highly experienced mitigation expert. Lisa Milstein's resume is also impressive, demonstrating years of mitigation investigation training and experience, as well as lecturing on mitigation and other capital punishment topics.  In addition to his experience as a mitigation investigator, Gerald Bierbaum was also an attorney, experienced in death penalty cases. (R-COA 4105-06, 4125).   Once trial counsel were authorized, counsel quickly hired Milstein and Bierbaum in the Summer of 2003. (R-COA 4107-08).

Despite being hired in mid-Summer of 2003, Milstein and Bierbaum didn't  interview Bourgeois until October 23, 2003. (R-COA 4107-08).

Bierbaum was not a mental health expert, but he testified he did not notice any symptoms or indications that Bourgeois was mentally retarded. (R-COA 4132-33).    During this all-important first formal interview, Bourgeois denied he suffered child abuse of any kind. He did, however, report a head injury from a motorcycle accident in 1984, which resulted in his allegedly being in a coma for as long as three months. (R-COA 4109).  This coma claim was repeated by Bourgeois to Dr. Cunningham on February 7, 2004. (R-COA 3638).

This head injury/coma revelation was a critical lead that guided the mitigation investigation and resulted in several experts reaching unsupportable conclusions once the evidence demonstrated that Bourgeois had lied about the coma.  (R-COA 3643; Dr. Cunningham had to change his approach to corroborating evidence after learning of the lie about the coma; R-COA 2906-08; Dr. Weiner had to change his opinion entirely because he could no longer rely on a head injury to explain a possible "impairment.").  The government advised the defense team that it was prepared to offer a medical report refuting Bourgeois' claims of having had a coma if Dr. Weiner testified. (Tinker Interrogatories #3 - submitted in

56

Response to Court Order; Attachment A to Government's Reply to Bourgeois's 2255 Motion - Sealed; DKT # 442-443). Understanding the consequences of exposing the jury to the coma fabrication, the defense decided not to call Dr. Weiner. *Id.* As the district court rightly concluded, "Bourgeois' dishonesty hampered the defense's development of evidence." (R-COA 5836).

Other events also hampered the mitigation investigation in ways not attributable to defense counsel. It was not until a March 17, 2004 email from Mr. Bierbaum to trial counsel, that Mr. Bierbaum identified a series of educational, employment, medical, government and financial records needed for the investigation. Milstein was the primary investigator who should have identified this earlier, but the mitigation investigation became woefully behind schedule and had been terribly delayed by December, 2003 because Milstein had developed a serious personal problem, and fundamentally failed to perform her duties. (R-COA 4114-15).

None of this was ever communicated to trial counsel. Although Dr. Cunningham complained of the quality of the mitigation interviews and

57

reports immediately to Bierbaum, he did not alert trial counsel to the sub-standard quality of the mitigation reports until February 7, 2004. (R-COA 3627, 3633, 3707). Importantly, Dr. Cunningham received an inquiry by email on December 1, 2003, in which Mr. Gilmore asked if the mitigation investigators were coordinating directly with Dr. Cunningham and providing documents to Dr. Cunningham. The evidence provided by Dr. Cunningham indicates that he did not respond to Mr. Gilmore's question. (R-COA 3707). Although Dr. Cunningham's declaration stated that he, as the mitigation expert, would inform counsel of the best way to proceed, and was there to assist defense counsel, Dr. Cunningham utterly failed in his role of assistant in this case. (R-COA 3707-10).

Following Bourgeois' conviction, the court conducted the penalty phase of the trial. In addition to the hideous facts offered at the guilt phase, the government offered additional substantial evidence in support of the alleged aggravating factors. The jury heard that Bourgeois physically beat his mother-in-law in front of toddlers. (Penalty Phase, Day 1, pp 35-38). He beat his numerous wives regularly. (Penalty Phase, Day 1, pp 44, 48, 61-63, 99-102; Day 2, pp. 81, 82, 87). He engaged in sadistic

bullying of young children relatives. (Penalty Phase, Day 1, pp 50-56). He physically abused toddler relatives. (Penalty Phase, Day 1, pp 70-74, 78 (3 year old girl); 82-84, (3 or 4 year old son)). He attacked a U.S. Marshal, while in custody. (Penalty Phase, Day 1, pp 109-13). He pulled a gun on his aunt & cousin, threatening to kill them (Penalty Phase, Day 1, pp. 115-17, 123-24). He was seen to be indifferent to the victim. (Penalty Phase, Day 1, p. 134). He attempted to hire an inmate, he believed to be a hitman, to kill family members who offered evidence against him: (Penalty Phase, Day 1, pp 155-62; Cousin Lisa Monroe; (Penalty Phase, Day 1, pp 156-57, 162, 189, 196-99; Day 2, 81, 83; Robin Bourgeois; (Penalty Phase, Day 1, pp 161-62; Gaynelle Collins Bourgeois).

Finally, the victim's family impact testimony was nothing short of heart-wrenching. (Penalty Phase, Day 1, pp 220-41). Dr. Carlos Estrada was a Board certified Psychiatrist, (Penalty Phase, Day 1, p. 252) with a Fellowship in mental retardation conducted an extensive background investigation on Bourgeois. Dr. Estrada had reviewed statements by many of the witnesses and by family members, who reported some of Bourgeois' abuse at the hands of his mother, rejection and abandonment.

59

Dr. Estrada observed Bourgeois throughout the trial, (Penalty Phase, Day 1, pp. 252, 272), collecting any additional information available on him, including the psychological reports of Drs. Weiner and Cunningham[15], (Penalty Phase, Day 1, p. 272), and the psychological report from a Sheriff's Office job application, when Bourgeois was 23 years old. (Penalty Phase, Day 2, pp. 18-19).

> "My conclusions are that he meets a number of specific items that have been found associated with violence, and they include items in his background that we found, sadly enough, repeatedly occurring in children, and then leading to violence as adults. Particularly, we've found that being a subject of rejection, neglect, and abandonment, being a survivor of actual physical or sexual or emotional abuse have a very high predisposition for violence as adults." .... So in terms of the background, I found these 5 elements of the background that Mr. Bourgeois shares with a group of individuals that show violent behavior as adults. In terms of his personality, we look for 3 things in the assessment of personality. Number one, we look for items that will decrease the capacity for self-control, such as ... poor intelligence or judgment or poor control of emotions, whether its due to illness or to alcohol or to mental retardation ..."

(Penalty Phase, Day 1, pp.282-84).

Dr. Estrada made several other damaging assessments of Bourgeois:

---

[15] Upon hearsay objection, Dr. Estrada was ordered not to refer to Dr. Weiner's report, which had been excluded for all purposes. (Penalty Phase, Day 2, pp. 25-33), or to any aspects of Dr. Cunningham's report, which relied upon Dr. Weiner's report, specifically including allegations of sexual abuse of Mr. Bourgeois.

"Mr. Bourgeois has the characteristics that in psychiatry we call a narcissistic personality disorder ... an individual whose basic motivation in life is the aggrandizing of his self-esteem and importance." (Penalty Phase, Day 1, p. 284). Dr. Estrada added: "On the basis of the assessment of the background factors and his personality factors, my opinion is that Mr. Bourgeois has a **much higher tendency toward violence than an ordinary person**." (Penalty Phase, Day 1, p. 285)(emphasis added). Dr. Estrada then testified that "Mr. Bourgeois' attitude throughout these proceedings has been one of a member of the defense team, and rather than the Defendant or the father of the victim," (Penalty Phase, Day 1, p. 286), and noted that Bourgeois even avoiding eye contact with his own 7 year old daughter when she was testifying at trial. (Penalty Phase, Day 2, pp. 63-64).

On cross-examination, trial counsel essentially used Dr. Estrada effectively to analyze mitigation evidence known to Dr. Estrada to Bourgeois' advantage.[16] On the basis of all the information obtained, Dr.

---

[16] The district court found that Mr. Gilmore had great confidence in Dr. Estrada's opinion and credibility and believed the defense would be able to obtain significant mitigating facts from the cross examination of Dr. Estrada. (R-COA 5838).

61

Estrada concluded that Bourgeois was untruthful with him when Bourgeois denied being abused as a child. (Penalty Phase, Day 2, pp. 17, 22). Dr. Estrada noted that Bourgeois was vague and reluctant to discuss his childhood. However, after listening to the trial witnesses, Dr. Estrada concluded Bourgeois had been neglected by his parents, rejected by them, and abused by his mother, (Penalty Phase, Day 2, pp. 22-24, 44) an illegitimate child, abandoned by his father, p. 24, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 48).

Dr. Estrada explained that these factors did not excuse what Bourgeois had done, but provided a psychological explanation for what he had done. (Penalty Phase, Day 2, p. 24). Dr. Estrada explained that Bourgeois' narcissistic personality disorder was consistent with Bourgeois' childhood abuse and abandonment. (Penalty Phae, Day 2, p. 44). Dr. Estrada noted that Bourgeois was not a sociopath. (Penalty Phase, Day 2, p. 66).

Dr. Estrada explained the psychological dynamic of the events resulting in the death of the child. At the time of the murder, Bourgeois was under a number of stresses: (1) his affair and his wife's discovery of

his illegitimate child, (2) financial stress, (3) serious marital problems with his wife, (4) and the confined space of the truck cab over a long period of time. One minor event of the toilet spilling triggered an "explosion of anger" by Bourgeois against the child. (Penalty Phase, Day 2, p. 41). Dr. Estrada explained that Bourgeois' violence was centered in intimate family settings, and opined that Bourgeois would adjust well in custody. (Penalty Phase, Day 2, p. 67). Dr. Estrada's opinion adopted many of the findings of Dr. Cunningham, albeit in a shortened presentation, and without a pressure-cooker depiction. (R-COA 3663-3677; 3711-12).

Trial Counsel then offered testimony that Bourgeois had been abused as a child.[17] Carl Henry, a close cousin, testified Bourgeois was abused by his mother. (Penalty Phase, Day 2, p. 113). His mother whipped him with an extension chord, (Penalty Phase, Day 2, p. 115), and she hit him in the head with a telephone. (Penalty Phase, Day 2, p. 115). He testified that Bourgeois had been teased about having no father. (Penalty Phase, Day 2, p. 116). The Reverend Clayton (son of Mary

---

[17] The district court had sustained an objection to Dr. Estrada's testimony regarding the lack of any evidence that Bourgeois had suffered abuse as a child. That was a proper ruling at the time because the evidence from the family members and friends had not yet been presented.

63

Clayton, with whom Bourgeois lived from pre-adolescent until age of 16) testified Bourgeois had been abused by Bourgeois' mother. (Penalty Phase, Day 2, pp. 123, 125).

The mitigation evidence from family members that Bourgeois had been abused was not without cost. Even defense mitigation witnesses from the family were aware of allegations that Bourgeois beat young children. (Penalty Phase, Day 2, pp. 106-08, 110). In reading the mitigation reports there was more than suspicion that Bourgeois sexually molested young relatives. Nevertheless, trial defense counsel developed any favorable evidence available; that Bourgeois was a hard-working man, and a good provider, and that sometimes times were happy and good. (Penalty Phase, Day 1, pp. 65, 103-04; Day 2, p. 46). Notably, against Counsels' advice, Bourgeois addressed the jury at the end of the punishment phase and proclaimed to the jury that he was innocent because someone else had killed the child. (Penalty Phase, Day 3, p. 5).

At the outset, Bourgeois failed to reveal his childhood issues to those who were working on his mitigation case prior to trial. (R-COA 5839, footnote 86)(Dr. Estrada reported that Bourgeois "denies any history of

64

childhood abuse, physical or sexual, neglect or trauma."). Bourgeois also lied about the alleged coma; a lie that sent defense counsel down a path that turned into a dead end when the truth was revealed. Trial defense counsel cannot be held responsible for failing to discover and present more evidence of an abusive childhood where Bourgeois himself lied and refused to report what he now claims really happened to him as a child. *Galloway v. Thaler*, 344 Fed.Appx. 64, 68-69 (5th Cir. 2009) (petitioner failure to disclose sexual abuse to attorneys despite their efforts to talk with him). This Court has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 251-53 (5th Cir. 2002), *Soria v. Johnson,* 207 F.3d 232, 250-51 (5th Cir.2000); *West v. Johnson,* 92 F.3d 1385, 1408-09 (5th Cir.1996). Thus, to the extent that trial defense counsel failed to discover and present more evidence of childhood abuse, it was not due to ineffective assistance of counsel. It was directly due to Bourgeois' failure to disclose the information and other family witnesses reluctance to disclose the information. *Moody v. Polk*, 408 F.3d 141, 148-49 (4th Cir. 2005) (erroneous psychological report direct result of

65

Bourgeois's dishonesty, and not ineffective assistance of counsel), *see also Thomas v. Taylor,* 170 F.3d 466, 471 (4th Cir.1999).

It is true that trial counsel decided not to offer certain mitigation evidence to the jury. A critical factor guiding these decisions was Bourgeois' unwavering defense that he did not commit the crime; he claimed his wife committed the crime. (*See* Penalty Phase, Day 3, pp. 23-24; R-COA 3992-93, 4026, 4031). Bourgeois provided trial counsel with explicit instructions to pursue this line of defense throughout the trial. (C-ROA 3997-4022). Mr. Gilmore testified they didn't put on some of the psychological testimony because it presumed that Bourgeois had committed the offense, a position completely contrary to his guilt phase defense. Bourgeois concurred with trial counsel's decisions in this regard. (R-COA 4030-31).

Although habeas counsel seems to argue that a conflict between the guilt defense and mitigation defense is irrelevant in evaluating trial counsel's decision not to offer such conflicting mitigation evidence (Pet. Br. at 69-73), the ABA Guidelines and relevant case law are contrary to

66

habeas counsel's position. The ABA Guidelines[18][19], which habeas counsel

cited repeatedly to the district court, suggest that a unified defense should

be pursued and maintained.

> "Formulation of and adherence to a persuasive and understandable defense theory are vital in any criminal case. In a capital trial, the task of constructing a viable strategy is complicated by the fact that the proceedings are bifurcated. The client is entitled to have counsel insist that the state prove guilt beyond a reasonable doubt. [FN255] At the same time, if counsel takes contradictory positions at guilt/innocence and sentencing, credibility with the sentencer may be damaged and the defendant's chances for a non-death sentence reduced. Accordingly, it is critical that, well before trial, counsel formulate an integrated defense theory [FN256] that will be reinforced by its presentation at both the guilt and *1048 mitigation stages. [FN257] Counsel should then advance that

---

[18]    AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES.

[19] *Strickland* stressed, however, that "American Bar Association standards and the like" are "only guides" to what reasonableness means, not its definition. 466 U.S., at 688, 104 S.Ct. 2052. We have since regarded them as such. See *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527 (2003). What we have said of state requirements is *a fortiori* true of standards set by private organizations: "[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Roe v. Flores-Ortega,* 528 U.S. 470, 479, 120 S.Ct. 1029 (2000). *Bobby v. Van Hook*, 130 S.Ct. 13, 17 (2009).

theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument." 31 Hofstra L. Rev. 913, 1047 -1048 (Summer2003).

"The Importance of an Integrated Defense During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, "the theory of the trial must compliment, support, and lay the groundwork for the theory of mitigation." [FN272] Consistency is crucial because, as discussed in the commentary to Guideline 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. [FN273] First phase defenses that seek to reduce the client's culpability for the crime (e.g., by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma. [FN274] But whether or not the guilt phase defense will be that the defendant did not *1060 commit the crime, counsel must be prepared from the outset to make the transition to the penalty phase. [FN275]".

31 Hofstra L. Rev. 913, 1059-60 (Summer2003); *See Harris v. Vasquez*, 949 F.2d 1497, 1525 (9ᵗʰ Cir. 1990) ("It was clearly within the "wide range of professionally competent assistance" for Ryan to choose not to present a psychiatric defense theory that could conflict with his alibi defense and his mitigation based on Harris's alleged remorse and his abusive childhood. It is also acceptable trial strategy to choose not to call

psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion.").

Here, trial counsel, with Bourgeois' concurrence, decided not to call Dr. Cunningham. One of the factors guiding this decision was the premise of Dr. Cunningham's prepared presentation that Bourgeois committed the crime. Another reason was the government had an expert from the Bureau of Prisons, who would have countered Dr. Cunningham's prison risk assessment relating to murders committed in prison by capital prisoners. (R-COA 3691-97). This strategic decision was reasonable under the circumstances and consistent with Bourgeois' instructions to counsel.

Counsel was also permitted to rely upon the expertise of its experts. The ABA guidelines presume that counsel will rely upon the expertise of the psychological experts, including mitigation investigators.

> "As reflected in Guideline 4.1 and the accompanying commentary, the provision of high quality legal representation in capital cases requires a team approach that combines the different skills, experience, and perspectives of several disciplines. [FN168] The team approach enhances the quality of representation by expanding the knowledge base available to prepare and present the case, increases efficiency by **allowing attorneys to delegate many time-consuming**

**tasks to skilled assistants and focus on the legal issues in the case**, [FN169] improves the relationship with the client and his family by providing more avenues of communication, and provides more support to individual team members." (Emphasis added).

31 Hofstra L. Rev. 913, 1002 (Summer2003).

"Counsel should conduct interviews of potential witnesses in the presence of a third person so that there is someone to call as a defense witness at trial. Alternatively, **counsel should have an investigator or mitigation specialist conduct the interviews**."(emphasis added).

31 Hofstra L. Rev. 913, 1020 (Summer2003)

.... "As noted supra in the text accompanying note 103, a **mitigation specialist** who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures [childhood sexual abuse], **is invaluable in conducting this aspect of the investigation**".(emphasis added).

31 Hofstra L. Rev. 913, 1022-26 (Summer2003).  *See Harris v. Vasquez*,

949 F.2d 1497, 1525 (9th Cir. 1990):

"It is certainly within the "wide range of professionally competent assistance" for an attorney to rely on properly selected experts. Harris has not alleged any facts showing that Ryan should not have chosen the two psychiatrists who assisted the defense, or that Ryan had any reason to believe the defense psychiatrists were incompetent, or that their credentials were deficient in any way. As we have stated above, there is no evidence in the record regarding the two

70

defense psychiatrists work or opinions other than Ryan's conclusory, self-serving declaration. It does not indicate that Ryan, untrained in psychiatry, questioned or should have questioned the competence of the psychiatrists or should have chosen a different defense at the guilt or penalty phase.";

*See also Clark v. Mitchell*, 425 F.3d 270, 285-90 (6th Cir. 2005):

It was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals.[FN5] This conclusion is \*286 supported by this court's decision in *Campbell,* 260 F.3d at 555-56. In *Campbell,* a defendant seeking habeas relief alleged that his counsel was ineffective for failing to suspect that he may have "suffered from [post-traumatic stress disorder] based on the facts and circumstances of his case." *Id.* at 555. This court rejected the defendant's argument, relying heavily on the fact that counsel had the defendant examined by a trained psychologist who failed to detect evidence of the defendant's possible mental disorder. *Id.* at 555-56. The court noted that there was "no evidence that [the trained psychologist] was incompetent, or that [counsel] had any reason to question [the expert's] professional qualifications." *Id.* at 555. Thus, the court found that "it was objectively reasonable for ... counsel to rely upon [the trained psychologist's] diagnosis and ... trial counsel's failure to independently diagnose PTDS was not unreasonable." *Id.*

It is critical to understand that the errors of psychological experts are not automatically attributable to counsel. Additionally, there is no constitutionally recognized right to effective experts. In the case of *Skaggs v. Parker*, 235 F.3d 261, 265, 268 (6th Cir. 2000), counsel retained

71

an individual as their psychological expert from recommendations of colleagues, without conducting an independent investigation into the expert's legitimacy.  The expert turned out to be a charlatan, who testified in a manner seriously damaging to the defense.  The Sixth Circuit found counsels' performance in this regard was not ineffective assistance.  *See also Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998) (holding that "The Constitution does not entitle a criminal defendant to the effective assistance of an expert witness. To entertain such claims would immerse federal judges in an endless battle of the experts to determine whether a particular psychiatric examination was appropriate); *Harris v. Vasquez,* 949 F.2d 1497, 1518 (9th Cir.1990); *Silagy v. Peters,* 905 F.2d 986, 1013 (7th Cir.1990).   Furthermore, it would undermine the finality of criminal convictions, which would constantly be subject to psychiatric reappraisal years after the trial had ended.  *Harris,* 949 F.2d at 1517-18; *Silagy,* 905 F.2d at 1013"; *see also Wilson v. Greene*, 155 F.3d 396, 401 (4th Cir. 1998) (holding that "This circuit consistently has "rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of counsel."); *Pruett v.*

72

*Thompson,* 996 F.2d 1560, 1573 n. 12 (4th Cir.1993); *Poyner v. Murray,* 964 F.2d 1404, 1418 (4th Cir.1992); *Waye v. Murray,* 884 F.2d 765, 766-67 (4th Cir.1989) (per curiam) (rejecting defendant *Waye's* claim that his psychiatrist had not performed adequately in failing to raise diminished capacity  and observing that the constitution does not recognize a procedural rule for an ineffective expert witness).

Courts generally hold the experts ultimately responsible for the information contained in their report but do not find ineffective assistance on the part of a defense attorney if the expert's opinion is later determined to be incorrect or subject to criticism.  *See Moody v. Polk*, 408 F.3d 141, 150 (4th Cir. 2005) (holding that Doctor had ultimate responsibility for his own expert report - Dr. Noble informed trial counsel when he faxed them the outline that "I will be doing my own last revisions and additions later this morning." J.A. 294. Counsel bears no responsibility for Dr. Noble's failure to finalize his outline in a form that did not include information about which he had doubts. ... we have consistently " 'rejected the notion that there is either a procedural or constitutional rule of ineffective assistance of an expert witness, rather than ineffective assistance of

73

counsel.' "; *see also Wilson v. Greene,* 155 F.3d 396, 401 (4th Cir.1998); and *Thomas,* 170 F.3d at 472.

A review of the mitigation reports suggests the investigators operated fairly independently, without ongoing supervision from Trial Counsel, as the ABA Guidelines presume. Mr. Bierbaum repeatedly noted the legal and strategic significance of evidence and information uncovered and appears to offer advice to trial counsel and to Dr. Cunningham regarding its significance, admission, and its presentation in mitigation. Mr. Bierbaum did not appear to be in need of supervision from trial counsel, and Dr. Cunningham was not the type of expert who wanted trial attorneys attempting to control him.

The district court found that the "defense team formed strategy through emails, including correspondence with Dr. Cunningham, on how to deal with trial matters such as Bourgeois' choice to testify." (C-ROA 5841). The strategy of trial counsel during the penalty phase was clearly to avoid, as much as possible, an obvious conflict between Bourgeois' position at the guilt stage, that Robin Bourgeois killed the child, and risk further alienating the jury, but to provide a psychological explanation of

74

his personality disorder in an effort to obtain a sentence of life imprisonment. This was the best defense strategy reasonably available to trial counsel. As in the guilt stage, trial counsel argued the evidence of premeditation was insufficient and did not support a death sentence.

Habeas counsel clearly was able to identify and present additional evidence of Bourgeois suffering child abuse and sexual abuse. However, the question permeating that evidence is whether it was reasonably available to trial counsel at the time of the trial. The record suggests not. Trial counsel's ability to present this information and other mitigation evidence was compromised by various factors: the family's reluctance to relate the extent and degree of child abuse by Bourgeois' mother, while the mother was still alive (Bourgeois's mother died following the trial); Trial counsel was saddled with a mitigation specialist who, unbeknownst to trial counsel was a cocaine addict, who explained her failure to make progress on the mitigation investigation with one false excuse after another; trial counsel were confronted with a "dual sword" dilemma regarding Dr. Weiner's planned testimony and psychological conclusions, in that Dr. Weiner's report and conclusions relied upon the fabricated

75

report by Bourgeois and his sister Claudia Williams, that Bourgeois had a head injury resulting in a coma for at least a couple of weeks to months. Neither Bourgeois nor trial counsel were comfortable with Dr. Cunningham as a witness or with his PowerPoint presentation, which effectively conceded that Bourgeois committed the murder, contradicting the defense theory. There was also supplemental evidence of child abuse. Bourgeois likely would have opened the door to the additional negative evidence that Bourgeois abused other young children if he advanced additional family history.

The district court noted that the investigators and attorneys had contacted "over 50 people" to discuss mitigating evidence. (R-COA 5844). Many of the witnesses "felt constrained in talking about his childhood because they did not want to disparage his still-living mother." *Id.* Some witnesses had the age old dilemma of having both favorable and unfavorable information. *Id.* (noting that Mr. Tinker recalled family members with information that would help the case and that would have a negative impact on the case).

As with the lay witnesses, trial counsel sought to avoid the negative

impact occasioned by Drs. Weiner and Cunningham's testimony by developing mitigation presentation through Dr. Estrada. Trial counsel provided Dr. Estrada with Dr. Weiner's report, which discussed Bourgeois's childhood physical and sexual abuse. The government had provided Dr. Estrada with Dr. Cunningham's report, which likewise discussed Bourgeois' physical abuse. Rather than calling Drs. Weiner and Cunningham, trial counsel used Dr. Estrada, with whom counsel had a long-standing relationship and with whom counsel had been consulting throughout the prosecution. This was a reasonable course under the circumstances as they existed. Strategic decisions after reasonable evaluation are virtually unchallengeable. Dr. Estrada discussed the child abuse reportedly suffered by Bourgeois, and provided a meaningful psychological explanation for his abusive behavior, which inferentially covered the murder. Although perhaps not as detailed or lengthy as would Dr. Cunningham's presentation, Dr. Estrada's testimony did not share the drawbacks of Dr. Cunningham's and Dr. Weiner's presentations. As the ABA Guidelines discuss, presenting mitigation evidence in light of an alibi guilt defense requires some level of subtlety. This Circuit has

77

recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant.  *See*, e.g., *Andrews*,  21 F.3d at 623 n. 21.

In at least some capital cases, the defendant might benefit at the sentencing phase of the trial from the jury's "residual doubts" about the evidence presented at the guilt phase:

> "[A]s several courts have observed, jurors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts ... about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases. To divide the responsibility ... to some degree would eliminate the influence of such doubts." 758 F.2d, at 247-248 (J. Gibson, J., dissenting) (citations omitted).

*Lockhart v. McCree*, 476 U.S. 162, 181, 106 S.Ct. 1758, 1769 (1986).

At the penalty phase, trial counsel argued that the government had not proven premeditation during the guilt phase, an indirect challenge to the guilty verdict, designed to invoke any residual doubt about the guilt verdict. Dr. Estrada's presentation in the penalty phase bolstered this argument.

As trial counsel presented a substantial mitigation presentation

through Dr. Estrada, habeas counsel is placed in the position of demonstrating the presentation was insufficient. His burden of persuasion increases with the substance of the mitigation evidence and testimony presented. *See, e.g., Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir.2000) (stating that the deferential review mandated by *Washington* requires courts to be "particularly wary" of claims that counsel failed to present "enough" evidence on a certain issue); *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir.1999) ("Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing."); *Prejean v. Smith,* 889 F.2d 1391, 1398-99 (5th Cir.1990) ("Although it is possible that [trial counsel] could have produced more of the same type of [mental capacity] evidence ... such detail is not required by [ *Washington*]."); *see also Wilson v. Ozmint,* 352 F.3d 847, 861-62 (4th Cir.2003) (finding counsel's decision not to present additional mitigating evidence reasonable in light of counsel's belief that "their best mitigation evidence had been presented," and "that the additional evidence would only have detracted from the power of the mitigation evidence that they had already presented").

79

Bourgeois places a lot of emphasis upon trial counsel's failure to present specific evidence establishing his borderline personality disorder. The district court conducted a detailed analysis of the expert testimony regarding this disorder. (R-COA 5863-71). This Court need not revisit the entirety of this evidence under a "threshold inquiry." Some additional review is necessary to understand the context. The district court opined that "Dr. Estrada provided the fullest view into how that disorder effected Bourgeois." The court found it compelling that, although Dr. Estrada did not communicate to the jury at trial that Bourgeois suffered from borderline personality disorder, Dr. Estrada in his post-trial deposition "conceded ... that it is possible that he had sufficient information at the time of trial to arrive at [that diagnosis]." (R-COA 5867). The court properly concluded that trial counsel is not deemed constitutionally ineffective by relying upon an expert's opinion after providing them sufficient evidence. (R-COA 5868) (citing *Bell v. Thompson*, 545 U.S. 794, 810 (2005). Trial counsel cannot be blamed for the experts' failure to properly diagnose and label Bourgeois' personality disorder.

The district court held that "counsel made a probing effort to

investigate mitigating evidence."    (R-COA 5847).    That finding is supported by the record.  In this case, Bourgeois has not demonstrated that trial counsel shirked their duty to investigate possible mitigating evidence...." *Johnson v. Cockrell,* 306 F.3d 249, 252 (5th Cir.2002).  By way of contrast, those cases in which the Supreme Court and this Circuit have recently granted habeas relief for counsel's ineffectiveness in the punishment phase have resulted from counsel's failure to make any meaningful investigation or to present any significant case in mitigation. *See Williams,* 529 U.S. at 395 (granting habeas relief when the defense's case in mitigation only relied on the fact that the defendant "turned himself in, altering the police to a crime they otherwise would never have discovered, expressing remorse for his actions, and cooperating with the police after that"); *Lockett,* 230 F.3d at 711 (holding in a pre-AEDPA case that the "record overwhelmingly points to the conclusion that Lockett's counsel did little work in investigating possible bases for a *sentencing* defense for Lockett."); *Moore,* 194 F.3d at 617 ("To be clear, we are dealing here with counsel's complete, rather than partial, failure to investigate whether there was potentially mitigating evidence that could be presented

81

during the punishment phase of Moore's trial."). "In assessing counsel's performance [at the sentencing phase], we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might reasonably have expected from these leads." *Neal,* 286 F.3d at 237. Here, trial counsel conducted a dedicated and meaningful mitigation investigation and presented a meaningful mitigation defense under the circumstances. *See Parr v. Quarterman*, 472 F.3d 245, 256-58 (5ᵗʰ Cir. 2006). Based on the record as a whole, "with eyes focused on how trial counsel viewed the landscape before them," the district court found that "trial counsel engaged in reasonable decision making bolstered by a reasonable investigation." (R-COA 5879). Reasonable jurists would not disagree when viewing the landscape of "available" evidence from trial counsel's perspective at the time of trial.

The district court then considered whether a reasonable trial counsel would even present the evidence of borderline personality disorder if the experts had presented such a diagnosis prior to trial. (R-COA 5868-69). The court concluded that this is a difficult question over which reasonable

82

and seasoned defense counsel could disagree. The court specifically noted that "Bourgeois has not sufficiently recognized the aggravating edge of that evidence, the Government's use of similar evidence against him at trial, and the absence of any testimony about rehabilitation." (R-COA 5869).

At trial, the jury was informed that Bourgeois had a narcissistic personality disorder. This disorder has similar features to a borderline personality disorder. Importantly, the latter disorder carried with it, as did the former disorder, the fact that Bourgeois would remain subject to violent rages – the borderline personality disorder did not lessen his potential for future violent behavior. The district court found it very possible that the jury might view the disorder presented during the habeas process as only aggravating in nature because it could result in the increased likelihood that Bourgeois will act out violently again. (R-COA 5870) (citing *Nelson v. Quarterman*, 472 F.3d 287, 307-08 (5th Cir. 2006)). The district court's conclusion that a reasonable defense attorney might still decide not to present the evidence of a borderline personality disorder even if the mental health experts correctly diagnosed the defendant is not

an unreasonable conclusion.  As such, Bourgeois did not convince the district court that his trial defense counsel failed to properly represent him in failing to present evidence of his borderline personality disorder. Any failure in this regard is attributed to the experts rather than the trial defense counsel.  No reasonable jurists would debate or disagree on such a conclusion.

Bourgeois also failed to establish prejudice in regards to his ineffective assistance of counsel claims.  When considering *Strickland* prejudice, this Court reviews "the totality of  the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the evidence in aggravation." ("[W]e reweigh the evidence in aggravation against the totality of available mitigating evidence.").  ("[T]he question is whether there is a reasonable probability that, absent the errors, the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009).

Of course, trial defense counsel could not present evidence unless it was actually "available" to them.  The record reveals that some of the

84

supplemental mitigation evidence presented during the habeas process only recently became available due to the death of Bourgeois' mother. If true, it cannot be said to have been reasonably available at the time of trial. Claudia Williams testified at the evidentiary hearing that some information regarding child abuse by Bourgeois' mother was not shared with investigators because of the shame of it and the fact that their mother was still alive at the time of the trial. (R-COA 3452-55). Brenda Goodman conceded she didn't share information regarding the sexual abuse of Bourgeois until recently, because she didn't want to talk about it earlier. (R-COA 3578). Such supplemental evidence should be discounted to the extent it was not reasonably available to trial counsel. Likewise, the opinions of the newly hired psychological experts were not reasonably available to trial counsel.

As the district court observed, "Trial counsel adduced some of the evidence upon which Bourgeois now relies." (R-COA 5881). Thus, much of the "supplemental" mitigation evidence would be cumulative to that offered at trial. Bourgeois argues that it was improper for the court to "discount the value of additional ... evidence of Appellant's history of

physical abuse" and refused to reweigh the evidence with the additional details. (Pet. Br. at 82-86). The court did not "discount" the additional evidence and did not refuse to consider and properly weight the evidence presented by habeas counsel. Rather, the court simply found that the quality and nature of the "additional evidence" did not paint a picture of Bourgeois that was any more mitigating than what the jury actually heard.

At trial, Dr. Estrada concluded that Bourgeois had been neglected by his parents, rejected by them, and abused by his mother, (Penalty Phase, Day 2, pp. 22-24, 44) an illegitimate child, abandoned by father, and disciplined harshly as a child. (Penalty Phase, Day 2, p. 24, 48). The supplemental mitigation reportedly added sexual abuse and increased the level of physical abuse, abandonment and rejection previously known to Dr. Estrada. (Dr. Estrada's Deposition, p. 21, 26-27). Dr. Estrada's opinion did not change from the trial to the time of his deposition in 2010. The new material "confirmed some of the suspicions or professional guesses that I had ...." . (Dr. Estrada's Deposition, p. 15, 19, 21). "[W]e are splitting hairs here about narcissistic borderline. The fact is whatever we

86

call it, my opinion at the time that I testified and is documented and my opinion now, which has been reinforced with the new documentation that I have received, is that Mr. Bourgeois suffered from a condition that under frustration or stress results in violence and that this – as a result of this tendency, he became violent continuously through a manner of six weeks against the child that led to her death." (Dr. Estrada's Deposition, p. 69, see also, pp. 37, 39). Arguably, the supplemental mitigation evidence could be said to have bolstered Dr. Estrada's opinion that he gave at trial. *Cardenas v. Cockrell*, 2003 WL 24057305, at *16-17 (S.D.Tex., 2003). The district court recognized that habeas counsel were able to present "more nuanced and detailed defensive theories," but concluded that jury members would not have responded more favorably to the additional evidence. (R-COA 5881). Thus, there was no reasonable probability of a different result. (R-COA 5882).

Bourgeois takes aim at the district court's application of the legal standard. (Pet. Br. at 88-89). He claims the court failed to assess whether the "new evidence" had a reasonable probability of causing "at least one juror to strike a different balance." (Pet. Br. at 89)(citing *Williams v.*

*Taylor*, 529 U.S. 362, 397-98 (2000)).  In Bourgeois' view, the court's comments about how "the jury" would view various aspects of the "additional" evidence indicates that the court was erroneously focused on the "jury in its entirety."  *Id.*  This is essentially picking nits with the district court's word choices in a 225 page Memorandum and Order. Notably, Bourgeois cites no authority to support his argument that a court must focus with precision upon individual jurors and actually use the term "individual jurors" to properly analyze and assess prejudice in a capital case.  Nevertheless, it seems that the requirement of a unanimous finding on the juror's part for both guilt and punishment would inherently mean that an assessment of whether the result might be different is tantamount to a focus upon how individual jurors would view the evidence.  In other words, if the "additional mitigating evidence" would have caused at least one juror to strike a different balance, then it naturally follows that the jury's decision would be a "different result."  Thus, the fact that the court referred to the "jury" as opposed to "individual jurors" does not support Bourgeois's claim that the court applied an improper legal standard.

Ultimately, considering the evidence as a whole, the heinous nature

of the crime, overwhelming evidence of aggravating factors, and the incremental nature of the supplemental mitigation evidence supports a finding that no individual juror would have changed his or her mind. In other words, the "additional evidence" Bourgeois presented in the habeas proceedings, when weighed against the evidence as a whole, would not have impacted the sentence of death because no individual juror would have voted differently. *Strickland*, 104 S.Ct. at 2071 (finding no prejudice where state's overwhelming presentation of evidence relating to aggravating factors supporting imposition of death penalty); *Jones v. Johnson*, 171 F.3d 270 (5th Cir.1999) (finding no prejudice where the brutal and lengthy nature of the murder, the defendant's confessions, and the lack of other mitigating evidence required the conclusion that counsel's failure to present the proposed evidence would not have made any difference with respect to the outcome of the sentencing phase), *Sharp v. Johnson*, 107 F.3d 282 (5th Cir.1997) (finding no prejudice where horrendous nature of crime and circumstances would have overwhelmed mitigating evidence identified by defendant). *See Andrews,* 21 F.3d at 624 (concluding that the failure to introduce mitigating evidence, which

89

included evidence of mental retardation, did not prejudice defendant because of the cold-blooded nature of the crime); *King v. Puckett,* 1 F.3d 280, 285 (5th Cir.1993) (concluding "that the failure to offer mitigating evidence in the form of King's diminished mental capacity" did not affect "the outcome of his sentencing."); *Glass v. Blackburn,* 791 F.2d 1165, 1170-71 (5th Cir.1986)(finding no prejudice from counsel's failure to introduce mitigating evidence because the murder was calculated and cold-blooded).  Bourgeois has not demonstrated any error in the district court's findings and conclusions, and Bourgeois has not demonstrated that reasonable jurists would disagree or debate those findings and conclusions.

## CONCLUSION

For the foregoing reasons, the district court's judgments were correct in all respects and this Court should deny Bourgeois' request for a certificate of appealability on any of his three issues.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

RENATA GOWIE
Chief, Appellate Division


_____

TONY R. ROBERTS
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
(713) 567-9810
ATTORNEYS FOR APPELLEE

# CERTIFICATE OF SERVICE

I, Tony R. Roberts, Assistant United States Attorney, hereby certify that on July 9, 2012, an electronic copy of Appellee's Brief was served by notice of electronic filing via this court's ecf system upon opposing counsel:

Victor J. Abreu
Jennifer Givens
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
Suite 545 West - The Curtis Center
Philadelphia, PA 19106

Upon notification that the electronically-filed brief has been accepted as sufficient, and upon the Clerk's request, seven paper copies of this brief will be placed in the United States Mail, postage prepaid, addressed to the Clerk. *See* 5th Cir. R. 25.2.1; 5th Cir. R. 31.1; 5th Cir. ecf filing standard E(1).

s/ Tony R. Roberts
TONY R. ROBERTS
Assistant United States Attorney

92

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1.  Exclusive of the Exempted Portions in 5th Cir. R. 32.2.7(b)(3), The brief contains **18,222** words.

2.  The Brief Has been prepared in Century Schoolbook, 14 point font, produced by Corel WordPerfect 8 software.

3.  The Undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, May result in the court's striking the brief and imposing sanctions against the person signing the brief.

4.  This brief complies with the electronic submission of 5TH CIR. R.25.2.1, because it is an exact copy of the paper document.

5.  This brief is free of viruses because it has been scanned for viruses with the most recent version of Trend Micro scanning program.

s/ Tony R. Roberts
TONY R. ROBERTS
Assistant United States Attorney