# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 5, 2013

Lyle W. Cayce
Clerk

No. 11-70024

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

ALFRED BOURGEOIS,

> Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:07-CV-223

Before KING, JOLLY, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Alfred Bourgeois, a federal prisoner sentenced to death for the murder of his young daughter on the grounds of a military base, requests a certificate of appealability (COA) authorizing him to appeal the district court's denial of his motion to vacate his conviction and sentence under 28 U.S.C. § 2255. For the reasons that follow, we conclude that Bourgeois has not made a substantial showing of the denial of a constitutional right and we therefore DENY his application for a COA.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-70024

## I. FACTS AND PROCEDURAL HISTORY

Bourgeois, a truck driver, was indicted on July 25, 2002, and charged with murdering his two-and-one-half-year-old daughter on the grounds of the Corpus Christi Naval Air Station (CCNAS), where he was making a delivery. In October 2002, the district court appointed John Gilmore to represent Bourgeois.[1] Gilmore had experience in capital cases, both as a prosecutor and as defense counsel. In February 2003, the district court authorized the defense to hire an expert pathologist and to hire Doug Tenore as an investigator. Later, the court authorized the defense to hire additional experts, including a DNA expert, a polygraph expert, a mitigation expert, two mitigation investigators, a neurologist, a neuropsychologist, a jury-selection expert, a psychologist specializing in family violence and parent-child relationships, bite mark experts, and a "battered baby" expert.

---

[1] The Federal Public Defender's Office represented Bourgeois initially but was allowed to withdraw because of a conflict of interest.

2

No. 11-70024

A superseding indictment in July 2003 alleged all four of the statutory intent elements[2] and three statutory aggravating factors for the death penalty.[3] Immediately thereafter, the district court appointed Douglas Tinker as co-counsel and ordered that his appointment was retroactive to his first appearance in the case, as a volunteer, on April 10, 2003. Tinker had represented over a dozen clients facing a death sentence.[4]

---

[2] The statutory intent elements are that Bourgeois

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;

(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]

18 U.S.C. § 3591(a)(2).

[3] The statutory aggravating factors are (1) that Bourgeois "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim"; (2) that he "committed the offense after substantial planning and premeditation to cause the death of a person"; and (3) that "[t]he victim was particularly vulnerable due to . . . youth or infirmity." 18 U.S.C. § 3592(c)(6), (c)(9), (c)(11).

[4] The district court stated in its § 2255 opinion that in 1995, the Criminal Justice Section of the Texas Bar named Tinker Outstanding Criminal Defense Lawyer of the Year, that Tinker was well known in the legal community as a "defense attorney's defense attorney," and that his experience with cases involving genetic material had earned him the reputation as a DNA expert. The district court explained that it appointed Gilmore and Tinker because they had extensive experience, sterling character, and were among the most zealous, competent attorneys in the local bar. The court stated that its familiarity with their efforts, in this case and others, reinforced the strong presumption that their attention to certain issues to the exclusion of others reflected trial tactics rather than neglect.

No. 11-70024

Jury selection began on February 9, 2004.  The guilt-innocence phase of trial began on March 2 and ended on March 16.  The government presented the following evidence at the guilt-innocence phase.

The victim, JG,[5] was born on October 5, 1999, and lived in Texas with her mother, Katrina Harrison.[6]  In April 2002, a paternity test established that Bourgeois was JG's biological father.  At that time, Bourgeois was married to Robin Bourgeois (Robin).  He and Robin had a seven-year-old daughter, AB1994, and a one-year-old daughter, AB2001.  After a court ordered Bourgeois to pay child support for JG,[7] Bourgeois and Harrison agreed that he could take custody of JG for the summer.  Medical and photographic evidence established that JG was a healthy, happy child when she left her home with Bourgeois on May 16, 2002.

The family stayed at the Bourgeois residence in LaPlace, Louisiana, from May 16 until May 28, when they left for Alabama, where Bourgeois had an orientation for his new truck-driving position.  When they left Alabama, the family stayed in the 18-wheeler truck, night and day, until June 27, 2002, when they arrived at the CCNAS.  Bourgeois forced JG to spend almost every moment of the last six weeks of her life on a potty chair, both at their residence[8] and

---

[5]  The victim was referred to as "JG1999" throughout the district court proceedings. We will refer to her in this opinion as "JG."

[6] Harrison was murdered on December 19, 2002, hours after government agents had spoken to her on the telephone.  The man responsible for her murder was caught, confessed, and killed himself in prison.

[7]  Bourgeois took his teenaged niece to Texas for the custody and support hearing, and planned to tell the judge that she was his daughter and that she had kidney problems, so that the judge would order less child support for JG.

[8]  In a search of Bourgeois's home after he was arrested, the FBI found a dent in the bedroom wall, where JG's potty had been located.  Swabs taken from reddish brown stains on the bedroom wall and in the bathroom were later determined to contain JG's blood.

while the family traveled throughout the country in his 18-wheeler.[9] Throughout the time that JG was in his custody, Bourgeois relentlessly tortured JG by biting her all over her body, burning her, whipping her with belts, extension cords, and his hands, beating her with a baseball bat, shoes, and other objects, duct-taping her mouth,[10] and forcing her to drink his urine from a jug that he kept in his truck. The government presented graphic photographic and testimonial evidence of this abuse,[11] including from Bourgeois's wife and daughter, AB1994,[12] who witnessed much of it. Witnesses testified that

---

[9] Robin testified that when JG would fall asleep and fall off the potty chair, Bourgeois would make her get back on the potty. She said that Bourgeois referred to JG as a "bitch" and "a little mother f***er."

[10] Robin testified that JG had trouble breathing when Bourgeois taped her mouth and that the skin around JG's mouth became irritated from the tape and the alcohol that was used to remove the adhesive when the tape was removed.

[11] In the first photograph of JG with her father, taken the first time he met her, her eyes are filled with tears. Photographs taken while the family was traveling depict JG wearing sunglasses and socks. Robin testified that JG wore sunglasses because her eyes were bruised and wore socks to cover the injuries to her feet, which were too swollen to wear shoes. During the entire time the family was traveling, however, Bourgeois sent postcards to JG's biological mother, pretending that JG was having a wonderful time.

[12] AB1994, who was nine years old at the time of trial, testified that JG's hands and feet were pretty when she came to them, but got ugly from her dad biting them, and that JG wore socks because "she was bitten all up, and her feet looked real bad." A nurse who examined JG at the hospital on June 27, 2002, testified that they could not insert a needle or IV through JG's hands because they were so swollen and "very hard, like rockish." FBI Special Agent Megan Beckett testified that JG's hands and feet were unlike anything she had ever felt on a human being – cold and hard and swollen. AB1994 testified that her father bit JG "all over," including on the top of her head and on her back, and that JG bled when he bit her. AB1994 told the jury that she saw her father whip JG with a belt and an extension cord, saw him tape her mouth, and witnessed him making JG drink his urine. She said that JG had black eyes from being hit by her father. AB1994 testified that her father told her it was her (AB1994's) fault that he was hurting JG. AB1994 also testified that she witnessed her father beating her mother and her grandmother. However, he never bit or hit AB1994 or AB2001.

No. 11-70024

Bourgeois had wished for JG's death because he did not want to have to pay child support for her and that he had made plans for disposing of her body.[13]

The government presented medical evidence that JG had over 300 injuries, including at least ten different head injuries. The medical examiner, Dr. Elizabeth Rouse, found that the ultimate cause of death was "an impact to the head resulting in a devastating brain injury." AB1994 testified that after JG spilled the contents of her potty chair in the cab of the truck on the CCNAS, Bourgeois spanked JG and then held her by the shoulders and slammed her head into the window of his truck. Dr. Rouse testified that the injuries she observed in the autopsy were consistent with having been caused by the events that AB1994 described.

After Bourgeois struck JG's head, he and AB1994 got out of the truck. Robin testified that she was asleep when they arrived at the CCNAS warehouse and that when she awoke, she found JG lifeless. According to Robin, Bourgeois took JG from the truck and laid her on the pavement beside it. Robin and AB1994 both testified that he told them to tell anyone who asked that JG had fallen out of the truck. Although they complied initially, the story did not hold up for long because the doctors who treated JG immediately realized that her severe injuries could not have been caused by a fall from the truck.

---

[13] Robin testified that she told Bourgeois many times that he was going to end up killing JG. When she asked Bourgeois what he was going to say if he killed her, Bourgeois said that he was going to throw her out of the truck into the woods and then go to a truck stop and report that she had been kidnaped. AB1994 testified that her father would put JG on the steering wheel when he was driving and tell her that she made him want to kill her. She testified further that she heard her dad say that when JG died, he would take her to the swamp and leave her there.

No. 11-70024

Numerous witnesses testified to Bourgeois's callous indifference to JG's critical injuries.[14]  They said that he seemed to be more concerned with arranging to pick up and deliver his next load.

A doctor testified that he observed evidence of sexual trauma in the photographs of JG taken during the autopsy.  There was also evidence that semen was found on rectal swabs collected after JG died.

After Bourgeois was arrested and incarcerated, he made incriminating statements to relatives, friends, and other inmates.  Three inmates who had been incarcerated with Bourgeois prior to trial testified that Bourgeois told them that he killed his daughter and was going to make it look like an accident and that he described JG as a "bad child" who "used to shake her butt all the time."[15]

Bourgeois was the only witness for the defense at the guilt-innocence phase.  He testified that he never harmed JG, never touched her inappropriately in a sexual way, and did not cause her death.  On cross-examination, he told the jury the same story he had told investigators: that JG fell from the truck.  When the prosecutor asked him about JG's numerous injuries, he had implausible explanations for how she sustained each one.  He accused the witnesses who had testified against him of lying and said that he was upset and "highly hurt" by the loss of his baby.

In closing arguments, defense counsel blamed Robin for the murder and abuse of JG.  Counsel also argued that if the jury believed Robin, AB1994, and the inmates, there was no evidence of premeditation.  After deliberating for less than two hours, the jury found Bourgeois guilty of premeditated murder.

---

[14]  FBI Special Agent Michael David Harris, who interviewed Bourgeois on June 27, testified that Bourgeois stated that the doctors had told him that they had done just about everything they could do for JG and that he did not want "it" to suffer.  Agent Courtney Scharn also testified that Bourgeois referred to JG as "it."

[15]  One of the inmates testified that Bourgeois described how JG fell about ten feet at a dinosaur park and laughed as he said, "That f***ing baby's head got as big as a watermelon."

No. 11-70024

The punishment phase began on March 22 and ended on March 24, 2004. The jury had to find that Bourgeois intentionally killed JG. The government alleged as statutory aggravating factors that (1) Bourgeois committed the offense in an especially heinous, cruel, or depraved manner that involved torture and serious physical abuse; (2) he committed the offense after substantial planning and premeditation; and (3) JG was particularly vulnerable because of her youth. The government alleged the following non-statutory aggravating factors: (1) Bourgeois is likely to commit criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of others; and (2) he caused injury, harm, and loss to JG's family.

The defense alleged the following statutory mitigating factors by a preponderance of the evidence: (1) Bourgeois had an impaired capacity to understand the wrongfulness of his conduct; (2) he was under unusual and substantial duress; (3) he did not have a significant prior history of other criminal conduct; (4) he committed the offense under severe mental or emotional disturbance; and (5) other relevant information. As non-statutory mitigating factors, the defense alleged that (1) Bourgeois had been abused as a child; (2) other persons who may be culpable in the offense may not be punished; (3) he was under stress from family and economic factors; and (4) at the time of the offense he was driving across the country with three children and one other adult in the cab of an 18-wheeler truck.

At the punishment phase, the government presented testimony from Bourgeois's ex-wives, girlfriends, acquaintances, children, and jailhouse informants about his abusive and violent history. The government also presented evidence that Bourgeois had attempted to hire an inmate, whom he believed to be a hit man, to kill family members who were going to testify

No. 11-70024

against him.[16] Government expert psychiatrist Dr. Carlos Estrada testified that Bourgeois had a narcissistic personality disorder and that he was likely to be violent in the future. Defense counsel's cross-examination of Dr. Estrada brought out some mitigating evidence about Bourgeois's abusive childhood and the stress that he was under at the time of the murder.

Bourgeois's sister and cousin testified for the defense that Bourgeois's mother singled him out for abuse and sent him to live with an elderly neighbor, Mary Clayton. Ms. Clayton's grandson also testified about Bourgeois's mother's abuse. Bourgeois testified, expressing sympathy to JG's family and sorrow for the loss of JG, but continued to blame Robin.

After five and one-half hours of deliberation, the jury found that the government had proven all of the statutory and non-statutory aggravating factors and that Bourgeois had shown two mitigating factors: six jurors found that he was under stress and all found that he was driving across the country in a truck with three children and one other adult in the cab of an 18-wheeler truck. The jury unanimously found that the aggravating factors outweighed the mitigating factors and recommended a death sentence.

Trial defense counsel, Gilmore and Tinker, represented Bourgeois on direct appeal. This Court affirmed the conviction and sentence, and the Supreme Court denied certiorari. *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005), *cert. denied*, 547 U.S. 1132 (2006).

In May 2007, Bourgeois filed a motion for relief pursuant to 28 U.S.C. § 2255, raising fourteen grounds for relief. Bourgeois filed a motion for an evidentiary hearing and the district court held oral argument on the motion in April 2010, to designate the issues to be resolved at a hearing. Although the district court initially limited the evidentiary hearing to four days and excluded

---

[16] Although the district court did not allow the jury to hear it, the prosecutor, the FBI case agent, and the trial judge (all female) were among those Bourgeois wanted to have killed.

No. 11-70024

some issues from the hearing because they could be adequately decided on the record, it later expanded both the time and the manner in which Bourgeois could present evidence. The court conducted a week-long evidentiary hearing in September 2010, heard additional testimony at other times, and allowed the parties to present videotaped depositions of other witnesses as well as affidavits. Trial counsel Tinker was terminally ill during the § 2255 proceedings, and the district court allowed the parties to question him through interrogatories. Although he answered the government's interrogatories, his condition worsened before he was able to answer the interrogatories propounded by Bourgeois's counsel. He died on November 10, 2008.

In May 2011, in a careful and comprehensive opinion, the district court denied § 2255 relief and also denied Bourgeois's request for a COA. *Bourgeois v. United States*, No. C-07-CV-223 (S.D. Tex. May 19, 2011) (hereinafter Dist. Ct. Op.). The district court denied Bourgeois's motion to alter or amend the judgment on June 17, 2011. Bourgeois filed a timely notice of appeal and now requests a COA from this court for three claims:[17]

---

[17] Bourgeois did not request a COA for the remaining claims he raised in his § 2255 petition. Those claims are: (1) Bourgeois is mentally retarded, making him ineligible for execution; (2) trial counsel ineffectively failed to present evidence of mental retardation at the punishment phase; (3) Bourgeois's conviction violates due process because the fatal injury occurred outside the territorial jurisdiction of the United States; (4) trial counsel ineffectively failed to challenge the admissibility of testimony concerning bite marks; (5) trial counsel ineffectively failed to challenge the admissibility of testimony about digitally enhanced autopsy photographs; (6) the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that four inmates were promised some benefit for testifying against Bourgeois; (7) trial counsel labored under a conflict of interest because of representation of clients associated with this case; (8) the prosecutor engaged in misconduct by making improper argumentative statements at both phases of trial; (9) trial counsel ineffectively failed to rebut evidence of Bourgeois's indifferent demeanor at trial; (10) a witness improperly relied on Bourgeois's interactions with counsel as a basis to formulate an adverse opinion about him; (11) appellate counsel ineffectively failed to advance several claims; (12) the cumulative effect of the claimed errors resulted in a constitutional violation; and (13) the method by which the government would carry out Bourgeois's execution violates the Constitution.

No. 11-70024

(1) the district court erred in dismissing, without an evidentiary hearing, his claim that trial counsel were ineffective for failing to challenge jurisdiction;

(2) trial counsel were ineffective at both phases of trial for failing to present available expert testimony to rebut the government's assertion that JG was sexually assaulted; and

(3) trial counsel provided ineffective assistance during the punishment phase by failing to pursue and present mitigating evidence of his life history of abuse, neglect and abandonment, personality disorder, cognitive deficits, and the combined impact of his mental-health problems.

"This court may not consider an appeal from the denial of a 28 U.S.C. § 2255 motion for relief unless either the district court or this court issues a COA." *United States v. Hall*, 455 F.3d 508, 513 (5th Cir. 2006) (citing 28 U.S.C. § 2253(c)(1)(B)). To obtain a COA, Bourgeois must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338. In making the decision whether to grant a COA, this Court's examination is limited to a "threshold inquiry," which consists of "an overview of the claims in the habeas petition and a general assessment of their merits." *Id.* at 327, 336. This Court cannot deny a COA because it believes that Bourgeois ultimately will not prevail on the merits of his claims. *Id.* at 337. On the other hand, "issuance of a COA must not be *pro forma* or a matter of course." *Id.* "While the nature of a capital case is not of itself sufficient to warrant the issuance of a COA, in a

11

death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alterations omitted) (internal quotation marks omitted).

Having reviewed the briefs, the district court's thorough and well-reasoned opinion, and the entire voluminous record before this court pursuant to the framework established by the Supreme Court in *Miller-El*, we conclude that Bourgeois is not entitled to a COA. The district court did not abuse its discretion by declining to conduct a full evidentiary hearing on Bourgeois's claim that his trial counsel were ineffective in failing to challenge federal jurisdiction. Further, no reasonable jurist would debate the district court's resolution of Bourgeois's ineffective assistance claims, and the issues he seeks to raise on appeal are not adequate to deserve encouragement to proceed further. We therefore DENY Bourgeois's request for a COA for the reasons that follow.

## II.  DISCUSSION OF CLAIMS

### A.  Denial of Evidentiary Hearing on Ineffective Assistance in Failing To Challenge Federal Jurisdiction

Bourgeois argues that the district court should have conducted an evidentiary hearing on his claim that trial counsel rendered ineffective assistance by failing to challenge federal jurisdiction with available medical evidence that JG manifested physical, neuropsychological, and behavioral indications of significant brain injury prior to entering the CCNAS, and expert testimony interpreting that evidence, to counter the government's assertion that her fatal injuries were inflicted on federal property. Bourgeois contends that effective counsel would have investigated and presented evidence that the fatal blows to JG's head were delivered prior to her arrival at the CCNAS, based on medical evidence that she suffered head injuries seven to ten days prior to her death and lay witness testimony about her impaired behavior and injured appearance prior to her arrival at the CCNAS. Bourgeois asserts that if he had

No. 11-70024

been granted an evidentiary hearing, he also would have presented evidence that (1) trial counsel Tinker told habeas counsel, in a meeting on February 1, 2008, that he never investigated or challenged jurisdiction because he misunderstood the law and thought federal jurisdiction was established if the decedent was found unconscious on federal land; and (2) notes taken by one of the prosecutors prior to trial show that the prosecutor thought the existence of federal jurisdiction was in question.

The government had the burden of proving, as an essential element of the crime, that the murder occurred "[w]ithin the special maritime and territorial jurisdiction of the United States." 18 U.S.C. § 1111(b). The "special maritime and territorial jurisdiction of the United States" includes lands reserved or acquired for the use of military facilities. *Id.* § 7. It is undisputed that the CCNAS is a place within the special maritime and territorial jurisdiction of the United States. Jurisdiction is determined by "the place where the injury was inflicted[] . . . without regard to the place where the death occur[red]." *Id.* § 3236. Thus, to establish the jurisdictional element of the crime, the government had to prove that Bourgeois caused JG's fatal injuries on the CCNAS. The jury was instructed that it must find jurisdiction beyond a reasonable doubt.[18]

A district court must grant an evidentiary hearing in a § 2255 proceeding "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Bourgeois asserts that the government's evidence at trial proved, at most, that the fatal injuries *might have* occurred at the CCNAS. He argues that an evidentiary hearing was

---

[18] Although our precedent requires that jurisdiction be proven by a preponderance of the evidence, *United States v. Bell*, 993 F.2d 427, 429 (5th Cir. 1993), the jury was instructed, without objection from the government, that it had to find jurisdiction beyond a reasonable doubt. The government does not challenge the applicability of that standard of proof.

No. 11-70024

required because he proffered evidence in the § 2255 proceedings that JG's fatal injuries *did not* occur at the CCNAS, thus creating a factual dispute.

1.

In her trial testimony, Bourgeois's daughter, AB1994, described the events that led up to JG's death as follows:  On the day that JG went to the hospital, June 27, 2002, JG was sitting on the potty.  Her dad got lost and the truck stopped.  After the truck started back up, JG was still on the potty, wiggling around.  The potty tipped over.  Her dad got mad and stopped the truck.  He told AB1994 to give JG to him and she did.  He took JG's pants off and he started spanking her.  Then he took her by the shoulders and he started hitting the back of her head on the window, about four times.  AB1994 said that she saw JG making a "real, real sad face."  Her father put JG's pants back on and told AB1994 to take her.  AB1994 said that JG "was awake, and then she just, like, fell asleep."  Her dad got out of the truck to make sure it was at the right place, and then she got out of the truck to help him back the truck up to the loading dock at the warehouse. AB1994 said that when she got back in the truck, she saw Robin administering CPR to JG.  She testified that her dad then put JG on the ground beside the truck and that JG looked "dead, sleeping."  Then her dad made up a story that JG fell from the truck, so that he and her mom would not have to go to jail.

Robin testified at trial as follows:  the Bourgeois family left their home in LaPlace on the afternoon of June 26 and arrived at Ingleside Naval Station at about 4:00 or 5:00 a.m. on the morning of June 27.  They parked across the street until they could unload around 7:00 a.m.  When she went to sleep, while they were waiting to unload at Ingleside, JG was on her potty in the back of the truck. When she awoke, the truck was at the CCNAS.  JG was sitting straight up in the passenger's seat, limp and unresponsive, and her heart was beating very fast. Robin tried to administer CPR, then blew the horn on the truck until Bourgeois

came. She asked him what he had done to JG and told him that JG was dying. When she told him he needed to get JG to the emergency room, Bourgeois responded that he would take her after his truck was unloaded.

Employees on Ingleside Naval Station testified that they spoke with Bourgeois when he stopped there to make a delivery on the morning of June 27. None of them saw any indication that JG had suffered any fatal injuries during their interactions with Bourgeois. The evidence showed that Bourgeois left Ingleside and arrived at the CCNAS in about the time it would take to drive there directly, without stopping. Two individuals who worked at the CCNAS testified about their interactions with Bourgeois that morning when he stopped to ask for directions and for assistance when his truck broke down on the CCNAS, prior to his arrival at the warehouse where he was to make a delivery. Neither of them observed anything that would indicate to them that JG was injured. The CCNAS warehouse supervisor testified that when Bourgeois arrived at the warehouse, he went inside the trailer to inspect the load and while he was inside the trailer, there was a shaking movement that he assumed was from the cab of the truck. Another CCNAS warehouse employee testified that when he drove into the trailer on the forklift, the trailer moved a little bit.

Michael Boyd of the Corpus Christi Fire Department, who responded to the CCNAS in the ambulance, testified that JG was not breathing when they got to the scene. William Guy Smith, operations manager for the Navy Exchange at the CCNAS, testified that he took Bourgeois to the hospital. While he was there, the doctors told the family that when JG arrived at the hospital, she did not have a heartbeat and that it took them 10-12 minutes to get her heart beating.

According to Bourgeois's own testimony on cross-examination, JG was alive when he drove onto the CCNAS. He testified that when his truck broke

down on the CCNAS, he, JG, and AB1994 were singing ABCs.[19]  He said that when he got the truck started, JG was sitting on her potty in the sleeper, getting her hair combed by Robin.

Dr. Rouse, who performed the autopsy on JG on June 29, 2002, testified for the prosecution that JG's death was caused by closed head injuries resulting from tremendous forces applied to her brain.  JG had ten bruises on her head, each of which indicated where something hit her or she hit something.  All were recent injuries, within a few days, with red, fresh blood.  Dr. Rouse observed the following factors:  (1) a subdural hematoma ("where blood has leaked, and that indicates where tremendous forces have been applied to the brain, resulting in her death"); (2) a subarachnoid hemorrhage ("which is blood over the actual surface of the brain"); (3) swelling of the brain; (4) hemorrhage along the optic nerve; and (5) hemorrhage on the back of the retina on both eyes.  Dr. Rouse testified that a scenario in which JG was grabbed by the shoulders, by an adult, and then repeatedly slammed into a truck window "could certainly explain the injuries that were seen on the child."

Slides of JG's brain tissue were sent to Dr. Kathleen S. Kagan-Hallet, an associate professor of pathology with the University of Texas Health Science Center in San Antonio, for microscopic examination.  Dr. Kagan-Hallet's report was incorporated into Dr. Rouse's autopsy report.  In the portion of her report entitled "microscopic findings and comments," Dr. Kagan-Hallet noted older injuries and some "in a stage of early organization."  In the section entitled "neuropathologic diagnosis," she noted a "history of head trauma" and described a "right subdural hematoma, mostly recent, minimal organization

---

[19] FBI Agent Harris testified that when he interviewed Bourgeois on June 27, while JG was in the hospital, Bourgeois told him that JG had been sitting in his lap singing her ABCs while he was sending a message to dispatch that his truck was broken down on the CCNAS.

(approximately 10 days' duration)." She also noted "Cerebral white matter. Organized contusion infarcts (7+ days' duration), myelin tearing and axonal bodies."

Dr. Akhtar, the pediatric intensive-care physician who saw JG in the emergency room on June 27, testified that JG was limp and not breathing on her own. He observed blood behind her eyes and called in a retina specialist. He stated that blood in the retina is a sign of severe trauma to the head. According to Dr. Akhtar, the kind of damage he saw – blood behind the eyes, blood in the brain, and edema to the brain – could not have been caused by a fall from a height of five to seven feet. Dr. Kuffel, an ophthalmologist and retina specialist, testified that he observed multiple, massive hemorrhages all over the backs of both of JG's eyes, consistent with life-threatening trauma. When asked if the injuries he observed were consistent with someone holding the child by the shoulders and slamming her head into a window four or five times, he answered, "Yes. Definitely."

> In closing argument, the prosecutor only briefly mentioned jurisdiction:

> The last element that we have to prove is that it happened on a Special Territorial or Maritime Jurisdiction of the United States and that was because it was on the Navy base. That's why we had the FBI investigating and the Naval Criminal Investigative Service, and the Medical Examiner came from the Army.

Defense counsel did not refer to jurisdiction in their closing arguments.

### 2.

Although the district court concluded that an evidentiary hearing was not necessary for this claim, it nevertheless permitted Bourgeois to present considerable evidence in support of it, including the report and deposition testimony of Dr. Jan Leestma, a forensic neuropathology consultant. Dr. Leestma's report did not answer the "critical question . . . of when the fatal head injuries to the child were caused" and did not specify a cause of death. Although

he acknowledged that JG's condition deteriorated after the reported incident in Bourgeois's truck, he suggested that some of JG's brain injuries – specifically "a coagulopathy which appears to have included sagittal sinus thrombosis and possibly cortical venous infarctions" – may have "resulted in the child's death at any time with or without any new episode of trauma."

In his deposition, Dr. Leestma testified that JG's death was caused by increased intracranial pressure caused by venous thrombosis – clotting of the cerebral veins and the superior sagittal sinus. He stated that the thrombosis antedated JG's collapse and decompensation at the CCNAS by several days and that it led to infarctions in the brain and cerebral edema and bleeding. He acknowledged that the blood clot in the sagittal sinus contained some recent red blood cells that could be two to three days from the time of death but stated that the blood clot itself was probably several days older than that. It was his opinion that the retinal bleeding was caused by increased intracranial pressure and not by physical forces or impact and that the subdural hematoma observed by Dr. Rouse was not consistent with an injury that was inflicted while JG was on the CCNAS. However, he acknowledged that there are two components to the subdural hematoma: (1) the chronic component, which was 10 days to 2 weeks before JG's death; and (2) an acute component, the fresh blood, which cannot reliably be aged and dated more precisely than within about two to three days from the time of death. He opined that it cannot be known if the acute component contributed to or caused JG's death and that a child who had suffered an injury that led to this type of subdural hematoma could have acted normally for several days before dying. He also testified that a pre-existing subdural hematoma can bleed without additional injury. Dr. Leestma admitted that the intracranial pressure could have resulted from a head injury that occurred on the CCNAS but stated that what percentage that might be, or even if it occurred, cannot be assessed. He concluded that there was insufficient scientific evidence

presented at trial to conclude that JG died as a result of an injury that was inflicted on the CCNAS. Dr. Leestma's opinion about when and where the fatal injuries occurred was based *solely* on the medical evidence; he did not consider any eyewitness testimony or any other circumstantial evidence that would have put JG's injuries in context.[20]

The government presented the testimony of Dr. Rouse in rebuttal, by telephone. She testified that trauma explained all of the autopsy findings. She agreed with Dr. Leestma that there was a thrombus in the sagittal sinus but said that it could not have caused the tearing of the myelin and the axonal bodies, which are all traumatic. She explained that one of the difficulties of dating injuries is that the time varies widely, depending on the physiological condition of the person. JG was on life support and her body's healing was not normal. According to Dr. Rouse, JG's scalp injuries and bruising were recent – within days, and there was fresh blood in the scalp bruises, which indicated an impact site. Dr. Rouse acknowledged that, as Dr. Kagan-Hallet found, part of the subdural hematoma was approximately 10 days old. However, she pointed out that Dr. Kagan-Hallet also saw evidence of an acute component – recent bleeding in that hematoma.[21]

Dr. Rouse agreed with Dr. Leestma that the medical evidence, alone, cannot be used to determine the exact date of JG's fatal brain injury. However, Dr. Rouse testified that it is necessary to consider the medical evidence along with the witness reports that correspond with the injuries seen in the autopsy

---

[20] In the appendix to his § 2255 motion, Bourgeois submitted an affidavit of forensic pathologist, Dr. Werner Spitz, who disagreed with AB1994's testimony that JG's head was struck multiple times on the interior of the vehicle and concluded that the autopsy findings "place in question causation of the injuries and their timing." The district court found that Dr. Spitz's affidavit was not credible because he dismissed AB1994's testimony without having viewed her in court.

[21] Dr. Kagan-Hallet died after the trial and prior to the § 2255 proceedings.

to determine what caused JG's death. Dr. Rouse concluded that JG suffered injuries that fit within the timing that she was on the CCNAS and that the description by witnesses of what occurred on the CCNAS "certainly would explain the injuries, would explain the trauma to the brain and would explain her clinical course."

At the evidentiary hearing, during Gilmore's testimony, the district court asked him if there was any indication that the fatal injury did not occur on the CCNAS and whether Bourgeois had testified that it occurred there. Gilmore stated that he did not recall there being any discussion about that or any controversy.

3.

The district court, comparing the testimony of Dr. Leestma and Dr. Rouse, found that the most important disagreement of the experts was whether the medical findings must be considered in the light of other evidence. Dr. Leestma did not take into account any testimony about the circumstances of JG's death, such as AB1994's testimony. Dr. Rouse, however, testified that professionals use the circumstances surrounding the death to inform their medical findings. Dr. Leestma's refusal to consider anything but the medical evidence made his conclusions less credible to the district court. The district court found that the trial testimony was consistent with Dr. Rouse's explanation at the evidentiary hearing that a complex series of injuries caused JG's death. The district court also found that Dr. Rouse's testimony harmonized with  testimony from other medical experts who examined JG before she died and found that she bore signs of recent trauma when she arrived at the hospital.

The district court also relied on AB1994's testimony, observing that AB1994 was a highly-credible witness who convincingly described, to the best of her ability and beyond expectations for her young age, what her father had done to her little sister. The court also noted that AB1994's testimony was consistent

with the accounts of the CCNAS employees who spoke with Bourgeois when he stopped to ask for directions and for help in re-starting his truck and whose descriptions of their encounters with Bourgeois suggested that JG had not yet suffered a life-threatening injury. The court stated that Bourgeois's and AB1994's actions in the hour leading up to the murder, as described by those who came into contact with them, did not even suggest the urgency that they showed once it became clear that JG was dying. The district court also pointed out that Bourgeois's own testimony, as well as his statements to the FBI at the time, placed the fatal injury on federal property.

The district court concluded that Bourgeois had failed to show that trial counsel had any basis to raise a reasonable doubt about the location of the killing. The court observed that trial counsel were aware, before trial, that the forensic evidence could be interpreted in such a manner that the fatal injury could have occurred more than two days before JG's death but that, if they had tried to argue insufficiency of the evidence of jurisdiction, they might have lessened their credibility with jurors.

4.

No reasonable jurist could debate the district court's decision to limit the evidentiary hearing on the issue of whether counsel rendered ineffective assistance by failing to present medical evidence to challenge the basis for federal jurisdiction. Although the district court did not allow a full evidentiary hearing on this claim, the court nonetheless permitted Bourgeois to present considerable evidence, including expert testimony, to support his claim. Bourgeois claims that if he had been given a hearing, he would have presented evidence about Tinker's alleged misunderstanding of the law and would have questioned the prosecutor about his notes from the interview with Dr. Rouse. He has not identified any other evidence, beyond that which he was allowed to

present in the § 2255 proceedings, that he would have presented at a full evidentiary hearing.

The record supports the district court's observation that trial defense counsel were aware, before trial, that the forensic evidence, considered in isolation, could be interpreted in such a manner that the fatal injury could have occurred more than two days before JG's death. At a hearing on March 1, 2004, the prosecutor stated that a doctor was going to testify that JG was brain dead when picked up by the ambulance at the CCNAS. Tinker responded, "A doctor will also testify that it could have occurred more than two days before." Tinker's statement indicates that he understood the law and is evidence that he made a strategic decision not to challenge jurisdiction. The prosecutor's notes that Bourgeois relies on state: "*If incident occurred off mil base - NO jurisdiction!*" Those notes prove nothing more than that the prosecutor was aware of what needed to be shown to establish jurisdiction.

The record also supports the district court's conclusion that Bourgeois's reliance on Dr. Kagan-Hallet's description of the subdural hematoma as being of "approximately 10 days' duration" is misplaced. Dr. Kagan-Hallet and Bourgeois's own expert, Dr. Leestma, as well as the medical examiner, Dr. Rouse, all found that the subdural hematoma had two components: (1) a chronic component, that was approximately ten days old; and (2) an acute component, fresh blood, that was one to three days old. Dr. Rouse testified that the fresh blood, as well as the other recent injuries JG suffered, were all consistent with eyewitnesses' descriptions of the events on the CCNAS. Bourgeois's argument improperly discounts AB1994's testimony, which the district court found credible. Thus, although the medical evidence did not establish conclusively that Bourgeois fatally injured JG on the grounds of the CCNAS, there was, as the district court noted, considerable circumstantial evidence that Bourgeois administered the fatal blows to JG while they were on the CCNAS.

No. 11-70024

Bourgeois criticizes the district court for relying on his trial testimony that JG was singing her ABCs on the grounds of the CCNAS when his truck broke down. However, that is what Bourgeois told the investigators while JG was still in the hospital and he repeated it when he testified at trial. Trial counsel obviously were aware of Bourgeois's statements to the investigators and his testimony, as well as the other eyewitness testimony and substantial circumstantial evidence that JG was fatally injured on the CCNAS, and reasonably could have decided not to challenge jurisdiction.

Because Bourgeois has failed to demonstrate the existence of a contested fact issue with regard to whether trial counsel's decision not to challenge the evidence that the fatal injury occurred on federal land was unreasonable or that Bourgeois was prejudiced by their decision, no reasonable jurist could debate the district court's decision not to expand further the evidentiary hearing to address this issue. *See Hall*, 455 F.3d at 519. Accordingly, Bourgeois is not entitled to a COA for this claim.

## B. Ineffective Assistance of Counsel Claims

We now turn to consider Bourgeois's ineffective assistance of counsel claims. These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed, Bourgeois had to

> show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687.

23

No. 11-70024

"[T]he proper standard for attorney performance is that of reasonably effective assistance." *Id*. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. at 689 (citations omitted) (internal quotation marks omitted).

With respect to the duty to investigate,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91; *see also Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). The Supreme Court recently stated that these three post-*Strickland* cases, each of which

No. 11-70024

granted relief on ineffective assistance claims, did not establish "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011). "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington v. Richter*, 131 S. Ct. 770, 789-90 (2011). Bourgeois's trial counsel were "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789.

To demonstrate prejudice, Bourgeois

> must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

"When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* When considering the prejudice prong, the district court's task was "to evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. at 397-98.

## 1. Failure To Present Expert Testimony To Challenge Sexual-Assault Evidence

No. 11-70024

Bourgeois requests a COA for his claim that trial counsel ineffectively failed to present expert testimony to counter the government's evidence (1) that JG suffered trauma, consistent with sexual assault, and (2) that swabs from her rectum were positive for p30, a protein indicating the presence of semen.

a.

In its opening statement at the guilt-innocence phase of trial, the prosecution stated that expert testimony would establish that "there was seminal fluid in the rectum of that baby." At trial, the government presented evidence that JG slept with Bourgeois and AB1994 in the master bedroom, with the door locked, while Robin and AB2001 slept in another room. In addition, the government presented evidence that Bourgeois tried to obtain custody of JG by claiming that her mother had mistreated her. Shortly after JG came to live with the Bourgeois family, Bourgeois and Robin noticed that JG was bleeding from her vagina. Bourgeois told Robin that someone had told him that one of JG's mother's boyfriends had attempted to sexually molest JG. They took JG to Child Protective Services (CPS) in Louisiana, where they reported that JG might have been molested before they took custody of her and that JG was not being taken care of at her mother's home in Texas.[22] CPS sent them to New Orleans, where Dr. Scott Anthony Benton examined JG and found no evidence of abuse and no explanation for the reported bleeding.

On May 24, 2002, Bourgeois complained to the Texas Department of Family Protective Services that JG's mother and her home were unfit and expressed concern that JG's mother was associated with a rapist. An

---

[22] Dana Banks testified that Bourgeois and his family visited her and her husband in June 2002. While they were there, Bourgeois told her that he had JG because the mother and the mother's boyfriend were abusing her. He told her that JG was molested with a finger and it caused bleeding. Nathaniel Banks, Dana's husband, testified that Bourgeois told him that he had JG because the mother was neglecting her and she had been abused but did not say that she had been sexually abused. Bourgeois testified, on cross-examination, that he thought JG had been molested before he took custody of her.

investigation was conducted and no evidence was found to support Bourgeois's allegations, which were found to be frivolous and made in bad faith.

The day after her death, JG was examined at the hospital by Carol Ann McLaughlin, a Sexual Assault Nurse Examiner. McLaughlin testified that she did not observe any trauma to JG's genitalia but that it was very common to find no trauma, even when there had been sexual abuse. On cross-examination, the defense elicited more detailed testimony that McLaughlin found no trauma in the genital examination. On redirect, McLaughlin testified that no trauma did not mean that there had been no penetration.

During the autopsy, Dr. Rouse, the medical examiner, conducted a sexual-assault examination and did not observe any external trauma to JG's genital area.[23] Dr. Rouse also took photographs of JG's genital area and swabs from JG's mouth, vagina, and rectum. Slides were made from the swabs, and the slides and swabs were given to the FBI for testing.

The tests conducted by the FBI revealed the presence p30 on three of the swabs taken from JG's rectum during the autopsy, but no male DNA was detected in tests conducted on the swabs. In October 2003, the district court granted defense counsel's motion to appoint a DNA expert, Dr. Elizabeth Johnson. Biological samples were sent to Dr. Johnson for testing in January 2004.

On February 19, Technical Associates, the lab Dr. Johnson used to conduct the tests, reported to her that no acid phosphatase (AP) and no spermatozoa were detected but that weak p30 activity was detected. On February 25, the prosecutor told the district court that the government had not yet gotten Dr. Johnson's report. The court reiterated its previous order that all expert reports,

---

[23] The autopsy report stated: "The external genitalia are those of a normal female child, and there is no evidence of any trauma to the labia or introitus. The hymen is present and appears atraumatic. The back is straight and the anus is unremarkable and atraumatic."

including Dr. Johnson's, must be turned over to opposing counsel by the following day or counsel would be precluded from presenting the testimony of those experts at trial. Tinker stated that he had called Dr. Johnson the previous week and asked for a report. Although defense counsel received the report of Dr. Johnson's laboratory findings on February 26, they did not provide it to the prosecution.

On March 1, 2004, Dr. Johnson, who was in Colorado at the time, faxed Tinker a two-page handwritten summary of her findings and conclusions, which stated:

(1) The FBI did not test the rectal swabs with AP reagent or do a sperm search. They did only a p30 test and a DNA test. The p30 test was positive but there is no indication of male DNA found.

(2) The AP test performed by Technical Associates was negative. A weak positive result was obtained in the p30 test performed by Technical Associates. A microscopic sperm search yielded a negative result.

(3) The FBI's positive p30 result could be a false positive due to bacterial proteins found on the rectal swab. If the p30 positive result was due to the presence of semen, sperm should also be detectable.

(4) The tested sample would be expected to contain 500 sperm, enough to observe microscopically, even if a small portion is used to make a slide, and enough to produce a male DNA result on DNA testing.

Dr. Johnson also sent Tinker an excerpt of an article describing levels of p30 that have been detected in bodily fluids other than semen, including amniotic fluid, breast milk, saliva, female urine, and female serum (blood).

The government used the autopsy photographs and the p30 test results to argue that Bourgeois sexually assaulted JG and called three witnesses: Dr. Scott Anthony Benton, Caroline Zervos, and Anthony Onorato.

No. 11-70024

Dr. Benton, the Medical Director of the Children-at-Risk Evaluation Center and Clinical Associate Professor with LSU and Tulane Schools of Medicine, had examined JG on May 21, 2002, after Bourgeois reported to Louisiana CPS that blood had been found in JG's diaper.  He testified that he found nothing in that examination that would account for the blood.  Although the area surrounding JG's urethra was very red and inflamed when he examined her in May, tests revealed no evidence of blood in the urinary-tract system.  However, he stated that a normal physical exam does not preclude there having been a sexual assault a day or two before the exam.  Dr. Benton testified that the autopsy photographs of JG taken on June 29, 2002 show blood in the periurethral area of the skin – a bruise, most likely from trauma.  In his examination of JG when she was alive, she had inflammation, not a bruise.

Dr. Benton testified further:  Sexual assault in children can be difficult to detect because they heal quickly and often there is no physical evidence when they are examined.  However, even in the absence of signs of trauma or a report of assault, male sexual assault can be proven through forensic testing:  (1) a test for AP, which is a substance predominantly produced in the male prostate and deposited in ejaculation or pre-ejaculation; (2) a test for the presence of the prostatic specific antigen, called p30 or PSA; (3) the "more confirmatory" observation of sperm cells; and (4) Y chromosome DNA analysis.  The p30 assay is a "confirmatory" test for the presence of semen because p30 is found only in the male prostate gland and in human breast milk.  It is not unusual to identify semen where no sperm are detected, in part because of the low survivability and rapid degradation of sperm.  Sperm also would not be found in other circumstances, such as if the man has had a vasectomy, if he only deposits pre-ejaculate fluid, or has been ill.  Because sperm rapidly lose their tails and die in a vaginal and rectal environment, "they're very difficult to find, on a rape kit or trace forensic evidence" and "you could still detect semen, but not find sperm."

No. 11-70024

On cross-examination, defense counsel did not challenge Dr. Benton's observation of trauma. Instead, the cross-examination focused on the reliability of p30 testing. Dr. Benton testified that although "very low levels of false positives" had been reported with the p30 test, "there is no such thing as 100% accuracy."

FBI forensic-serology examiner Caroline Zervos testified that the FBI Laboratory usually does two-step testing on blood and semen: first a presumptive test and then a confirmatory test. In this case, they conducted only the confirmatory p30 test for the presence of semen on the swabs taken from JG's rectum. The p30 test was positive for the presence of semen on three of the swabs. On cross-examination, trial counsel asked Zervos whether anything other than prostate proteins could result in a positive p30 test. She responded that other substances could test positive on a p30 test besides PSA, and that the p30 protein has been found in male peripheral blood[24] and male urine, at very low concentrations. She was not aware of p30 being found in female fluids and did not know if anything could be ingested that would have the same kind of reaction in the anal tract. Later, Tinker told the district court that he got more than he wanted from Zervos because she did not know whether substances in food might cause a false positive.

FBI forensic DNA examiner Anthony Onorato testified as follows. In the autosomal STR testing he performed, the only DNA found on the swabs taken from JG's rectum belonged to JG; male DNA was not detected. It is not unusual to detect semen, but not male DNA, on a swab. He recommended Y-chromosome DNA testing, a more sensitive test for the presence of male DNA. Orchid-Cellmark Laboratories conducted Y-chromosome testing on behalf of the FBI,

---

[24] Zervos explained that peripheral blood is blood circulating in the extremities.

and no male DNA was detected.[25]  On cross-examination, Onorato testified that Zervos's report revealed that a sperm search conducted by the FBI laboratory was negative for the presence of sperm.  When trial counsel attempted to elicit testimony about other possible sources of the p30 protein, Onorato testified that there are no foods that contain p30, but there are other substances, body fluids, that may contain p30 at very low levels.  The protein is astronomically high in semen, compared to its content in something like male blood, and generally it is only found in male blood when the man has a prostatic malignancy.

In closing argument at the guilt-innocence phase, the prosecutor argued:

> The DNA, our DNA, expert testified that the swabs that were taken from JG-1999's little bottom had semen on them.  There was semen in that baby's bottom.  But the swabs were taken at the autopsy and the autopsy was done on June 29th.  The baby was thrown on the side of the truck on June 27th and died on the 28th, two days.  Dr. Benton testified, the DNA specialist testified that the sperm is very delicate, that it degrades quickly.  But when you get a confirmatory test for semen, you've got semen.  It's an ejaculate from a man, not from a woman, from a man from sexual arousal.  And that's what we know.

> The other thing that Dr. Benton told us, as many of the other physicians, is that there can be things happen and not show.  You know, I thought it was real interesting yesterday when Mr. Bourgeois was testifying because I said, what was that around her eyes? I said [was] that Vaseline?  No, we don't have Vaseline in the truck.

> What is so bad about having Vaseline?  I thought that was interesting.  It's a lubricant.  Why would you have to deny that?

---

[25] Bourgeois asserts that trial counsel's objection when the government sought to elicit testimony from Onorato that Y-chromosomal DNA testing had been performed by Orchid Cellmark on behalf of the government and that those results were negative for male DNA demonstrates either that trial counsel had never seen the Orchid Cellmark results, even though they were provided in pretrial discovery, or that he failed to understand their beneficial significance.

No. 11-70024

The defense closing argument highlighted the weaknesses in the evidence of sexual assault. Tinker pointed out that the prosecutor did not "talk about the fact that they found no evidence of trauma to the rectum or the genitalia when they examined this child at the hospital." Tinker reminded the jury that the DNA test was negative and that the government's testing should have "no reliability as far as your decision making in this case" because the government's evidence of sexual assault rested on "nothing but insinuations since that test for the semen, the advanced test, I don't know what it's called, was negative. There's no evidence of semen being found on this child." The district court sustained an objection to the argument that there was no evidence of semen.

The prosecution did not present any additional evidence of sexual assault in the punishment phase. In its initial closing argument at the punishment phase, in discussing the statutory aggravating factor (whether the defendant committed the offense in an especially heinous, cruel, or depraved manner and whether it involved torture and physical abuse), the prosecution did not mention sexual assault or the evidence of semen. During its final closing argument at the punishment phase, the prosecution mentioned the evidence of semen twice. First, in discussing videotapes depicting Bourgeois laughing while tormenting children, the prosecutor asked: "Was he laughing when he beat JG1999 to death? Was he laughing when he bit her, or he burns her, or he put his filthy semen in her little body?" Second, in arguing that Bourgeois had not shown remorse, the prosecutor stated:

> The defendant spoke to you. Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever. He murdered this baby. His signature with his teeth marks and his semen is all in that baby.

b.

32

No. 11-70024

Bourgeois argues that trial counsel should have (1) challenged Dr. Benton's alleged observations of genital trauma in the autopsy photographs; (2) elicited testimony from Dr. Rouse, who performed the autopsy and took the photographs relied on by Dr. Benton, that she found no evidence of vaginal or anal trauma; and (3) presented the Sexual Abuse Nurse Examiner reports that support Dr. Rouse's conclusion that there was no evidence of vaginal or anal trauma.  He contends further that trial counsel should have challenged the government's forensic evidence that semen was detected on the swabs by calling Dr. Johnson to testify that (1) because all of the other tests for semen yielded negative results, a positive p30 test, alone, is inadequate to establish the presence of semen; (2) p30 is found in many bodily fluids other than semen; (3) the "very weak" and "weak" p30 results could have been the result of rectal bacterial contamination on the swabs or even JG's own biology, not semen; (4) if semen had been present, sperm would have been detected, and it was not; and (5) contrary to Dr. Benton's testimony, sperm cells do not easily die and rapidly degrade.  Bourgeois contends that trial counsel also should have presented (1) evidence that the FBI's protocols, as well as protocols from other law-enforcement crime labs and the manufacturer of the p30 test used by the FBI, require that "borderline" p30 results, such as the "weak" and "very weak" positive results obtained in the FBI tests, be confirmed through the identification of sperm; and (2) expert testimony that even after three more specific and sensitive sperm searches were conducted, no sperm were detected on any of the swabs that allegedly contained semen.

Bourgeois argues that the district court's post hoc creation of a strategic basis for counsel's failure to present expert testimony is inconsistent with Tinker's explanation that he did not call Dr. Johnson as a witness because he had trouble getting her to return telephone calls, she did not have her own lab, and she did not do the testing he requested in a timely fashion.  Bourgeois

33

contends further that Tinker's explanation is inconsistent with his statement to the district court on January 16, 2004, that Dr. Johnson had been prompt in her work and good at communicating with him. Bourgeois argues that the fact that Dr. Johnson's report was submitted to counsel after the court-imposed deadline for disclosing expert reports serves only to highlight Tinker's deficient performance because it was Tinker's responsibility to make sure that all expert reports were submitted in a timely manner. He maintains that, in any event, Tinker should have requested leave of court to present Dr. Johnson's testimony.

Bourgeois maintains that if trial counsel had presented evidence that there was no semen in JG's rectum and no physical evidence of sexual assault, there is a reasonable probability that at least one juror would have refused to return a guilty verdict or would have chosen to spare his life. He asserts that, in addition to the obvious inflammatory nature of the evidence of sexual abuse, that evidence effectively negated the guilt phase defense – that Robin had abused and murdered JG. He contends that this evidence also prejudiced him at the punishment phase because it was used to support the statutory aggravating circumstance that the murder was committed in a heinous, atrocious, or depraved manner. He asserts that because no evidence is more inflammatory and prejudicial than the alleged sexual assault and anal rape of a two-year-old girl by her own father, any reasonable juror would have weighed this evidence in its deliberations and likely found it impossible to grant mercy. Finally, Bourgeois argues that the district court applied the wrong standard in assessing prejudice: He did not need to show that counsel could have "eviscerated" or completely "eliminated" the government's evidence of sexual assault.

34

No. 11-70024

c.

In the § 2255 proceeding, Bourgeois presented the declaration and testimony of Dr. Johnson. In her declaration, Dr. Johnson stated that if she had been called as a witness at trial, she would have testified that:

(1) There was insufficient scientific evidence to conclude that the substance on the swabs was semen, and four scientific tests (AP, p30, sperm search, STR DNA testing and Y-chromosome DNA testing) were negative for the presence of male fluids or male cells.

(2) The weak positive p30 result should not be considered conclusive in the light of numerous contradictory tests.

(3) The government's evidence regarding the alleged semen was erroneous and scientifically unsubstantiated.

(4) Dr. Benton's testimony about sperm was erroneous.

(5) Spermatozoa are very durable and do not easily degrade; they can be easily detected microscopically; their abundance in seminal fluid facilitates microscopic detection even after the tail is lost; and they can be found for up to six days in the vaginal tract of a living female.

At the evidentiary hearing, Dr. Johnson testified that if she had been called as a trial witness, she would have testified consistently with the summary report that she faxed to trial counsel on March 1, 2004. Further, she would have testified that, despite the weak positive p30 result, "taking all of the test results, some of which were negative, negative for sperm, negative for acid phosphatase, negative for DNA, even on Y chromosome testing, that it was not reasonable to conclude that there was semen present on the swabs." She explained that although p30 is referred to as prostate specific antigen (PSA), it is a protein that is found in abundance in human seminal fluid and in lesser concentrations in other fluids – amniotic fluid, breast milk, male urine, male and female serum, and some female urine.

No. 11-70024

Dr. Johnson testified that the testing she had done was completed at the end of January 2004. She claimed that she was not aware of the February 26 deadline for expert reports and said that if Tinker had made her aware of it, she would have sent her report on time. She was critical of Tinker, stating that he was not well-versed in semen and DNA detection and that although she tried to bring him up to speed, she got the impression that he still did not grasp the concepts that well.

Dr. Johnson characterized Dr. Benton's trial testimony that sperm might not have been found because it could have degraded as "totally erroneous" because sperm are incredibly tough and very durable, have been located decades after an offense, and can be found in decomposing bodies 30 days after death.

On cross-examination, Dr. Johnson acknowledged that a stronger color on a p30 test indicates a larger quantity of p30 than a weaker color but that a weaker color still discloses the presence of p30. She also conceded that if the test card used by the FBI was sensitive down to one half of a nanogram, that would throw her numbers off, by eight-fold, with respect to the amount of sperm that would be expected to be detected. However, she said that sperm still should be able to be detected.

Dr. Johnson testified that she did not know what was present in the serum and urine of a two-year-old because none of the studies involve children. She conceded, however, that if the blood found on JG's underwear was tested and was negative for p30, that is an indication that her blood did not contain p30 and could be eliminated as the source of the positive p30 result. She testified that breast milk could be digested and trigger a positive p30 result, prompting the district court to point out that there was no evidence that JG had ingested any breast milk. On redirect examination, Dr. Johnson stated that she was not aware that JG had ingested male urine prior to her death and that might have impacted the test.

36

No. 11-70024

Bourgeois also presented in the § 2255 proceeding a report and testimony from forensic criminalist Charles Alan Keel, who stated that: (1) the government's proof of the presence of semen was inadequate and flawed and should never have been offered as evidence by scientists; (2) Dr. Benton's testimony was false or, at best, erroneous, and many of his statements are "patently absurd" and "ludicrous"; (3) sperm is the only definitive proof of the presence of semen from a forensic specimen in the criminal-justice context; (4) there is no proof of semen being detected in the evidence that was presented at trial; (5) if the positive p30 test result was caused by semen, male DNA should have been detected; (6) if the positive p30 test result was caused by semen, sperm should have been detected because a positive p30 test result cannot reliably predict the presence of semen without the presence of sperm; (7) sperm cells die but can still be detected; (8) the fact that there was no semen found in JG's underpants is another red flag against a conclusion that semen was present; and (9) there is no semen on the swabs. When the district court asked Keel whether a toddler would produce p30, he replied that he did not know.

The government presented Tinker's answers to interrogatories, explaining why he did not call Dr. Johnson as a witness at trial:

> I had met Dr. Johnson at a seminar and was very impressed with her presentation. I spoke with her afterward about helping us with Mr. Bourgeois' case. I had a great deal of problems getting her to return my phone calls. I learned, during my dealings with her that she did not have her own lab. She did not do the testing I requested in a timely fashion and, therefore, we did not utilize her services.

The government also presented Gilmore's affidavit, in which he stated that Tinker dealt with Dr. Johnson exclusively and that Tinker told him about problems getting Dr. Johnson to communicate and to make herself available to perform the testing he had asked her to do. Gilmore testified at the § 2255 evidentiary hearing that Tinker was very upset with Dr. Johnson toward the

trial date because she would not talk to him.  Tinker was also upset that she faxed him a handwritten note, not a formal, written report as he had requested.

Finally, the government presented a letter report and the testimony of FBI forensic examiner Jerrilyn Conway, in which she stated:

(1) Zervos's and Onorato's decisions to not conduct the AP test is consistent with the policies and practices of the FBI lab.  The FBI lab does not conduct AP testing in suspected semen samples from body orifices because of the possibility of contamination from vaginal secretions that also contain AP and because AP usually is not detectable after fourteen hours.

(2) The FBI uses the p30 test to determine whether semen is present.

(3) Although PSA has been found in bodily fluids other than semen (female urine, female serum, amniotic fluid, breast milk, and the serum of boys and girls), the FBI lab's PSA test includes dilution steps to ensure that only semen can produce a positive result, making the test confirmatory for the presence of semen.  Technical Associates, the lab used by Dr. Johnson to perform her tests, stated in the report submitted to Dr. Johnson that the p30 test is a confirmatory test for semen.

(4) The complete article containing the page Dr. Johnson faxed to Tinker regarding other substances that would trigger a positive PSA result describes experiments that the authors conducted to determine whether female urine and female blood would give a positive result on the PSA test.  The authors eliminated those substances as potential positive triggers and verified the reliability of the PSA test with respect to both female urine and female serum. Further, the concentration levels described on the page sent to Tinker by Dr. Johnson refer to undiluted substances containing PSA, which is not the dilution level that would be tested in a PSA test.  Applying the dilution levels that the test requires and that the FBI used in this case, none of the substances listed would have produced a positive PSA result.  The only one that would be close

would potentially be breast milk, but it would not be expected to give a positive result. Ingestion of male urine would not be expected to produce a positive PSA result on a rectal swab because the digestive system would have broken down the protein to the point that it would not be detected.

(5) A study published in a British journal in 2004 determined that the level of PSA in girls' serum is .004 nanograms per mil, which could not trigger a positive PSA result, even if undiluted. Further, the PSA test of blood on JG's underwear was negative, so her blood could be eliminated as the source of the positive PSA result from the rectal swab.

(6) The weak positive p30 result in this case means that there is a limited amount of PSA present, which means there is a limited amount of semen present. The term "weak" does not call into question the results; it only refers to the amount of semen that is detected. The p30 test is a qualitative test. If it is positive, then PSA is present, and it is present at a level that semen can be concluded to be on the swab.

(7) Because of the confirmatory nature of the PSA test, the decisions to not conduct a microscopic search for sperm by Zervos and Onorato is consistent with the policies and practices of the FBI Lab.

(8) The FBI protocol is to only identify a sperm cell if the head, midpiece, and tail are all intact. The survivability of a sperm cell within a live rectum is limited. Most of the studies show that sperm cells can only be identified after maybe 24 hours, sometimes longer in cervical samples.

(9) Dr. Johnson's calculations regarding the amount of sperm that she would expect to be detected do not take into account the natural variability of both PSA and sperm within a semen sample. Further, Dr. Johnson's calculations were based on a sensitivity of 4 nanograms per mil, which is what the PSA test manufacturer guarantees. The FBI's validation, however, found that the cards used in this test were sensitive down to about .5 nanograms per

mil, which would reduce Dr. Johnson's calculations by a factor of 8. Thus, sperm that could be expected to be detected on that sample range from 1 to 1,000.

(10) Studies have shown that PSA from seminal fluid can be detected in the absence of AP activity, identifiable spermatozoa, or even male DNA.

When asked how she could explain positive p30 results, a negative AP result, and the inability to identify any sperm cells, Conway responded that the sample was a limited one that had potentially been degraded; the AP could have degraded to a point that it was not detectable; and the sperm cells either may not have been deposited in abundance because of the natural variation in the semen or there could have been a limited number, and they also would have been degraded.

On cross-examination, Conway testified that the FBI's position is that despite all the other negative tests, the p30 test alone confirms the presence of semen. She conceded that studies existing at the time of trial in 2004 had identified the presence of low levels of PSA in female fluids and that Zervos's trial testimony that PSA had not been detected in female fluids was incorrect. She also conceded that Onorato did not give a complete list of all the fluids where p30 has been found and that Dr. Benton incorrectly testified that p30 does not exist anywhere else in bodily products except the male prostate and human breast milk. She conceded that evidence of sperm potentially can be found after they lose their tails; it depends on how many there are and whether the biologist can recognize them. She stated that the position of the FBI is that its dilution steps ensure that only semen can produce a positive PSA result, making the test confirmatory for the presence of semen. That dilution process eliminates a possibility of anything else reacting with the card.

d.

The district court began by observing that, to succeed, Bourgeois had to prove that (1) Dr. Benton was incorrect in his physical observations of trauma

and (2) the positive p30 test results did not necessarily equate to positive results for semen. The court stated: "Absent evidence that would likely eviscerate the effect of either prong, the other would give the jury a sufficient basis to find that Bourgeois sexually assaulted his daughter."

Noting that Bourgeois did not call any witnesses at the evidentiary hearing to criticize Dr. Benton's observations of trauma and did not question Dr. Rouse about her sexual assault examination, the district court concluded that Bourgeois had not shown that Dr. Rouse's initial observation of no trauma was more valid than Dr. Benton's trial testimony, had not shown that Dr. Benton's specialized knowledge about childhood sexual abuse and prior treatment of JG did not provide sufficient support for his expert opinion, and had relied on the unproven speculation that Dr. Rouse would not defer to Dr. Benton's observations.[26] The court pointed out that, unlike Dr. Rouse, Dr. Benton could comment on the condition of JG's genital area over time and could compare the autopsy photographs with those he had taken when he examined JG a little over a month before her death. The court found that, at best, Bourgeois had shown that experts could disagree on how to interpret the evidence collected during the autopsy.

The district court also pointed out that trial counsel challenged the evidence of sexual trauma in cross-examining McLaughlin, the nurse who examined JG the day after her death. Further, in closing arguments, Tinker stressed that "they found no evidence of trauma to the rectum or genitalia when

---

[26] The district court also stated that Bourgeois relied on Dr. Spitz's affidavit in which he stated that Dr. Rouse, who performed the autopsy and took photographs, was in a much better position than Dr. Benton, who only looked at the photographs, to determine whether there was sexual trauma. The court found that Dr. Spitz was not a credible expert and that his affidavit did not "necessarily eviscerate Dr. Benton's interpretation of the evidence." In his reply brief, Bourgeois asserts that he never relied on Dr. Spitz's opinion for lack of trauma; that Dr. Spitz was not presented at the § 2255 hearing; and that his credibility is not at issue.

they examined this child at the hospital." The district court held that Bourgeois had not adduced any evidence or testimony during the post-conviction proceedings that would put a stronger case against the evidence of sexual trauma than the essence of that brought out by trial counsel. Therefore, the court held that he failed to show that counsel performed deficiently in not challenging Dr. Benton's testimony about sexual trauma.

The district court held that although trial counsel did not call Dr. Johnson as a witness, it was evident that he was familiar with her report and had used it to prepare for cross-examination. The court added that trial counsel did not leave the forensic testimony about sexual assault unrebutted: cross-examination of Dr. Benton focused on whether the p30 test was susceptible to false-positive results, Zervos and Onorato were asked whether substances other than semen could cause a positive result on the p30 test, and Zervos acknowledged on cross-examination that she did not know if digested food could contain p30 – a factor that Dr. Johnson's testimony would have refuted if she had been called. The court noted that trial counsel's questioning and argument also highlighted that the government's experts observed no sperm and that the absence of sperm caused the government experts to recommend DNA testing. The court concluded that trial counsel's questioning introduced doubts that could not have been raised by expert testimony, such as that digested food could contribute to the positive p30 results.

The district court acknowledged, however, that expert testimony could have provided some benefit to the defense: Dr. Johnson's testimony would have been valuable in showing that the weak positive results obtained by the government should have compelled it to perform the more-confirmatory sperm search. However, Dr. Johnson's testing did not completely discount the possibility that Bourgeois sexually assaulted JG: Dr. Johnson acknowledged that a weak positive result indicates the amount, not the presence, of PSA,

which was consistent with the testimony of government expert Conway that a "weak" p30 result does not question the identification of the substance as semen, but only the amount of semen that is detected.

The court also noted that the testimony of Bourgeois's experts at the § 2255 hearing would only have re-confirmed that a substance containing PSA, foreign to JG's body, was found in JG's rectum: Dr. Johnson agreed that because the blood on JG's underwear tested negative for p30, JG's blood could be ruled out as the source of the positive p30 result. Bourgeois's other expert, Keel, could not conclusively identify a substance naturally occurring in a two-year-old girl that would contain p30 and stated that he did not know if a toddler could produce p30. There was no evidence to suggest that the p30 came from amniotic fluid, breast milk, or female urine.

The district court relied on the testimony of the government's expert, Conway, that the only substance other than semen that contains PSA at a level near that which could trigger a positive reaction is breast milk. Because there was no evidence that breast milk could have been in JG's rectum, the district court was persuaded by Conway's testimony that "if the PSA test was positive, they can be assured that that came from semen."

The district court concluded that, considered in the context of the trial and post-conviction record, the testimony from Dr. Johnson and Keel did not show that trial counsel were ineffective in relying on cross-examination to challenge the government's forensic evidence. The court stated that, given the complex scientific issues at play, and the fact that Bourgeois's experts questioned, but did not conclusively eliminate, the possibility of sexual assault, he failed to show that using experts to highlight that information would have swayed the jury. The court therefore held that it was a reasonable tactical decision for trial counsel to utilize Dr. Johnson's expertise to assist on cross-examination of the

government's experts, without calling her as a witness to confirm the presence of semen.

Based on its observations of their testimony, the district court also found that Keel and Dr. Johnson would not have been persuasive witnesses because they identified the same errors in testing that trial counsel had identified but got bogged down with fine distinctions that did not completely discount the possibility of sexual assault. The court concluded that a reasonable trial attorney could be concerned that a prolonged attack, without a clear-cut resolution, could make a minor, but highly inflammatory, issue a much more prominent feature in the jury's deliberation.

The court also held that Bourgeois failed to show a reasonable probability of a different result at the punishment phase had trial counsel disputed the sexual-assault evidence in the manner he proposed in the § 2255 proceedings. Even if trial counsel could have shown that there was no semen on the rectal swabs and that Dr. Benton incorrectly identified sexual trauma, and performed deficiently by failing to do so, there was other evidence that hinted that Bourgeois committed improprieties on his daughters (JG and AB1994) when he spent nights locked in a bedroom alone with them. The court also pointed out that an aggressive challenge to the sexual assault evidence could have opened the door to additional prejudicial evidence that trial counsel had successfully prevented the prosecution from presenting, including evidence that witnesses had seen Bourgeois "French kiss" AB1994, that he would have her sit on his lap inappropriately, and that he treated her like a mature adult. The court concluded that the evidence of sexual abuse was an inflammatory, but not decisive or pronounced, factor in both phases of the trial and the post-conviction evidence questioned, but did not completely eliminate, the possibility that Bourgeois had sexually assaulted JG. The court held that the sexual abuse evidence did not substantially affect the factors the jury had to consider reaching

a verdict as to his guilt. With respect to the punishment phase, the court held that although the sexual abuse evidence made Bourgeois seem more selfish, uncaring, and inhuman, even if trial counsel had conclusively rebutted the government's evidence of sexual abuse, the jury nevertheless had heard graphic testimony about how Bourgeois viciously abused JG in numerous other ways. Accordingly, the government's brief mention of sexual assault in the punishment phase closing argument was only another reminder that JG bore the signs of her father's abuse throughout the rest of her body. The court acknowledged that although evidence of sexual abuse could unduly inflame a jury in other circumstances, the evidence of Bourgeois's abusive and violent tendencies prevented any reasonable likelihood that jurors would have reacted differently in the punishment phase had they heard the evidence of sexual abuse.

e.

No reasonable jurist could debate the district court's assessment of this claim. The evidence Bourgeois presented in the § 2255 proceeding was no more effective at removing the possibility that Bourgeois sexually assaulted JG than the evidence his counsel elicited at trial. As the district court noted, the § 2255 evidence established, at best, that experts could disagree about whether there was evidence of trauma to JG's genital area. Although it would have been helpful to the defense if Dr. Rouse had testified that she did not observe any genital trauma at the autopsy, defense counsel challenged the evidence of sexual trauma in cross-examining Nurse McLaughlin, and in closing arguments, trial counsel reminded the jury that no evidence of trauma was found when JG was examined. Such testimony by Dr. Rouse would not, however, have rebutted Nurse McLaughlin's testimony that it is common to find no trauma even when there has been sexual abuse and that the absence of trauma does not mean that there was no penetration or Dr. Benton's testimony about the difficulty of

detecting sexual assault in children because they heal quickly and often there is no physical evidence when they are examined.

No reasonable jurist could debate the district court's decision that trial counsel did not perform deficiently in relying on cross-examination to challenge the prosecution's forensic evidence. On cross-examination in the § 2255 proceeding, Dr. Johnson acknowledged that a stronger color on a p30 test indicates a larger quantity of p30 than a weaker color but that a weaker color still discloses the presence of p30. Dr. Johnson was not aware of any studies showing that p30 could be found in girls of JG's age, and Keel did not know whether a toddler could produce p30. Critically, the testimony of Bourgeois's experts at the § 2255 hearing failed to establish that any of the bodily fluids identified by Dr. Johnson and Keel, other than semen, contain p30 at levels high enough to trigger a positive p30 test result.

Finally, no reasonable jurist would debate the district court's conclusion that Bourgeois was not prejudiced. The district court applied the correct standard of prejudice, stating in the first sentence of its discussion that "Bourgeois must also show a reasonable probability of a different result had trial counsel vigorously attacked the evidence of sexual assault." Dist. Ct. Op. at 180. In the light of the medical and photographic evidence of JG's torture, abuse, and the fatal blows to her head, corroborated by the testimony of AB1994 and Robin, as well as the evidence of premeditation demonstrated by the unfounded reports to CPS, the post cards sent to JG's biological mother, and Bourgeois's statements to Robin about what he would do when he killed JG, there is not a reasonable probability that the outcome of the guilt-innocence phase of the trial would have been different, even if trial counsel had done everything Bourgeois contends they should have done. And, considering the graphic evidence of Bourgeois's vicious torture of JG during the final weeks of her life, culminating in the brutal bashing of her head in the presence of his seven-year-old daughter, there is no

reasonable probability that a juror would not have found that the government had proved the statutory aggravating circumstance that the murder was committed in a heinous, atrocious, or depraved manner, even if trial counsel had rebutted the evidence of sexual assault in the manner Bourgeois contends they should have done. Furthermore, as the district court pointed out, it is likely that if counsel had challenged the sexual-assault evidence in the manner that Bourgeois suggests they should have done, it could have opened the door to additional prejudicial evidence.[27]

## 2. Ineffective Assistance - Mitigating Evidence

Bourgeois's final COA request is for his claim that trial counsel rendered ineffective assistance at the punishment phase by failing to present mitigating evidence of his impoverished background, dysfunctional family, physical abuse, sexual abuse, Borderline Personality Disorder (BPD), brain damage, low intelligence, and the stress that he was under at the time of the murder.

a.

We begin by describing the events leading up to the trial and the evidence presented at the punishment phase of the trial.

Defense counsel retained Dr. Mark Cunningham as an expert witness on mitigation evidence and the risk of violence in prison society. Pursuant to Dr.

---

[27] In his reply brief, Bourgeois asserts that the allegations of his sexual misconduct with AB1994 emanated from Robin, who lied about the circumstances of JG's death and testified to avoid prosecution. He states that none of his children, including his two other daughters, have ever alleged that he engaged in sexually-inappropriate behavior. He thus contends that the presentation of evidence to support counsel's attempted arguments that there was no semen and no sexual assault would not have highlighted the issue any further and would not have opened the door to any excluded evidence. No reasonable jurist could debate the district court's conclusion to the contrary, and the record supports that conclusion. The transcript reflects that at a hearing on the admissibility of evidence that Bourgeois may have engaged in inappropriate conduct of a sexual nature with AB1994, the district court was unchallenged by trial counsel when it commented that "everybody in this room knows what was going on with Mr. Bourgeois and AB1994. . . . One can only imagine, when Robin was locked out of the bedroom, and AB1994 was sleeping in there with him, what was going on."

Cunningham's recommendation, defense counsel retained mitigation specialist, Lisa Milstein and her associate, Gerald Bierbaum.

Milstein and Bierbaum interviewed Bourgeois on October 23, 2003. In that interview, Bourgeois denied child abuse. He reported a head injury from a three-wheeler accident in 1984, and said that he was in a coma for three months. The mitigation investigators also learned that when he was six or seven years old, Bourgeois moved in with an elderly neighbor, Mary Clayton, with whom he lived until her death when he was a teenager.

In December 2003, defense counsel filed a motion for a mental-health evaluation of Bourgeois because they had "observed highly-unusual, often bizarre behavior, . . . listened to abnormal conversations, and . . . noticed an unnatural writing style." The parties agreed to have Dr. Carlos Estrada examine Bourgeois, and the examination was conducted on December 26, 2003.[28]

Dr. Estrada submitted a report of his evaluation on January 20, 2004. Dr. Estrada reported that Bourgeois had denied any history of childhood physical or sexual abuse, neglect, or trauma but that he suffered a broken leg, broken nose, and concussion from a 1984 motorcycle accident and broke a collar bone in a 1989 accident when he fell asleep behind the wheel of a pick-up truck. Dr. Estrada found that Bourgeois "appears to have an above average intelligence and memory and an average knowledge commensurate with his level of education and experience."[29] He found that Bourgeois's "thought processes show no thought disorder, no delusions, no hallucination, no obsessions, and no

---

[28] Trial counsel wanted to retain Dr. Estrada as a mental-health expert, but he had already been retained by the government. Trial counsel had worked with Dr. Estrada previously and considered him to be a trusted, candid witness.

[29] Bourgeois untruthfully told Dr. Estrada that he had attended college for two years and had worked as a police officer. At a hearing on April 10, 2003, Bourgeois told the district court that he had attended college for two years. At his arraignment on the second superseding indictment on July 25, 2003, Bourgeois stated that he had attended college for one year.

compulsions." He stated that Bourgeois "has a very clear recollection of the events before, during the incident, and afterwards"[30] and was "able to remember and describe the details and postulate alternative theories for his defense; none of which involves disturbed mental status." Dr. Estrada reviewed taped telephone conversations Bourgeois had with family members and others and stated that they "reveal a clearcut understanding of the events that led to the death of the daughter and a clear understanding of the evidence against him that reveals no altered mental status at the time, no presence of delusions, and no presence of irrational thinking or irrational behavior or inability to know right or wrong."

Defense counsel also retained Dr. George W. Holden, a psychologist who specialized in family violence and parent-child relationships. In a letter report dated December 19, 2003, Dr. Holden stated that Bourgeois did not intend to kill JG, but was merely punishing her for making a mess and was trying to teach her a lesson so she would not spill the contents of her potty in the future. He stated that Bourgeois's fatigue and lack of attachment to JG probably contributed to his overreacting and being especially brutal to JG, and that Bourgeois was also stressed by traveling in a confined space with four other people, including three young children. Dr. Holden stated that toilet training incidents are a common cause of physical abuse and that what Bourgeois did to JG is "largely understandable and not uncommon, just a more extreme case with a tragic end." In a supplemental letter report dated February 25, 2004, Dr. Holden stated that

---

[30] Bourgeois told Dr. Estrada that as he started to unload the truck at the CCNAS, he found JG lying on the pavement by the side of the passenger door of his truck unconscious and foaming from the mouth. He proclaimed his innocence and insinuated that Robin was to blame because she could not get over the jealousy of him having JG as a result of an extramarital affair. He offered two theories for how JG was fatally injured: (1) she was playing and may have fallen out of the truck or (2) Robin might have accidentally hurt her when pulling her from the front seat to the back of the cabin, hitting her head and causing the unconsciousness, and then JG fell through the door.

when a child dies during the course of discipline, it is much more likely that the parent did not intend to seriously injure, let alone kill, the child. He stated that what probably happened was that, in a fit of rage over the spilled potty, Bourgeois lost control of himself and, in the course of administering physical discipline, fatally injured JG.

The mitigation investigators interviewed dozens of witnesses in the two months prior to jury selection, including Bourgeois's siblings and other family members as well as friends of Bourgeois and several members of Ms. Clayton's family.

On January 30, 2004, about two weeks before trial, the mitigation investigators furnished reports to Dr. Cunningham and trial counsel. Upon receiving the reports, Dr. Cunningham complained to Bierbaum about the quality of the mitigation interviews and reports.

On February 4, 2004, Bierbaum wrote a memo regarding a lengthy interview of Bourgeois that he and Tinker had conducted on January 29. That memo records details about Bourgeois's abuse by his mother, including being tied to a chair by his wrists, naked, and being whipped with an extension cord and being stripped down in the bathtub and whipped again the next day. His mother continued to administer severe beatings when he visited his home after he had moved in with Ms. Clayton. His mom always beat him with his clothes off. She shaved his head bald and she had long fingernails that she used to pick in his nose in an aggressive manner. Bourgeois also reported that he and Robin argued a lot about money, were about to lose their house in the summer of 2002, and he was behind in making payments on the car and all the credit cards.

On February 7, about a week before trial, Dr. Cunningham conducted a five-and-one-half-hour interview of Bourgeois.[31]  He also conducted extended

---

[31] He also met with trial counsel and, for the first time, complained to them about the quality of the mitigation investigators' work.

telephone interviews of Bourgeois's older siblings. In a letter report dated February 10, Dr. Cunningham stated that he had learned that Bourgeois had suffered a serious head injury in 1984, when a three-wheeler he was driving collided with a telephone pole. Claudia Williams, Bourgeois's older sister, reported to Dr. Cunningham that Bourgeois was unconscious for a number of hours following this accident and did not regain consciousness until after hospitalization and surgery. Williams and her husband also told Dr. Cunningham that Bourgeois experienced recurrent "rage" episodes, accompanied by violent assaults and verbal aggression, observed from his early childhood but which worsened in severity following the head injury. Dr. Cunningham recommended that trial counsel obtain a comprehensive neurological and neuropsychological evaluation of Bourgeois.

In a report dated February 25, 2004, Dr. Cunningham listed "a number of adverse developmental factors that singly and collectively increased the likelihood of an adverse and/or criminally violent outcome in adulthood," including Bourgeois's abandonment by his father, emotional rejection and abuse, physical abuse, the death of his older brother, and a significant head injury and subsequent rage attacks. Dr. Cunningham also noted "pro-social patterns and positive relationship behaviors" including that Bourgeois had maintained continuous employment and was regarded as responsible and hardworking; that he was an involved father who provided economic support as well as relationship to his children; and that he displayed an ongoing interest in and was a constructive influence on his nieces and nephews.

Dr. Cunningham also gave trial counsel a risk-assessment letter dated February 25, describing his opinion that Bourgeois would not present a risk of violence while incarcerated. Dr. Cunningham stated that it was his understanding that despite sharing a common day room or group cell, Bourgeois had "not engaged in any assaults on inmates or staff and further that he has

received few if any disciplinary write-ups." He stated that rates of disciplinary infractions and violence in prison are negatively correlated with age and that inmates serving terms of life without parole represent better institutional assault risks than inmates serving parole-eligible terms. He observed that most life-sentenced capital inmates had a 20-30% risk for acts of assaultive violence and an 8-10% chance of a more chronic violence problem in prison. He opined that Bourgeois would have the following probabilities of serious institutional violence across a capital life term: 2% of any serious assault, less than 1% aggravated assault on staff, and less than 0.2% homicide of an inmate. Characteristics that increased Bourgeois's likelihood of a positive adjustment to prison, and reduced his likelihood of perpetrating a serious institutional assault, included his being over age 35 at the outset of his prison term, his history of gainful employment, and his continuing relationships with family members.

Dr. Cunningham acknowledged that Bourgeois had made threats of inflicting violence from prison but stated that "the credibility of these reports has not been determined." Further, he did not think that Bourgeois had the financial resources or ties to organized criminal groups to order any violence from prison. He also expressed confidence that the Department of Justice could use special conditions of confinement to restrict and monitor Bourgeois's communications so that any risk would be negligible.

Dr. Cunningham prepared two PowerPoint presentations – one for mitigation and one for future risk of violence – and gave trial counsel a binder with the proposed slides. He also prepared questions for counsel to ask him on direct examination. He proposed to testify that adverse factors in Bourgeois's background – an overwhelmed family system, abandonment by his father, difficulty in controlling his impulses from an early age, physical abuse, emotional abuse, abandonment and rejection, and neuropsychological problems including organic deficits and low IQ – were ingredients simmering in a pressure

cooker, the lid of which blew off as a result of the stress of marital and financial problems.

In his presentation about risk of future violence, Dr. Cunningham proposed to provide general information about behavior in secure environments, including the Bureau of Prisons, and mechanisms available in the prison to control disruptive or violent inmates as well as specific factors that would make Bourgeois less likely to be a threat in prison: his age, his behavior in pre-trial custody, his continuing relationship with family and friends, and his history of employment and stability in the community.

Pursuant to Dr. Cunningham's recommendation, trial counsel obtained court funds to employ a neurologist to perform an EEG and a neuropsychologist, Dr. Donald Weiner, referred to counsel by Dr. Estrada, to evaluate Bourgeois. The results of the EEG did not reveal any abnormalities. Dr. Weiner evaluated Bourgeois on February 28. He reported that Bourgeois's IQ was in the borderline range of intellectual functioning and that Bourgeois did not have any specific learning disabilities. Bourgeois told Dr. Weiner that he had been in a three-wheeler accident in 1984, which resulted in him being in a coma for one to two months. Dr. Weiner stated that neuropsychological test results revealed "mild overall cerebral damage, with moderate cerebral damage in the posterior portion of the cerebral cortex . . . likely due to the injuries sustained in the three-wheeler accident." Bourgeois told Dr. Weiner that he has become aggravated more easily since the 1984 accident, and Dr. Weiner found that Bourgeois's performance on one of the tests suggests that he may exhibit inappropriate behavior under stressful circumstances without always being aware of the inappropriateness of his actions. Dr. Weiner found no evidence of malingering and believed that his test results were a valid indication of Bourgeois's level of neuropsychological functioning.

No. 11-70024

After the guilt-innocence phase, trial counsel furnished Dr. Weiner's report to the prosecution. In a hearing on March 17, the prosecution stated that Dr. Estrada had reviewed the material and had found serious flaws in Dr. Weiner's methodology. Noting that the EEG had not indicated any evidence of impairment, the prosecution stated that it intended to bring in its own neuropsychologist to test Bourgeois. Trial counsel objected to any additional testing. The court ordered a hearing on Dr. Weiner's proposed testimony to find out what testing he had performed.

In a hearing on March 19, defense counsel informed the court that they had decided not to call Dr. Weiner as a witness. The district court told the defense that if they were not going to call Dr. Weiner as a witness, they could not rely on the results from his testing and that Dr. Cunningham and Dr. Estrada would not be allowed to use Dr. Weiner's report during their testimony.

Before the sentencing hearing began, the district court discussed with Dr. Cunningham his intended PowerPoint presentation. The government wanted to exclude the part of Dr. Cunningham's testimony that discussed the Bureau of Prisons's policies and practices, and the related testimony about how offenders in general behave in prison, and focus instead on Bourgeois's own propensity for violence. The district court refused to limit the scope of Dr. Cunningham's testimony but stated that it would allow the government to call an expert witness to rebut Dr. Cunningham's testimony. The government announced that it intended to call John Shaw from the Bureau of Prisons if the defense called Dr. Cunningham.

At the punishment phase, the government presented the following evidence:

● Bourgeois beat Robin repeatedly, including while she was pregnant.

● Felony charges were pending against Bourgeois as a result of an incident that occurred while Robin was in the hospital giving birth to AB2001,

in which he punched his mother-in-law in the mouth and beat her with a lamp, in the presence of AB1994 and other children.

● At his and Robin's wedding, Bourgeois fought with Robin's brother when the brother warned him not to beat Robin.

● Bourgeois terrorized Robin's adopted brother, who was nine or ten years old and could not swim, by holding him by his feet over the side of a high bridge and over a pier at a boat launch. On another occasion, Bourgeois repeatedly dunked the boy in the water at the beach until he threw up from swallowing water. On yet another occasion, Bourgeois grabbed the boy by his ankles and swung him around until his head hit Bourgeois's sleeping dog, which woke up and bit the boy.

● Bourgeois pushed, choked, and argued with his first wife, Sheila Bourgeois, during their four-month marriage and while she was pregnant. She left him after he pushed her over a chair and she "busted up" her nose. Their daughter, SB1988, did not want to be alone with Bourgeois.

● Ex-wife Cynthia Bourgeois's daughter shook with fear every time Bourgeois was in her presence. When the child was three years old, Bourgeois took her to a family gathering and when she returned, she had a "big knot" on her head, walked with a limp, and had a bruise on her back in the shape of a footprint. She said that Bourgeois had pulled her hair out and put her head in the toilet.

● After divorcing Gaynell Belvin James, Bourgeois took their three-year-old son for the day, and the boy returned very shaky, nervous, and withdrawn, with a large bruise on his thigh. The child was too afraid to go with Bourgeois again for many years. When the boy was thirteen years old, Bourgeois took him for what was supposed to be a day but kept him for a more than a month.

● While Bourgeois was married to ex-wife, Gaynell Collins Bourgeois, he had a bad temper and shoved and choked her.

No. 11-70024

● While incarcerated before trial, Bourgeois told a deputy United States Marshal, "If I was going to hit somebody, I would hit you." A couple of weeks later, Bourgeois lunged at the officer.

● Bourgeois's cousin, Isaac Bourgeois, III, got into a fight with Bourgeois over insults to Isaac's mother. Bourgeois bit Isaac's little finger to the bone. The next day, Bourgeois and his brother, Lloyd Ferdinand, confronted Isaac and his mother with guns and threatened to kill them. Then they got in Lloyd's truck, circled around Isaac and his mother, and told them they "could die today." Bourgeois was convicted of disturbing the peace as a result of that incident. Lloyd later apologized, but Bourgeois never did.

● On June 28, 2002, Bourgeois asked an FBI agent who was transporting him from the Nueces County Jail "how that girl [JG] made out."

● Four inmates testified about Bourgeois's incriminating statements and threats he made while they were incarcerated together before trial. Bourgeois knew that Adam Longoria was a member of the Texas Syndicate prison gang. Longoria represented that he was a "hit man." Bourgeois communicated to Longoria that he wanted his cousin, his ex-wife, and his wife killed and gave him their telephone numbers and addresses. He promised that his brother, Lloyd, would give Longoria a $100,000 18-wheeler truck and the names of people for drug runs. Longoria said that Bourgeois told him that he beat JG with a bat and extension cords. Orlando Campos testified that Bourgeois told him that he beat up his wives and ex-girlfriends and that he was going to kill Robin when he got out of prison. Wiley Taylor testified that Bourgeois told him that he was trying to have Robin killed so that she could not testify against him and that he and his brother made most of his money running drugs and illegal aliens. Taylor and Darrick Moore testified that Bourgeois told them he beat his wives and girlfriends.

No. 11-70024

● Robin testified that Bourgeois admitted that he did not have a conscience. She read a letter that Bourgeois had written to her uncle, intending that she see it, in which he stated: "in the name of God, Robin['s] days will be short. That niece of yours will have a short life." The letter also stated: "All this shit about extension cord beatings, biting this child, brutalizing this child, your niece told those people all this." On cross-examination, she testified that Bourgeois could not handle the knowledge of her extramarital affair. She also testified that in the summer of 2002, they were having financial problems and he was stressed by finding out that he had another child to support.

● JG's grandmother, Karen Jackson, testified about the impact of losing JG.

● An FBI agent testified that Bourgeois was a liar and was manipulative.

Dr. Carlos Estrada, the psychiatrist who had evaluated Bourgeois prior to trial, testified for the government. Dr. Estrada had interviewed Bourgeois for three hours, reviewed letters that Bourgeois had written, listened to recordings of Bourgeois's taped telephone conversations, and had reviewed statements made by witnesses and family members, who reported that Bourgeois had been rejected and abandoned and that his mother had abused him. He had also observed Bourgeois throughout the trial and had reviewed reports of psychologists who had evaluated Bourgeois.

On direct examination, Dr. Estrada testified that Bourgeois has a number of characteristics that have been found to be associated with violence, such as being the subject of rejection, neglect, and abandonment and being the survivor of physical, sexual, or emotional abuse, all of which can create a very high predisposition for violence as an adult. If those characteristics are coupled with three others – personal use of violence, belonging to a culture of beliefs where violence is accepted, tolerated, or approved, and the presence of previous social interventions regarding the violence – the predisposition for violence as an adult

is very, very high.  Bourgeois shares these elements with a group of individuals who engage in violent behavior as adults.

In assessing Bourgeois's personality for risk of violence, Dr. Estrada found items that may decrease self-control, items that will decrease the regard and respect and empathy for others, and motivations towards violence.  He found that Bourgeois has characteristics of a narcissistic personality disorder – an individual whose basic motivation in life is the aggrandizing of his self-esteem.  Such individuals need to have continuous positive feedback to their self-esteem and when that is not forthcoming, they feel extremely distressed, depressed, or angry and need to do something to re-establish the sense of being special and better than others.  One of the characteristics of a narcissistic personality disorder is the capacity to give a wonderful first impression.  Individuals with the disorder are lively, likeable, exciting, interesting, and sometimes very persuasive or charismatic.  But during the course of the relationship in the long term, the fact that their interest is almost self-subservient leads to conflict and disappointment with other people.  As a result of disappointment, personal problems are inevitable and result in friction that may lead to the break-up of relationships or businesses or actual violence.

On the basis of his assessment of the background factors and the personality factors, Dr. Estrada's opinion was that Bourgeois has a much higher tendency toward violence than an ordinary person.  He observed that Bourgeois's attitude throughout the legal proceedings had been one of a member of the defense team, rather than the defendant or the father of the victim.  He noted that Bourgeois had been very attentive, had made profuse notes, and had been able to discuss and provide assistance to his defense team as needed.  Bourgeois had also given the impression that he was disgusted with the presentation and answers of the witnesses and was not going to let what they said shake or affect

him.  Those two characteristics, in Dr. Estrada's opinion, were very consistent with a diagnosis of a narcissistic personality disorder.

At a bench conference following the government's direct examination of Dr. Estrada, Tinker told the court that, depending on how Dr. Estrada's cross-examination went, the defense was going to rest.  He noted that this was not the consensus of the rest of the defense team, particularly Dr. Cunningham.  He continued:  "For instance, he [Dr. Cunningham] would talk about how many people are in the penitentiary and that there are only 10% commit murders.  Well, I think why the hell would I want the jury to know that?  Maybe it's 3 percent.  But still."

Through cross-examination of Dr. Estrada, the defense presented mitigating evidence about Bourgeois's background and the circumstances of the offense.  When asked to tell the jury what he knew about Bourgeois's childhood, Dr. Estrada testified that Bourgeois was not truthful about his own abuse as a child and was vague and reluctant to talk about his background.  He said that it is not unusual for individuals who abuse their children to gloss over or give excuses for their parents' neglect or abuse.  He testified that, based on the testimony of witnesses, there were several indications of neglect and rejection.  Tinker stated:  "And I want you to understand that as I ask you these questions, I'm not asking these questions to help excuse what he did, but to explain it."

Dr. Estrada testified that Bourgeois was a child from an illegitimate relationship and his real father abandoned him.  Further, his mother selected him from among her many children for particular abuse.

When Dr. Estrada mentioned that he had received a report of neuropsychological testing by Dr. Weiner, the court called counsel to the bench.  The court stated that Dr. Weiner's report had been excluded from evidence and that no witness had testified that Bourgeois was abused or neglected in any way and asked Dr. Estrada where he got that information.  Tinker stated that he

would not ask Dr. Estrada to discuss Dr. Cunningham or Dr. Weiner's reports. The court stated that Dr. Estrada should not testify from Dr. Weiner's examination but that it did not see any reason why he could not testify from the information he got from Dr. Cunningham. The prosecutor pointed out that Dr. Cunningham's report contained references to Dr. Weiner's report.

Dr. Estrada testified that the prosecutor had asked him to provide information about the profile of people who abuse their children and that he had responded that people who commit that kind of offense generally were abused themselves. He said that he sent the prosecutor a letter describing the main personality characteristics of an abusive parent: a history of personal use of violence to get their way; a reliance on violence rather than dialogue or conflict resolution to take care of problems; being more concerned about themselves than about other people, more self-centered; expecting a child to conform to their needs, rather than conforming to the needs of the child; and a great difficulty tolerating frustration and stress.

Dr. Estrada stated that at the time of the murder, Bourgeois was stressed because: he had discovered that he had a child as a result of an affair and was very angry about that; he was under financial stress with debts; he had a serious marital problem with his wife and they had been arguing about a number of things, including their mutual affairs; and they were in a confined situation that made any little accident in the toilet the trigger for an explosion of anger that came from a number of different directions and ended up focused on the child.

Dr. Estrada said that during their interview, Bourgeois felt that the times where he was angry and violent with his wives were justified and that he had good reasons to act that way. Dr. Estrada also observed that Bourgeois's friends and relatives did nothing to stop the abuse of his wives or JG because they felt they did not have the right to interfere in the way he was handling his family. That is why Dr. Estrada found that Bourgeois was the product of an

environment where a certain measure of violence in family relationships, like harsh discipline of children or hitting the wife, is accepted.

When asked whether there was something that could have happened that would have prevented this, Dr. Estrada responded: "Yes, intervention before adulthood." He said that, ideally, such intervention should have occurred while Bourgeois was in elementary school.

Trial counsel tried to get Dr. Estrada to limit his assessment of the risk of future violence to family situations. Dr. Estrada responded that given Bourgeois's background and personality, and the pattern of abusive relationships, the short-term prognosis was that Bourgeois will become violent in a family situation. When asked whether Bourgeois would be a risk for violent conduct in the penitentiary, Dr. Estrada was unable to express a definite opinion without knowing the details of the prison circumstances in which Bourgeois would be confined. Dr. Estrada agreed with trial counsel that, the older a person is, the less likely they are to cause problems, and that there is a lesser degree of all kinds of violent incidents, the higher the supervision available. He also agreed that he would expect a person of Bourgeois's age to able to adjust better in the penitentiary than someone who enters prison as a rebellious youth.

On redirect examination, the prosecutor challenged the basis for Dr. Estrada's impression that Bourgeois had an abusive childhood. Dr. Estrada testified that Bourgeois reported being well cared for as a child and that no one had told him directly that there was any abuse or neglect, but he had read it in reports. He testified that it was his conclusion that Bourgeois is self-centered, angry, and has a high risk towards violence. He observed that when AB1994 approached the witness stand, she tried to establish eye contact with Bourgeois, but Bourgeois avoided eye contact with her. Dr. Estrada also acknowledged that this is not the usual case of child abuse and that he did not hear anything from

the evidence that communicated a culture that would allow for the systematic beating and torture and killing of a two-year-old.

On further cross-examination, trial counsel elicited testimony that Bourgeois's avoidance of eye contact with AB1994 could have been an effort not to intimidate her. Dr. Estrada also testified that Bourgeois is not a sociopath and that he believed Bourgeois would adjust well in custody.

At a bench conference, the court stated: "I don't think, Mr. Tinker, you could have hired a better witness for your defense than Dr. Estrada." Later, after the defense rested, the court stated that in cross-examining Dr. Estrada, Tinker essentially got into evidence the reports of both Dr. Cunningham and Dr. Weiner. The defense did not present any expert testimony, but did present the testimony of several lay witnesses.

Michelle Armont, Bourgeois's paternal half-sister, testified that their father had twenty-two children; that Bourgeois came to live with her after Ms. Clayton died; that Bourgeois had a temper, but that usually she could calm him down; that his only problem in school was tardiness; and that she had observed the same type of behavior by Bourgeois that she had observed by her nephew, who had attention deficit disorder. She testified that she assumed that Bourgeois did not move back in with his mother after Ms. Clayton died because they did not have a good relationship at the time; however, she said that Bourgeois and his mother resolved the problem in the end.[32]

Bourgeois's first cousin, Carl Henry, testified that Bourgeois's mother cleaned his nose with her long fingernails, causing a bad sore and a constant bloody nose; that she whipped Bourgeois with an extension cord and threw a telephone receiver at his head; that his mother sent him to live with Ms.

---

[32] The record contains some evidence of an apparent reconciliation between Bourgeois and his mother. In a handwritten letter to Bierbaum and Milstein on February 5, 2004, Bourgeois referred to a fish fry at his mother's home on the day JG was christened.

Clayton, but Bourgeois liked living there because Ms. Clayton cared for him better than his mother did; and that Bourgeois was hurt when teased about his father's absence from his life.

Ms. Clayton's grandson, Reverend Herman Clayton, Jr., who grew up in the same neighborhood as Bourgeois, testified that they were raised on a street that housed about thirty poor, black families. He stated that Ms. Clayton asked Bourgeois's mother to allow Bourgeois to live with her and that Bourgeois's mother refused on several occasions, but Ms. Clayton persisted. He said that Bourgeois would hide at Ms. Clayton's when his mother came to look for him. Although he did not witness any abuse, he was told by others that Bourgeois's mother whipped her children, and that she abused Bourgeois and whipped him for things he did not do. On cross-examination, he testified that Ms. Clayton was doing a favor for Bourgeois when she provided a home for him. He explained that Bourgeois's mother could not come to court because she had just come home from the hospital after having a heart attack.

After the defense rested, Bourgeois complained to the district court, outside the presence of the jury, about his lawyers not putting up a fight for him. He reiterated his belief that he had been convicted for something he did not do, based on what Robin's family had said, and complained that his family did not get a chance to testify prior to the punishment phase, when it was too late. The court told Bourgeois that his attorneys had a right to make strategic decisions in his best interest and that they had, in the court's opinion, exercised extremely good judgment. The court then stated that it wanted to make a record of the investigation that was done for Bourgeois. Defense investigator Tenore stated that he had been working on the case since March 2003 and had interviewed over fifty witnesses. Gilmore stated that he had a synopsis of every witness interview. Tenore also stated that mitigation investigator Bierbaum had spent a significant amount of time in Louisiana. The district court noted that it had

appointed one case-in-chief investigator, two mitigation investigators, and a mitigation expert as well as a neuropsychologist, a neurologist, a DNA expert, a forensic odontologist, a battered-baby expert, a juror selection specialist, and a polygraph examiner.

Against trial counsel's advice, Bourgeois testified at the punishment phase as follows:

> My sympathy goes out to the soul of JG1999, my baby, her family, my family, relatives and friends, and I'm very sorry for the death of my child. It's a hurting pain and a sorrowful thing that happened. And I feel or believe that I have been wrongfully accused of this crime that I've been convicted for . . . .
>
> So I feel like you all have been misled and I've been wrongfully convicted, and I'm just sorry for the pain and suffering, that I've been wrongfully accused for the death of my baby, and I did not kill my baby.
>
> I just want to close with that I loved JG1999, she's an infant that didn't actually come in this world and I think the real murderer got off with this crime. I just think you all should know that I have been wrongfully convicted. I feel my wife had a lot to do with this and she walked away free, and I just had to say this. If I never get an opportunity to say this to nobody else, my family, Katrina's family, JG1999 came from a lovely family. When I picked her up, when she got in my custody I had no problems with JG1999. She was a lovely kid, very lovely. I realize some of the pictures that you all seen in the swimming pool, I will say I was a little rough like that, I'm like that with all my children. And I just feel you all have been wrongfully misled.
>
> I just think I want to close with that, saying that I love my baby, I love her family, I love my family. And I thank each and every one of you for participating, the lawyers for the job they did, and for everybody that communicated. And God bless all of you all. Thank you.

Gilmore began his closing argument by saying: "It's difficult for me to come up here and argue to you about this punishment and what you're going to do to him knowing that he maintains his innocence, and knowing that you don't

believe that." After pointing out that Bourgeois's mother singled him out for abuse and that he went to live with Ms. Clayton to get away from his mother, Gilmore stated:

> Now, these things are offered to you not as an excuse for committing this crime, but to try to help you understand his mind set, and trying to help you understand where he comes from. This is – it's not an excuse for him, if you believe he committed this crime, for him doing it. It's something to show you that he's a human being.

Next, he mentioned that Bourgeois was upset about Robin's affair, was having economic problems, and then found out that he had a child from a one-night stand. Then he stated: "Something happened in that trip. If you believe that he did this, something happened during that trip that brought all these factors together and caused him to snap. If you believe he did it, it was not a premeditated act." He pointed out that if a person wants to kill a child of that age, it could be done immediately. Then he stated: "And I think that what happened is that at the Naval Air Station, these factors all came together and he snapped. Intending to discipline her, it got out of hand and it ended up killing her. That's not to excuse his behavior; it's in an attempt to try to explain what happened." He concluded by pointing out that the things Bourgeois had done in the past had been in family situations where emotion was involved and that such circumstances would not exist in the penitentiary; but if they did, the people who run the penitentiary know how to deal with it.

In his portion of the defense closing argument, Tinker told the jury that Bourgeois was an unwanted child in a large family with a mother who abused him. Referring frequently to Dr. Estrada's testimony, he argued that Bourgeois grew up in a society where it was accepted conduct to hit children and wives. Tinker noted that Dr. Estrada had explained that JG "ended up the victim of who he [Bourgeois] ended up because he started out getting abused himself." He concluded: "I hope that helps you out on who it is that they have called on you

65

to give the death penalty. There's no evidence he is a danger to anybody other than in the family setting. That's what their expert, Dr. Estrada, said. Dr. Estrada told you that because of his age he's least likely to cause any problem in the penitentiary."

In rebuttal, the prosecutor pointed out the inconsistency between Bourgeois's insistence that he is innocent and the explanations offered by Bourgeois's counsel: "Was there remorse in his voice? Did he ever admit to you that he lost it and accidentally killed the baby, and that it was his background that did it to him? No, he didn't. Not ever."

After the jury's punishment verdict, the court asked Gilmore if the defense investigated Bourgeois's neighbors, childhood friends, and school and employment records. Gilmore replied: "Yes, Your Honor. Mr. Tenore and Mr. Bierbaum did a fairly thorough investigation. They followed up all the leads. They dealt mostly with Mr. Bourgeois's brother, Lloyd Ferdinand, who directed them to all these people."

b.

In this § 2255 proceeding, Bourgeois argues that trial counsel were ineffective in presenting only a small fraction of his life story and omitting any compelling and descriptive details about his impoverished background,[33]

---

[33] Bourgeois grew up in an impoverished, isolated neighborhood on the banks of the Mississippi River, about fifty miles from New Orleans. His community, called "the Bend," consisted of a one-lane dirt road connecting about twenty homes, representing two or three different family units. The neighborhood was surrounded by sugar cane fields and hemmed in on one side by the River. The families of the Bend had all lived there for five generations or more and could trace their lineage back to "slave time." Most of the homes had been lived in for generations. The Bend was not connected to a sewage line.

dysfunctional family,[34] physical abuse and neglect,[35] sexual abuse, BPD,[36] brain damage,[37] low intelligence,[38] and the stress he was under during the summer of 2002.[39] According to Bourgeois, counsel's failings were the result of a lack of

---

[34] Bourgeois's mother was an alcoholic; he was the fifth of seven children born to her in less than nine years; his next older brother, Anthony, was born with cerebral palsy, was profoundly retarded, and required significant extra care, for which the family received no outside services; and his mother was overwhelmed by the number of children in her care.

[35] Bourgeois acknowledges that some evidence of childhood abuse was presented at trial but contends that it was not similar to the detailed evidence presented in the § 2255 proceedings and thus the jury did not hear firsthand, detailed accounts of how young Bourgeois was subjected to merciless, chronic, and long-standing physical abuse at the hands of his mother.

[36] Bourgeois argues that evidence that persons with BPD are extremely vulnerable to stress, and tend to experience dissociative and psychotic episodes in which they are unaware of their actions and unable to control their behavior, contrasts greatly with the prosecution's theory at trial, which was that he acted with premeditation when he killed JG in an effort to avoid paying child support. He contends further that the district court erred by concluding that a reasonable attorney could rationally decide not to present evidence of BPD in the light of its "aggravating edge" because (1) trial counsel never offered that explanation; and (2) trial counsel was never able to consider the option of a BPD diagnosis in the first place because they failed to provide Dr. Estrada or any expert with sufficient information about Bourgeois.

[37] Bourgeois contends that if trial counsel had consulted with Dr. Weiner about the substance and basis for his conclusions, and had provided medical records to him, he would have told them that whether Bourgeois had suffered a coma was not crucial to his findings, which were based on neuropsychological testing, and that regardless of the cause, Bourgeois has some brain damage. He also argues that the district court erred by speculating that counsel may have decided not to present evidence of brain damage because neurological conditions are double-edged. He asserts that trial counsel never offered that theory, nor could they, because they failed to prepare and consult with their expert about his findings and conclusions and were therefore not in a position to make an informed decision about the pros and cons of his testimony.

[38] Bourgeois argues that trial counsel ineffectively failed to present evidence that he has, at best, an IQ that is in the range of borderline intellectual functioning. He contends that the district court's subjective view of Bourgeois's testimony and the meaning or significance of his behavior at trial are belied by the testimony of government expert Dr. Price, who acknowledged that, despite Bourgeois's ability to testify and to drive a truck, he functions in the borderline level of intelligence.

[39] Bourgeois contends that trial counsel ineffectively failed to present all of the available evidence that, at the time of the murder, Bourgeois was experiencing stress as a result of his marital difficulties, financial pressures, and legal difficulties.

preparation rather than a strategic decision. He contends that if trial counsel had conducted their investigation in a timely manner, they would have discovered and addressed any concerns regarding Dr. Cunningham's testimony. Bourgeois contends further that the district court erred by suggesting strategic reasons for counsel's failure to pursue and present certain categories of mitigating evidence because such strategies were either never offered by trial counsel or were not the strategies that counsel stated that they pursued.  He asserts that at the punishment phase, trial counsel did not pursue their purported strategy of innocence but instead presented mitigating evidence and argued that Bourgeois's childhood history of abuse and the stress that he was under at the time of the murder explained his actions.  In addition, trial counsel asked the jury to find mitigating factors that would have been supported by the lay and expert testimony they failed to present, including:  Bourgeois's capacity to appreciate the wrongfulness of his conduct was significantly impaired; he suffered from extreme mental or emotional disturbance; and he was abused as a child.

In support of his claims in the § 2255 proceedings, Bourgeois relied on eight experts and numerous lay witnesses to present the evidence that he claims his trial counsel should have discovered and presented at the punishment phase.

Bourgeois submitted a declaration and the deposition testimony of Dr. Estrada, the government's expert witness at trial.  In his declaration, Dr. Estrada stated:

(1) New information provided by Bourgeois's habeas counsel confirmed what he strongly suspected at the time of trial:  Bourgeois has a history of family dysfunction and childhood physical and sexual abuse, and he has cognitive deficits that further affect his ability to make good judgments.  That history is

consistent with BPD,[40] which supplements the earlier diagnosis of narcissistic personality disorder.

(2) Bourgeois's abuse and killing of JG is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Bourgeois at the time of the offense. The brutal and bizarre manner of the killing, along with Bourgeois's background and mental health deficits, show that this "was purely a rage killing," born of Bourgeois's lifetime experiences, the psychological effects of those experiences, and his cognitive deficits. In addition, Bourgeois, like many borderline personalities, can decompensate into rageful outbursts when frustrated.

(3) If allowed to rely on Dr. Weiner's report at trial, he would have explained that Bourgeois's cognitive deficits were important factors that mitigate the offense and help explain Bourgeois's violent behavior.

(4) Knowing what he now knows and previously suspected, he does not believe the jury was provided with an accurate and complete picture of Bourgeois's mental-health profile. Although Bourgeois's actions were unquestionably evil, it is equally unquestionable that there is a reasonable and not particularly controversial mental health explanation for his actions.

In his 2010 deposition, Dr. Estrada testified that the sources of BPD include genetics as well as a childhood history of rejection, neglect, and abandonment. He stated that BPD is characterized by unstable relationships, including "episodes of honeymoon, followed by episodes of hate and violence." In addition, persons suffering from BPD are "extremely vulnerable to stress. And during episodes of stress, they are involved in impulsive behavior, behavior

---

[40] At the evidentiary hearing, the prosecutor stated that the government did not dispute the diagnosis of BPD.

with very poor judgment, bordering in psychotic, irrational behavior." Dr. Estrada connected Bourgeois's BPD to JG's abuse, stating:

> Under stress, this man went into episodes of rage against this child. He was frustrated. He already was predisposed to some form of inappropriate behavior by the fact that he was under stress, but the inappropriate behavior took both a violent sadistic form and sexual form. . . . This went on for six weeks until the accumulations of all the rages and violence, aggressive behavior toward this little girl caused her death.

He stated that Bourgeois's killing of JG was not premeditated, but resulted from rage and a loss of control. He explained:

> [I]t is clear that under stress his judgment is very poor and that he makes decisions that are driven by impulses and by emotions rather than by reason. And whatever his measured IQ or academic achievement is, his intellectual capacities and his knowledge are put aside by his feelings of rage, and he acts on those feelings in a manner that shows very poor judgment, very poor self-control and no concern about the consequences of his behavior on his life.

Dr. Estrada testified that Bourgeois's rage would impact his executive function and inhibit his judgment, planning, decision making, control of impulses, and management of cause and consequences. He summarized his opinion as follows:

> [T]his man under the serious stress that he was facing, finances, marital problems and being dumped with a new child that he didn't expect and fatherhood, care and financial obligations, under this stress, he reacted in a typical borderline fashion caused by his background of trauma, neglect and rejection by losing control of his anger and torturing, tormenting and abusing this child intermittently throughout six weeks with periods in which he was actually caring and nice to the child in typical borderline fashion that ultimately the abuse caused this child's death. It is my opinion, therefore, that this is not the act of a premeditation.

On cross-examination by the government, Dr. Estrada testified that he had not changed his opinions, expressed at trial, that: (1) Bourgeois is of above-average intelligence and memory; (2) Bourgeois's rage is triggered by interpersonal relationships, especially intimate ones, and such patients do much

better in a structured environment where there is no closeness or intimacy; and (3) Bourgeois is prone to violence, is a future danger, and is a self-centered, angry person. He acknowledged that there had been trial testimony about times when Bourgeois was violent outside the context of an intimate relationship. He testified that he still believes Bourgeois is narcissistic, but now has diagnosed him as having BPD as well. He explained, however, that BPD and narcissistic personality are an elaboration of the same issues. He acknowledged that many of the factors he used to diagnose narcissistic personality are the same factors he had used, post-trial, to diagnose BPD. His reassessment of the case, based on the additional information he had been given by Bourgeois's habeas counsel, was that in addition to being a narcissist, Bourgeois has BPD, which explains what he did, but does not make him any less violent.

On redirect examination, Dr. Estrada reiterated that "we are splitting hairs here about narcissistic borderline. The fact is whatever we call it, my opinion at the time that I testified and is documented and my opinion now, which has been reinforced with the new documentation that I have received, is that Mr. Bourgeois suffered from a condition that under frustration or stress results in violence and that this – as a result of this tendency, he became violent continuously through a manner of six weeks against the child that led to her death."

Bourgeois also presented a declaration and testimony from Dr. Cunningham. In his declaration, Dr. Cunningham criticized Bourgeois's trial counsel's efforts to develop mitigating evidence, their lack of a strategy for the punishment phase, and their lack of supervision of the mitigation investigators; stated that trial counsel's cross-examination of Dr. Estrada was inadequate for the jury to appreciate the mitigating quality of Bourgeois's history of abuse; and stated that he was confident that his testimony would have had a significant impact on the jury's sentencing determination and that he was "flabbergasted"

when told that he would not be called as a witness. Dr. Cunningham stated further that Bourgeois's rage attacks were consistent with an Intermittent Explosive Disorder, and that Bourgeois's developmental history, along with the emotional instability, relationship devaluation, and rage that almost certainly accompanied his conduct in killing JG, are consistent with BPD.

At the § 2255 evidentiary hearing, Dr. Cunningham complained that he did not timely receive information from the mitigation investigators and complained about the quality of their work. However, he acknowledged that he did not inform defense counsel about his concerns until early February, when he came to Corpus Christi to interview Bourgeois. He also elaborated on his previous criticism of trial counsel.

Dr. Cunningham testified that the symptoms described by Bourgeois's family implicate neurobehavioral disinhibition or attention deficit hyperactivity disorder and are mitigating because they indicate that he was psychologically damaged from an early age but that damage can be treated by providing a highly structured environment, like prison, and with anti-rage medications.

Dr. Cunningham also described his "pressure cooker" theory that he wanted to present at trial: Bourgeois had a historical susceptibility to rage attacks and was like a pressure cooker. Within that pressure cooker, there is a history of an overwhelmed family system, domestic conflict, physical abuse, father abandonment, and emotional rejection. Bourgeois keeps a lid on this most of the time, and that lid is composed of being a hard worker and maintaining steady employment, being involved with his children, and being a caring uncle.[41]

Dr. Cunningham testified further that, based on his research about risk factors for child abuse, to the extent that Bourgeois is someone who batters, he

---

[41] The district court interrupted and questioned him about whether the testimony about Bourgeois dangling his nephew over a bridge would look bad with the "caring uncle" comment.

is among millions of men in the United States who engage in that conduct. Therefore, his singular malevolence in terms of making him a candidate for the death penalty is somewhat reduced by a recognition, at least in terms of domestic violence, that this is a widespread, tragic dysfunction in our society.[42]

Dr. Cunningham stated that if he had testified at trial, he would have told the jury that risk assessments for prison are best based on the person's personal track record in confinement and on group statistical data on how capital offenders and murderers and inmates behave in prison; that research demonstrates that the seriousness of the offense is not a good predictor of violence in prison; and that the overwhelming majority of capital murderers, if sentenced to life in prison, never engage in serious violence. He said he was prepared to address the evidence that Bourgeois tried to hire a hit man by describing the differences between the Nueces County Jail and the Federal Bureau of Prisons and the latter's ability to maintain a safe environment.

Dr. Cunningham testified that if trial counsel had provided him with the materials provided to him by habeas counsel, those materials would have supported additional adverse developmental factors in Bourgeois's background: a genetic predisposition to personality disorder; corruptive paternal modeling of promiscuity and reproductive irresponsibility; corruptive maternal modeling of neglect, abuse, and scapegoating; borderline personality features; deficient intelligence and potential mental retardation; mother's inadequacy and potentially deficient intellect; inadequate primary attachment; rejection by legitimate paternal siblings; peer rejection and isolation; additional information regarding maternal rejection and expulsion; and additional information regarding emotional neglect and supervisory neglect.

---

[42]  The district court interjected that it could see why Tinker would not have wanted to present that testimony to the jury because it probably would have offended most of the jurors.

No. 11-70024

Dr. Cunningham testified that when he interviewed Bourgeois on February 7, 2004, Bourgeois told him that his nose was broken when his mother hit him with a mop handle for lying to her about the sexual abuse that he said was perpetrated by Jacob Clayton, whom he identified as the gay son of Ms. Clayton. This information about Bourgeois's allegation of sexual abuse is *not* in the reports that Dr. Cunningham provided to trial counsel.

On cross-examination, Dr. Cunningham stated that he was not aware that the government had a psychiatrist and a psychologist to testify about mitigation in rebuttal or that John Shaw of the Bureau of Prisons was going to testify in rebuttal about how many murders take place in the prison facility. He also acknowledged that his proposed testimony is inconsistent with a defense of innocence but pointed out that the information elicited from Dr. Estrada on cross-examination at trial was also inconsistent with the innocence defense. He also characterized such a defense as an "extremely high risk decision to make, in light of the jury's verdict and in light of the evidence in this case." During cross-examination, the district court noted for the record that Dr. Cunningham seemed to be very angry.

Bourgeois also submitted a declaration and testimony from Dr. Weiner, who stated that his test results and conclusions prior to trial are valid regardless of whether Bourgeois accurately reported a head injury and a coma and regardless of how the brain damage was caused. He testified that if defense counsel had provided him with Bourgeois's medical records, he would have known that Bourgeois did not suffer a head injury or a coma as a result of the 1984 accident and, if given the opportunity to do more testing, he could have offered a psychological explanation for Bourgeois's lie about the coma.[43]  Dr.

---

[43] Dr. Weiner testified that Bourgeois's medical records, which were not provided to him by trial counsel, also contain a report of Bourgeois striking his head in an 18-wheeler accident in July 1993 but he admitted that would not necessarily account for Bourgeois's

## No. 11-70024

Weiner said that if he had been called as a witness at trial, he would have testified that the brain dysfunction would impair Bourgeois's cognition so that he may at times perceive things in a distorted way and act in an inappropriate manner; and that brain damage can impair a person's ability to deal with emotions and cause problems with impulse control, ability to make judgments, and judging the future consequences of one's actions.

Bourgeois submitted the declaration and testimony of Dr. Michael M. Gelbort, a clinical neuropsychologist, who evaluated and tested Bourgeois in April 2007. He offered the following opinions:

(1) His test results are similar to Dr. Weiner's results and indicate no malingering. Test results showed Bourgeois's brain functioning is in the impaired range. Bourgeois's score on a cognitive dysfunction test indicated impulsivity, disinhibition, and trouble keeping his actions in line with reasonable thoughts.

(2) Bourgeois's IQ score is in the range of mental retardation. Formal psychometric data does not support Dr. Estrada's assessment of above average intelligence.

(3) Bourgeois's neuropsychological profile shows deficits in frontal lobe abilities, and there is clear evidence of impairment and impact on his executive functioning, which may result in acting impulsively and without forethought. Bourgeois's organic brain damage makes it more difficult for him to deal with emotional disturbance.

(4) Bourgeois's impairment is significant, particularly considering his abusive childhood, because the adult survivors of childhood abuse often suffer from impulse control difficulties. When this psychological damage is overlaid

---

deficits and there could be other reasons for them, such as his long history of physical abuse. .

75

with Bourgeois's organic deficits, his ability to modulate his conduct is quite impaired.

(5) It is irrelevant whether Bourgeois suffered a head injury as reported by Dr. Weiner because what is significant is that the deficits predated the murder. Bourgeois's impairments exist, even if the cause is not clear. The fact that Bourgeois may not have suffered a loss of consciousness in the three-wheeler accident that Dr. Weiner reported does not affect the validity or significance of Dr. Weiner's testing because one can suffer a traumatic brain injury without a loss of consciousness.

(6) Bourgeois described physical abuse from his mother and sexual abuse.

(7) Bourgeois is rather narcissistic. Dr. Gelbort did not express an opinion about whether Bourgeois is sociopathic although he "would absolutely agree" that many of the behaviors he had seen described can be caused by sociopathic etiology. He elaborated:

> [Bourgeois] says things to cover for himself at times. That's a characteristic of people who have sociopathy. It's also a characteristic, which is I think in this case more central, to someone who has a borderline personality disorder. I don't want them for my neighbor.

On cross-examination, the government pointed out that Dr. Weiner thought there was more posterior impairment than frontal lobe impairment. Dr. Gelbort testified that he would have localized the injury in another part of the brain but that he did not see the source of the impairment as being as influential as its effect. He acknowledged that Bourgeois's EEG was normal and stated that he did not know how to explain Bourgeois's behavior but that one could certainly understand that a brain with limitations and impairments such as Bourgeois's is much more likely to do things that are strange, bizarre, or out of the norm.

As an appendix to his § 2255 motion, Bourgeois presented a declaration from Dr. Holden, who stated that if he had been called as a witness in the

punishment phase, he would have testified that research reveals that the majority of filicides occur at the end of a disciplinary incident and that, in most cases, the parent does not intend to kill the child; and that Bourgeois's killing of JG was likely a disproportionate rage reaction resulting from stress and frustration. He opined that Bourgeois was in a violent rage during the incident, stemming from three sources: (1) his pathological child rearing; (2) the stressors, both immediate and distal, that he was suffering at the time; and (3) his organic deficits and impaired cognitive functioning. Dr. Holden concluded that his testimony could have helped the jury understand that Bourgeois's behavior fits a common pattern of abuse and that his acts of violence, although cruel, are actually common in cases of severe child abuse. He stated that if called as a witness at the sentencing phase, he could have (1) helped the jury place this awful crime in the context of family violence; (2) reviewed the neuropsychological and psychosocial factors that pre-disposed Bourgeois to violence against children; and (3) explained that Bourgeois's actions on the day of the crime were the behaviors of an abuse-survivor, experiencing high stress, with low functioning, and with consequent impairments in impulse control. Habeas counsel offered Dr. Holden's declaration in lieu of his testimony at the § 2255 evidentiary hearing.

Bourgeois also submitted the declaration of forensic psychiatrist Dr. Robert L. Sadoff, who evaluated Bourgeois and found that Bourgeois has four prominent features that affect his ability to function: (1) a history of significant childhood physical and sexual abuse; (2) significant, debilitating personality disorders, including BPD; (3) clinically significant organic brain damage; and (4) an IQ in the range of mild mental retardation. He noted that at the time of the crime, Bourgeois was under a great deal of stress from driving cross country in the cab of a tractor trailer, sharing close quarters with a family of five, including two children still in diapers, financial problems, and his wife's recent infidelity.

As a result of this combination of severe psychosocial stressors and neuropsychological deficits, Dr. Sadoff stated that Bourgeois had great difficulties coping and he responded with repeated impulsive acts that eventually led to the tragic death of JG.

Bourgeois also presented the declaration and testimony of Jethro W. Toomer, Ph.D., a clinical and forensic psychologist who evaluated Bourgeois and administered psychological personality tests. He expressed the following opinions:

(1) Bourgeois is a deeply troubled and impaired individual with precarious psychological functioning, he suffers from the lasting impact of savage childhood sexual and physical abuse, he has impaired intelligence, he has organic brain impairments which impact his ability to control impulses, make judgments, and predict the consequences of his actions, and his psychological functioning deteriorates during times of stress. When Bourgeois has acted in a rageful manner, he was likely acting out of mini-psychotic episodes secondary to his BPD. Bourgeois is not a sociopath.

(2) Results of psychological tests indicate that Bourgeois suffers from a delusional paranoid disorder, post-traumatic stress disorder, and a combination of schizoid, narcissistic, and borderline personality disorders. Individuals suffering from BPD manifest mini-psychotic episodes caused by stress or cues in the environment that serve as catalysts for unresolved emotional issues. There is evidence that Bourgeois has undergone such mini-psychotic states throughout his life. Bourgeois was experiencing numerous stressors at the time of the murder: financial hardship, child custody, the infidelity of his wife, resulting in him being "a time bomb waiting to happen." The mental health explanation for why he was a time bomb is mitigating because the behavior is not necessarily premeditated but is a function of all of his deficiencies.

No. 11-70024

Finally, Bourgeois submitted a declaration and the testimony of clinical psychologist Victoria Swanson, Ph.D., in which she expressed the following opinions: based on testing she conducted, Bourgeois is mentally retarded; and he has more of a borderline than a narcissistic personality disorder, but both disorders are in the same cluster of personality disorders. On cross-examination, she agreed that with the personality disorders that Bourgeois has and the deficits that she observed, it is difficult even for an expert to assess him and therefore, it would be logical for a defense lawyer to rely on the advice of experts when dealing with a difficult assessment.

In the appendix to his § 2255 motion, Bourgeois submitted declarations from many lay witnesses to support his claim that trial counsel were ineffective because they did not give the jury a complete view of his background.[44]  The information provided in these declarations may be summarized as follows:

1. Bourgeois's mother drank alcohol heavily and hated Bourgeois because he looked like his father.

2. Bourgeois's mother singled him out for abuse, whipping and beating him more than her other children. She had long fingernails and would pick at his nose until it was bleeding and eventually disfigured. She called him "little yellow bastard." One witness said that she burned Bourgeois with cigarettes.

3. Bourgeois was abandoned by his father.

4. Bourgeois had rages, temper tantrums, and mood swings. He could not control his behavior and calm himself down.

5. Bourgeois was picked on and teased as a child because he was "slow" and because he had light skin and green eyes.

6. The neighborhood where Bourgeois grew up was very poor.

---

[44]  Several of the witnesses who submitted declarations had been subpoenaed by trial counsel, and several of them were witnesses at trial.

No. 11-70024

7.  Bourgeois was a braggart and liar who exaggerated a lot to impress people and cover up his failures.

8.  Bourgeois felt rejected when his mother sent him to live with Ms. Clayton and he was hurt because he missed out on family outings.

9.  One of Ms. Clayton's relatives, Michael Clayton, beat Bourgeois up repeatedly.

10.  Bourgeois was "slow," "not smart," and "kind of dumb" and had lots of trouble with his school work.

11.  Bourgeois could not handle pressure and at the time of JG's death he was under a lot of stress:  financial problems, child support payments, the knowledge of his wife's adulterous affair, and the loss of his childhood home in a fire.

12.  When Bourgeois was a young boy, his brother Clyde drowned.  His brother Anthony was disabled and needed a lot of extra care from their mother.

13.  Bourgeois had several accidents, including driving a three-wheeler into a tree and an accident driving a truck.

At the § 2255 evidentiary hearing, Bourgeois presented testimony from several lay witnesses to show mitigating evidence of an abused childhood, sexual abuse, and low intelligence.

Claudia Williams, Bourgeois's oldest maternal half-sister, described how their mother whipped Bourgeois with an extension cord while he stood naked in the tub, leaving him bruised and bloody, and cut off the tip of his finger with a meat cleaver.  She stated that Bourgeois had temper fits and bad rages from an early age.  On cross-examination, she admitted that she had talked to the mitigation investigators three times before the punishment phase but did not tell them about their mother cutting off the tip of Bourgeois's finger or that their mother had whipped him in the tub with an extension cord until he bled because it was sad and she was ashamed of her mother.  Because her mother was still

80

alive at the time of trial, family members did not want to talk about the way the mother treated Bourgeois. She denied having heard that Ms. Clayton's son was a pedophile and had raped Bourgeois but said that she heard, from a family member, that a homosexual Sunday-school teacher had raped Bourgeois. She testified that she was present when Bourgeois had the three-wheeler accident and that he was unconscious for days.[45] She admitted that she knew that Bourgeois had hit his wives.

Ms. Clayton's granddaughter, Beverly Frank, testified that Ms. Clayton took Bourgeois in because he was mistreated by his mother. She said that she witnessed Bourgeois's mother whipping him with a belt and saw where the mother had picked at Bourgeois's nose until it bled. On cross-examination, she testified that Ms. Clayton's sons visited Ms. Clayton often while Bourgeois was living there but denied knowledge that any of them raped Bourgeois. She knew that one of them, Jacob, was "living a gay life," but said that did not make him a child molester. She testified that her father was the church choir director and denied knowledge of Bourgeois claiming to have been sexually assaulted during choir practice.

Another of Ms. Clayton's granddaughters, Brenda Goodman, testified that Bourgeois's mother drank alcohol excessively; was overwhelmed, frustrated, and neglectful; cursed and beat Bourgeois more than her other children; and picked at his nose, which stayed bloody all the time. Goodman testified that after they discovered that her Uncle Jake had AIDS, Bourgeois told her that her uncle had raped him. She described it as a "dark thing" that she could not tell her family, and admitted that she did not tell anyone about it until recently. Although

---

[45] The medical records of Bourgeois's three-wheeler accident on July 17, 1984, reflect that he tore his scrotum, broke his leg, and had surgery on his leg. The records state: "neuro signs OK"; "[n]ot knocked out"; and "Neurological: Within normal limits." There is no indication from the medical records that he lost consciousness.

No. 11-70024

Bourgeois's habeas investigators asked her about abuse in his background, she did not report it to them and did not mention it in her 2007 statement to them.

Bourgeois's cousin, Carl Henry, testified that Bourgeois's mother resented Bourgeois because she had a one-night relationship with his father and it did not work out. He testified that he saw evidence of Bourgeois's mother's abuse but did not provide specific details. On cross-examination, he said that Bourgeois was not raped at church during Sunday school but he did not know about choir rehearsal.

Another cousin, Murray Bourgeois, testified about Bourgeois's mother's abuse of him and her alcohol consumption. On cross-examination, he testified that Bourgeois lived with Ms. Clayton because she felt sorry for him and was trying to get him out of his abusive environment. He denied hearing that Ms. Clayton's sons were raping Bourgeois or that the Sunday school teacher raped him at church during the choir meetings.[46]

Kerry Brown, Bourgeois's lawyer in Louisiana, testified that Bourgeois had several child-support issues during the summer of JG's murder; that Bourgeois was having problems with debt but made poor decisions about money; and that Bourgeois was distressed by the knowledge of his wife's adulterous affair. On cross-examination, Brown admitted that if he had testified at trial, he could have said that he was defending Bourgeois on a charge that he had beaten his mother-in-law and that Bourgeois was overbearing, jealous of his wife, had a bunch of children he was not paying child support for, and had been charged with destruction of property.

Mitigation investigator Bierbaum testified at the evidentiary hearing and described his and Milstein's investigative efforts. He stated that he did not see

---

[46] As the district court observed, the testimony was inconsistent as to whether Ms. Clayton rescued Bourgeois from an abusive atmosphere or whether his mother sent him to serve as a care giver to the elderly, physically-impaired woman.

No. 11-70024

Bourgeois's hospital records until trial and expressed his belief that the medical record of a 1993 accident where Bourgeois went to the hospital and complained that he hit his head on the steering wheel of his 18-wheeler is potential mitigating evidence. On cross-examination, Bierbaum testified that he thought Bourgeois showed signs of neurological dysfunction but did not remember noting any symptoms of mental retardation.

In an affidavit and testimony at the § 2255 hearing, trial counsel Gilmore stated: When he met with Bourgeois he did not notice any mental health problems. In his dealings with Bourgeois he never had any indication or thought that Bourgeois might be mentally retarded. He did not recall what "highly unusual, often bizarre behavior, abnormal conversations, and unusual writing style" he was referring to in his motion for a mental-health evaluation prior to trial.[47] He had no reason to doubt Dr. Estrada's assessment that Bourgeois was of above-average intelligence. Bourgeois was very active in the defense team: he provided names and telephone numbers of persons to be contacted for mitigation as well as guilt-innocence; provided instructions to counsel in letters; and frequently passed notes to them at trial. He and Tinker always discussed the witnesses with Bourgeois and did not contact any witness without Bourgeois's direction. Bourgeois refused to talk about pleading guilty and maintained his innocence throughout the case. Gilmore praised Tinker, describing him as the best lawyer he has ever met.

With respect to the decision not to call Dr. Cunningham as a witness, Gilmore stated: He met with Tinker and Dr. Cunningham in his office, before the defense punishment case, where Dr. Cunningham showed them a notebook

---

[47] The record reflects that at a hearing on December 10, 2003, the district court questioned why the defense was asking for a mental examination after defense counsel had stated, repeatedly, that there was no competency or sanity issue. Gilmore responded that when the mitigation experts began interviewing Bourgeois and going over the materials, particularly the letters that Bourgeois had written, they felt that it was necessary.

of his proposed PowerPoint presentation as well as a list of proposed questions for counsel to ask him. After Dr. Cunningham's presentation, Gilmore and Tinker discussed it. Tinker did not like the PowerPoint presentation. They both thought Dr. Cunningham's testimony would conflict with Bourgeois's defense that he did not commit the crime. In addition, "we weren't impressed with him, to tell you the truth." They also did not think Dr. Cunningham was going to impress the jury. Tinker told Gilmore that he thought it would be more effective to develop mitigation evidence through Dr. Estrada than through Dr. Cunningham. After comparing what Dr. Cunningham could offer with Dr. Estrada's testimony, Gilmore and Tinker decided not to call Dr. Cunningham as a witness. They also discussed Dr. Cunningham's proposed presentation with Bourgeois and explained that Dr. Cunningham thought he exploded and committed the murder because he had a lot of pressure on him. Bourgeois agreed with counsel's assessment and their decision not to call Dr. Cunningham as a witness. The decision not to call Dr. Cunningham was a group decision. Dr. Cunningham was very angry that he was not going to be asked to testify and did not accept the decision in a professional manner. They elicited testimony from Dr. Estrada that mirrored the main part of Dr. Cunningham's proposed testimony – that Bourgeois did it but he did it because of all these pressures that were on him. Dr. Estrada was effective for the defense. With respect to the alleged inconsistency with the innocence defense in closing argument, Gilmore stated that they argued about Bourgeois's abusive history but did not argue that it caused him to commit the offense.

Gilmore testified about mitigating evidence as follows: He and Tinker and the investigators spoke with over fifty people. During the trial, they rented a conference room and talked to the witnesses individually; it took most of the day. They based the decision whether to call witnesses on how the witnesses would present in court, whether they had relevant evidence, and whether they had too

much baggage in terms of prior convictions. Gilmore knew that there were some allegations about childhood sexual abuse but he did not think it came from Bourgeois. He probably would have asked Bourgeois about those kinds of things, but did not remember whether he had done so.

Gilmore did not disagree with Dr. Estrada that the jury was not provided with an accurate and complete picture of Bourgeois's mental health profile.

c.

The government presented Tinker's answers to interrogatories as an exhibit in the § 2255 proceedings. Tinker stated: Gilmore was in charge of coordinating the investigation of the availability of non-expert defense witnesses and presenting their testimony at trial, and Tinker was in charge of dealing with the government's expert witnesses and obtaining and presenting rebuttal expert testimony. They made the majority of trial decisions jointly. In preparing for trial, they discussed and investigated the propriety of a defense based on Bourgeois's mental functioning, and that is why they had Bourgeois evaluated by Dr. Estrada. Dr. Estrada found that Bourgeois was of above-average intelligence, was competent to stand trial, and sane at the time of the offense. Some of the information gathered by the defense mitigation investigators might have helped the defense, but other information would have had a negative impact on their case. He had a neurological examination of Bourgeois done because there was a claim that Bourgeois had been in an accident and had been in a coma. He did not recall the examination resulting in any information that would have been helpful at trial. Furthermore, the government had informed the defense that it had medical records that proved that Bourgeois was never in a coma and that he only sustained broken bones in the accident. Based on the information he and Gilmore had, from experts and family members, they were unaware that Bourgeois was mentally retarded or near retardation level.

No. 11-70024

The government also relied on two expert witnesses: Dr. J. Randall Price, a neuropsychologist, and Dr. Roger Byron Moore, Jr., a forensic psychologist.

Dr. Price expressed the following opinions in his report:

> Mr. Bourgeois does not warrant a diagnosis of mental retardation. He does, however, have a Personality Disorder, Not Otherwise Specified, with predominately narcissistic, borderline, anti-social, and paranoid traits and features. He is grandiose, preoccupied with himself, has a sense of entitlement, and is arrogant. He has avoided real or perceived abandonment by others, experiences identity disturbance, and has a history of inappropriate, intense anger. He has failed to conform to social norms and has engaged in repeated deceit. He is impulsive, irritable, and aggressive. He is suspicious of others, reads meaning into benign events, and reacts angrily to perceived attacks on his character or behavior. He views himself as a victim. Available indicators of measured intelligence fall in the range of the upper limits of mild mental retardation to the lower limits of borderline intellectual functioning. However, he does not evidence significant deficits in adaptive functioning in adulthood. The difficulties in life experienced by Mr. Bourgeois are associated with his disordered personality structure rather than with mental retardation.

At the evidentiary hearing, Dr. Price testified that it would be of concern for malingering that Bourgeois lied to Dr. Weiner about being in a coma and that it was corroborated by Bourgeois's sister. According to Dr. Price, the ability to make up such a story and coordinate its telling with another person is consistent with a personality disorder or with an attempt to manipulate the results of the evaluation.

Dr. Price did not disagree that Bourgeois has features of BPD, which is an unstable personality, and that some people with unstable personalities act out in angry and aggressive ways that are not normal. He acknowledged such behavior by Bourgeois but stated that he thinks it is not organic but is associated with Bourgeois's unstable personality. He stated further that Bourgeois's plan to have people killed would not be consistent with a rage

86

disorder or a mini-psychotic episode; instead, it would be consistent with antisocial psychopathic traits and features. Dr. Price pointed out that Bourgeois's impulsivity is selective and does not pervade all areas of his life.

Dr. Price testified that there is not a neuropsychological test that isolates the frontal lobe of the brain and, therefore, both Dr. Gelbort and Dr. Weiner were wrong when they localized the deficits in different parts of Bourgeois's brain. Dr. Price concluded that Bourgeois's problems are personality trait issues and not organic brain dysfunction or mental retardation.

On cross-examination, Dr. Price expressed his opinion that Bourgeois's BPD came from his abusive childhood. He conceded that under significant stress, persons with BPD can decompensate into dissociative states and can also undergo psychotic episodes; and that the rages, dissociation, and psychosis are manifested in the intimate relationships in the subject's life. He acknowledged that Bourgeois has suffered black-outs under stress, which is consistent with dissociation.

Dr. Price testified that Dr. Estrada was wrong in his assessment that Bourgeois has above-average intelligence because Bourgeois is nowhere near that – he is either borderline or mildly mentally retarded on IQ testing. Dr. Price agreed that Bourgeois's low intellectual functioning affects his ability to manage his personality disorders and added that having lower intelligence in general is associated with more aggressive criminal actions because such individuals have problems with judgment and impulse control. Dr. Price testified that he did not think Bourgeois was malingering and he found no indication that Bourgeois suffers from attention deficit disorder. He testified that it is possible that Bourgeois does not test well because of low intelligence, impulsivity, or BPD. He testified further that some of Bourgeois's problems that have been interpreted as being adaptive behavior deficits are consistent with a personality disorder rather than mental retardation.

No. 11-70024

Dr. Price testified that he had no credible evidence that Bourgeois had a brain injury. He conceded that it would be significant from a neuropsychological standpoint that Bourgeois struck his head on a steering wheel in an accident but stated that if there was not at least an alteration in consciousness, it would probably be insignificant.

Dr. Price testified that he did not diagnose Bourgeois as having an antisocial personality disorder, although Bourgeois does have some sociopathic features. He agreed that Bourgeois's anxiety, nervousness, excessive worry and low self-esteem, observed by a psychiatrist when he applied for a sheriff's deputy job in 1985, are all consistent with an adult survivor of childhood abuse.

The government's other expert, Dr. Moore, evaluated Bourgeois for mental retardation, focusing on adaptive functioning. In his report, Dr. Moore stated:

> Mr. Bourgeois had a traumatic, abusive childhood. Multiple mental health experts have indicated that he has Borderline Personality Disorder, and he appears to be appropriately diagnosed as such. Borderline Personality is a disorder that is characterized by frantic efforts to avoid abandonment, intense and unstable interpersonal relationships, impulsivity, emotional instability (inappropriate, intense anger or difficulty controlling anger), and transient, stress-related paranoid thoughts or dissociative episodes. Mr. Bourgeois' abuse history provided the setting conditions that frequently lead to the development of this personality disorder.

> A key issue is whether the symptoms of intense interpersonal relationships, impulsive spending, and emotional volatility are due to cognitive deficits or personality factors. . . . His behavioral style is more reflective of a personality disorder than of a cognitive deficit, and appears to have possibly been fueled by the significant others that he had relationships with, some of whom were reported to be impulsive spenders and emotionally volatile. Bourgeois had adequate adaptive functioning but also displayed maladaptive behaviors reflective of Borderline Personality Disorder.

> He reportedly stuttered as a child and was described as having symptoms consistent with ADHD. He was also described as being somewhat uncoordinated and thus not a good athlete. These factors

led him to be teased by his peers and, along with the physical, emotional and sexual abuse that he suffered, it appears that his self esteem suffered significantly. It also appears that he developed Borderline Personality Disorder. . . . Neuropsychological testing indicates he has some degree of cognitive impairment. . . . Regardless of his performance on formalized tests of intelligence, his level of adaptive functioning is in line with that expected of his peers and he does not meet the diagnostic criteria for mental retardation.

At the evidentiary hearing, Dr. Moore agreed that Bourgeois is not a sociopath, and agreed that Bourgeois is driven in his conduct primarily by his BPD. He acknowledged that people with BPD are most likely to act out in a rageful or violent way with people with whom they are in a close relationship and that there would not be many of those kinds of relationships in the penitentiary.

d.

The district court, in addressing the ineffective-counsel claim regarding mitigating evidence, described the obstacles trial counsel faced in trying to defend Bourgeois and save his life: First, the horrendous facts made it likely that the jury would not see Bourgeois as a sympathetic defendant. Second, he often provided misinformation to defense counsel, the investigators, and the defense experts, which hampered the development of evidence and made a mitigation defense even more difficult. Bourgeois's untruthful reporting to Dr. Weiner that he had suffered a head injury that caused a coma was a critical lead that guided the mitigation investigation and resulted in several experts reaching unsupportable conclusions. Third, Bourgeois's violent behavior and threats while he was incarcerated before trial impaired his attorneys' efforts to demonstrate that he would not be violent in prison if the jury spared his life. Finally, Bourgeois's unwavering insistence that he did not kill JG compounded the challenges his counsel faced and limited their strategic choices, forcing them

to sometimes present inconsistent information to the jury as they built their case around the theory, insisted on by Bourgeois, that Robin killed JG. Despite those obstacles, trial counsel developed favorable evidence that Bourgeois was a hard-working man, a good provider, and that sometimes life with him was happy and good.

The district court concluded that trial counsel made a constitutionally-sound investigation, including seeking the assistance of expert witnesses and making a probing effort to investigate mitigating evidence. The court concluded that, with the possible exception of Dr. Weiner's evaluation, Bourgeois had failed to prove that trial counsel's investigation was not done quickly enough.

The district court found that the defense team was familiar with and had spoken with many of the lay witnesses Bourgeois presented at the § 2255 hearing. Many of the lay witnesses trial counsel spoke to were not willing to testify either because they feared Bourgeois or because they did not want to disparage his mother by testifying about childhood abuse. Similarly, the lay witnesses who testified about Bourgeois's personal history at the § 2255 hearing did not provide some of the information they testified about to Bourgeois's mitigation experts prior to trial, and some of them admitted that they would not have been willing to present that testimony at trial in 2004. In addition, some of the defense mitigation witnesses from Bourgeois's family were also aware of damaging information, including allegations that Bourgeois beat young children. The court also pointed out that the mitigation investigators' reports reflect more than suspicion that Bourgeois had sexually molested young relatives. Based upon its review of the whole of the unpresented mitigation evidence, the court concluded that trial counsel did not provide ineffective assistance in the investigation, preparation, or presentation of lay testimony in the punishment phase.

No. 11-70024

After recounting in detail all of the expert assistance that trial counsel secured before the punishment phase, the district court held that defense counsel made strategic decisions to attack the government's evidence through cross-examination rather than by calling experts in an effort to avoid, as much as possible, an obvious conflict between Bourgeois's defense, which blamed Robin for killing JG, and yet still present a psychological explanation of his personality disorder in an effort to obtain a life sentence. In attempting to craft a defense that would remain true to Bourgeois's wishes but still advocate for a sentence less than death, trial counsel had to make hard choices. The court acknowledged that no trial is perfect, that trial counsel made mistakes, and that hindsight and second-guessing might possibly suggest different courses of action. However, focusing on how trial counsel viewed the landscape before them at the time, the court found that trial counsel engaged in reasonable decision making bolstered by a reasonable investigation with regard to the decision not to present expert testimony.

The court held that each category of evidence Bourgeois faulted trial counsel for not presenting carried sharp aggravating factors with its mitigating thrust and that such evidence may have militated in favor of a finding that Bourgeois would be dangerous in the future. Accordingly, the court concluded that trial counsel's decisions had to be weighed with the recognition that the evidence Bourgeois faulted them for not presenting was not exclusively mitigating.

The district court further found that the trial investigators made a wide-ranging investigation that uncovered information about Bourgeois's abusive childhood and presented evidence of the same nature as the evidence developed by habeas counsel. Each of the four lay witnesses that trial counsel called in the punishment phase described his abused childhood. However, Bourgeois claimed not to have been abused, and his family was hesitant to discuss the abuse until

his mother died. The court stated that, to whatever extent the trial testimony lacked the depth of Bourgeois's post-trial evidence, the breadth of testimony about his abused childhood is nearly identical. Thus, the trial evidence largely followed the same themes and allowed for the jury to arrive at the same conclusions that they would have reached if they had before them the entirety of the mitigating evidence of physical abuse developed after trial.

The district court also found that the most troubling allegation Bourgeois made was that trial counsel failed to investigate his allegations of sexual abuse by two men. However, the court found that the testimony at the evidentiary hearing could not credibly validate those allegations. With the exception of Brenda Goodman, none of the other lay witnesses at the § 2255 hearing had heard about it, and the court found Goodman's testimony to be somewhat suspect because it was based solely on what Bourgeois told her, and no other witness could corroborate the allegations. The court concluded that Goodman's reluctance to tell others about a "dark thing" that she could not tell her family gave no confidence that she would have relayed the information to trial counsel. Because trial counsel could not be held responsible for introducing mitigating evidence that their client and other witnesses had failed to disclose, the court held that Bourgeois had not shown that trial counsel were ineffective by not presenting evidence of sexual abuse.

The district court was not convinced that a reasonable attorney would encourage the jury to choose a life sentence based on Bourgeois's intellectual limitations in the light of the fact that the jury was aware that Bourgeois had successfully worked for years as a truck driver, had heard his cogent, descriptive testimony that lacked any sign of mental impairment, and had observed his interaction with counsel and his ability to follow the course of the legal proceedings. Further, the government would have subjected any witness testifying about Bourgeois's low intelligence to the same cross-examination it

conducted at the evidentiary hearing. The court concluded that a reasonable attorney could weigh the probable benefit against the possible loss of credibility and decide not to focus the defense on Bourgeois's low intelligence.

The district court held that trial counsel were not ineffective by failing to present expert testimony from Dr. Cunningham about Bourgeois's abused childhood and its impact on his behavior. The court credited trial counsel's explanation that they decided not to call Dr. Cunningham as a witness because his theory of the case conflicted with Bourgeois's defense that he did not commit the crime. The court found that defense counsel elicited testimony from Dr. Estrada on cross-examination that sufficiently blamed Bourgeois's violence as an adult on his childhood abuse and adequately addressed Bourgeois's decreased threat of violence when incarcerated. The court found that trial counsel discussed Bourgeois's abused childhood and history as a sympathetic, not an explanatory or justifying factor, and that Bourgeois agreed with their decision. The court concluded that further discussion would only have emphasized that Bourgeois was like his mother, only much worse.

The district court rejected Bourgeois's complaints that trial counsel failed timely to provide information to Dr. Cunningham. The court found that the investigators turned over to Dr. Cunningham the results of their investigation well before the guilt-innocence phase started, and there was no evidence that Dr. Cunningham complained contemporaneously to trial counsel about the timing or completeness of that information. In addition, the court found that Dr. Cunningham had interviewed potential witnesses and the record contained no indication that those interviews unveiled a wealth of evidence that the investigators failed to find.

The district court found that trial counsel was familiar with Dr. Cunningham's conclusions and had sufficient communication with him as the trial approached. However, counsel knew that calling Dr. Cunningham would

bring along "so many hazards." The government had informed the court that, if Dr. Cunningham testified about Bourgeois's future danger, the door would be open to harmful evidence that did not come before the jury, including additional information that Bourgeois claimed to have committed another killing, had told people he wanted to kill Robin, had sexually assaulted AB1994, and was cruel to animals. The district court observed that other aspects of Dr. Cunningham's testimony would have offended jurors, citing as an example his proposed testimony that Bourgeois's repeated violence against women should be excused because domestic violence is a common and accepted feature in society.

The district court also characterized Dr. Cunningham's testimony as being detached from the extensive testimony that the jury had already heard about Bourgeois. First, Dr. Cunningham's conclusions that Bourgeois was an involved father who provided economic support to his children and that he was a positive influence on his nieces and nephews were at odds with the government's evidence that Bourgeois's reluctance to support more children played a role in the murder and the evidence of Bourgeois's abusive treatment of a nephew. Second, Dr. Cunningham's assertion that his research proved that Bourgeois was not a violent risk while kept in a highly-structured environment was at odds with the evidence of Bourgeois's actual behavior while incarcerated before trial. Third, Dr. Cunningham's confidence that prison officials could use special conditions of confinement to restrict and monitor Bourgeois's communications and prevent him from ordering violence from prison, was contradicted by evidence that Bourgeois had already bypassed similar conditions before trial. The court concluded that, for these reasons, Dr. Cunningham's testimony would seem hollow, and even unbelievable, given the evidence of Bourgeois's vicious nature and that Dr. Cunningham's claim that Bourgeois would not be violent if given a life sentence could offend the jury and lessen trial counsel's credibility.

No. 11-70024

The district court further found that in his evidentiary hearing testimony, Dr. Cunningham bore an arrogant demeanor as he broadly faulted defense counsel's efforts and lauded his own. Noting that Dr. Cunningham was appointed eight months before trial, the court stated that his records showed that he did little, if anything, until the last few weeks before trial. The court also pointed out that he interviewed witnesses, some of whom testified in the evidentiary hearing, and could have secured the information that he claimed went undiscovered by trial counsel.

The district court stated that from its own observations, Dr. Cunningham would not have been a good witness for the defense because (1) his presentation consisted of information he had apparently prepared and used in numerous cases in which he had testified previously; (2) although his speech was generally of a level pitch, his demeanor in the evidentiary hearing was consistently argumentative and condescending in tone and facial expression; and (3) he openly showed scorn, both in his physical manifestation and his substantive testimony, for the defense's case at trial. In sum, he did not appear to the court as an impartial scientific expert, but as someone seeking to advance an agenda.

The district court noted that all of the experts in the § 2255 proceeding who had examined and evaluated Bourgeois agreed that he suffers from BPD and all of them agreed that the disorder caused Bourgeois to be emotionally unstable, impulsive, and to have difficulties in his interpersonal relationships.[48] Although the court acknowledged the difficulty of diagnosing BPD because of Bourgeois's tangled mental-health issues, it concluded that Dr. Estrada had sufficient information prior to trial to diagnose BPD because he knew that Bourgeois had suffered neglect, rejection, and physical abuse at the hands of his

---

[48] The district court stated that Dr. Cunningham's testimony did not discuss BPD. However, he did state in his declaration, described *supra*, that Bourgeois's background and conduct in killing JG are consistent with BPD.

No. 11-70024

mother, was aware of Bourgeois's violence toward his wives, and had enough information to diagnose Bourgeois with the closely related disorder of narcissism. The court noted that Dr. Estrada conceded in his post-trial deposition that it was possible that he had sufficient information at the time of trial to have diagnosed BPD and that the "key features of [Bourgeois's] violent actions" had not changed as a result of the information he received after the trial.[49] The district court concluded that trial counsel had placed the building blocks for the diagnosis of BPD before the expert witnesses in compliance with their duty to investigate possible mental illness and that they could not be blamed for the experts' failure to properly diagnose and label Bourgeois's personality disorder.

The district court then addressed whether reasonable trial counsel would present the evidence of BPD if the experts had diagnosed it prior to trial. The court found that Dr. Estrada provided the fullest view into how Bourgeois's BPD affected him and that, in many ways, Dr. Estrada's deposition testimony differed little from the testimony presented at trial by both parties, but particularly by the government, as an aggravating circumstance.[50] The jury heard testimony that Bourgeois had a narcissistic personality disorder, which has in common with BPD the fact that Bourgeois would remain subject to violent rages. Thus, the diagnosis of BPD did not lessen Bourgeois's potential for future violent behavior. The court found it very possible that the jury might view the disorder

---

[49] The district court also found it telling that Dr. Cunningham's report did not mention the possibility of BPD, whereas Bourgeois now claims that the condition should have been abundantly obvious. As noted *supra*, however, Dr. Cunningham's report did mention BPD, although he did not explicitly state that it was his diagnosis.

[50] The district court noted that Dr. Estrada's deposition testimony about BPD was very similar to Dr. Cunningham's "pressure cooker" demonstration and would have raised similar concerns for the defense had it been presented at trial.

presented at the § 2255 proceeding as solely aggravating in nature because it could result in the increased likelihood that Bourgeois will act violently again.

The court also found that presentation of evidence that Bourgeois suffered from BPD was problematic for the defense because there was no evidence that BPD is susceptible to treatment. The court pointed to Dr. Estrada's deposition testimony that, although BPD would explain what Bourgeois did, it would not make him less violent in the future. Thus, the same evidence that would explain Bourgeois's violence toward JG would predict violence toward others. The court found that jurors might not have been impressed by knowing the cause of Bourgeois's viciousness; instead, they might conclude that when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate. The court therefore concluded that, without some evidence that treatment or confinement would control the effects of his BPD, the jury would be left to assume that Bourgeois's violent acts would persist immutably.

The court characterized the decision whether to present evidence of BPD as a difficult question over which reasonable and seasoned defense counsel could disagree but found that Bourgeois had not sufficiently recognized the aggravating edge of that evidence, the fact that the government used similar evidence against him at trial, and the absence of any testimony about rehabilitation. The court concluded that even if trial counsel had placed the mitigating influence of the BPD diagnosis before the jury, cross-examination would have gone the way it did in the § 2255 hearing, the government would have presented rebuttal evidence similar to Dr. Price's testimony in the § 2255 hearing that the commission of the murder was more a function of antisocial psychopathic traits and features, and the jury would have responded to the information in much the same way as Bourgeois's § 2255 expert, Dr. Gelbort, who said, "I don't want them for my neighbor." Thus, the court held that a

reasonably-competent attorney could rationally decide not to present evidence of BPD.

The district court held that trial counsel obviously made a strategic decision not to rely on Dr. Weiner's testing because he premised his conclusion that Bourgeois had brain damage on Bourgeois's fabricated claim that he had suffered a coma after a three-wheeler accident. The court stated that although Bourgeois now points to other potential episodes that may have resulted in brain trauma, the fact remains that Dr. Weiner's testimony would have allowed the government to label Bourgeois a manipulator and a liar. With Bourgeois's chosen defense to blame the killing on Robin, and his decision to testify, trial counsel would have incentive to shore up his credibility. The court thus concluded that trial counsel's decision not to call Dr. Weiner, on that basis alone, was reasonable.[51]

The court concluded that in the end, counsel must approach the decision whether to present evidence of brain damage with careful deliberation because evidence of mental and neurological conditions is double-edged: although it can create jury sympathy, it can also bolster the government's claims of future dangerousness by showing poor ability to control impulses and learn from past mistakes. With the certainty that Dr. Weiner's testimony would reveal Bourgeois's manipulation and lies and the marginal benefit to the defense, the district court concluded that trial counsel did not perform deficiently in deciding not to present evidence of neurological impairment.

---

[51] The court found that additional factors developed in the § 2255 hearing confirmed the wisdom of trial counsel's decision not to call Dr. Weiner as a witness: (1) Bourgeois repeatedly criticized Dr. Weiner for using an outdated IQ test; (2) Dr. Price testified that Dr. Weiner used outdated methodology and that Dr. Weiner's attempt to localize the injury in Bourgeois's brain was an out-of-date approach; (3) Dr. Price credibly testified that Dr. Weiner and Dr. Gelbort failed to apply norms to adjust Bourgeois's raw test scores; and (4) Dr. Price attributed the defects that Dr. Weiner described to a personality disorder, not a brain injury.

No. 11-70024

The district court found that the record does not contain a clear explanation of why trial counsel chose not to call Dr. Holden at the punishment phase to testify that Bourgeois did not commit an intentional or premeditated murder but that in a fit of rage over the spilled potty, Bourgeois lost control of himself and in the course of administering physical discipline, fatally injured JG. However, the court observed that Dr. Holden's opinion was premised on Bourgeois's having committed the murder, a theory incompatible with that chosen by the defense and which would have conflicted with Bourgeois's testimony at the punishment phase. The court also found that Dr. Holden's testimony was academic, speculative, and untethered to the facts of the crime. After seeing how his opinions fared when subjected to scrutiny (as trial counsel did in the hearing regarding the admissibility of Dr. Holden's opinions at the guilt-innocence phase), the court concluded that a reasonable and competent attorney might not have chosen for him to testify. The court observed that, in fact, the government seemed eager for Dr. Holden to testify, knowing how it would benefit the prosecution. The court concluded that its observations assured that trial counsel did not render deficient performance in not calling Dr. Holden as a punishment phase witness.

In addition to holding that counsel did not perform deficiently, the district court also held that Bourgeois was not prejudiced by counsel's decisions regarding the presentation of mitigating evidence. In evaluating prejudice, the court stated that it considered the entirety of Bourgeois's unpresented evidence, along with all of the available evidence, not just that favoring the defense.

The court began by noting that the facts of this case are "atrocious" and that the jury saw Bourgeois as a violent man: Bourgeois committed a horrible murder, preceded by torture, neglect, and abuse of his helpless victim; he was indifferent to JG's injuries, unremitting in his beatings, uncaring about her death, and unremorseful at trial; he bit her, beat her with various objects, and

99

## No. 11-70024

probably sexually assaulted her; the government presented significant evidence that the rage he reserved for his young daughter resulted from financial concerns, not psychological conditions; and the episode that resulted in JG's death was not an isolated incident – Bourgeois had been violent in the past and continued his violence while in custody; he had been cruel to children before, beat his wives, assaulted his mother-in-law, threatened jail guards, tried to assault a deputy United States marshal; and had threatened to kill witnesses.

The court pointed out that trial counsel adduced some of the evidence upon which Bourgeois relied on in the § 2255 proceeding:  the jury knew that his mother abused, neglected, and abandoned him, and Dr. Estrada's testimony put some of the blame on mental-health issues.  The court acknowledged that habeas counsel had presented more nuanced and detailed defensive theories, but concluded that the jury would not have responded more favorably to the additional evidence than it did to the theory defense counsel fashioned to conform to Bourgeois's chosen defense.  The court concluded that, given the whole of the evidence, there was no reasonable probability of a different result and thus no prejudice and consequently no cognizable ineffective-counsel claim based on a failure to investigate and present mitigating evidence of Bourgeois's background and mental state and condition.

e.

No reasonable jurist could debate the district court's decision that trial counsel's investigation and presentation of mitigating evidence was not deficient.  Further, no reasonable jurist could debate the district court's decision that, considering the totality of the available mitigation evidence presented at trial and in the § 2255 proceeding, weighed against the evidence in aggravation, Bourgeois failed to demonstrate a reasonable probability that he would not have received a death sentence if counsel had presented all of the mitigating evidence that he claims they should have presented.

As the district court pointed out in careful detail, trial counsel presented some evidence of Bourgeois's impoverished background, dysfunctional family, abandonment, rejection, physical abuse, and the stress he was under at the time of the murder. The supplemental mitigating evidence developed in the § 2255 proceeding added more details, some of which were not reasonably available to trial counsel because of witnesses' reluctance to disparage Bourgeois's mother while she was still alive. Bourgeois's argument is that counsel should have presented *all* of the details. That is essentially an attack on counsel's strategic choices about what evidence to present. For example, Kerry Brown, Bourgeois's lawyer in Louisiana, was subpoenaed by trial counsel. Although the details he provided in the § 2255 proceedings about the stress that Bourgeois was under in the summer of 2002 might have been helpful, his testimony on cross-examination that Bourgeois had "beat the hell out of his mother-in-law" would not have been helpful to the defense if he had testified at trial.

The record supports fully the district court's finding that trial counsel made a strategic decision not to call Dr. Cunningham as a witness because his testimony would have been inconsistent with the defense theory, they were not impressed with him or his presentation and believed it would be better to elicit the information through cross-examination of Dr. Estrada, and they were concerned with the evidence they expected the prosecution to present in rebuttal. The record also supports the district court's observation that Dr. Cunningham would not have been a good witness for the defense not only because his proposed testimony would have been inconsistent with the defense theory, but also because jurors would likely be offended by his suggestion that Bourgeois's culpability was reduced by the recognition that he is one among millions of men in the United States who engage in domestic violence, which is widespread in our society. Moreover, his testimony about the risk of prison violence would have been rebutted by a government expert and was inconsistent with

No. 11-70024

Bourgeois's actual behavior while incarcerated. As the district court noted, trial counsel elicited from Dr. Estrada on cross-examination the most valuable points that Dr. Cunningham would have made: that Bourgeois's background of abuse and neglect reduced his ability to tolerate frustration and the stress that he was under at the time of the murder and that Bourgeois was less likely to be violent in prison because of his age and because of the higher supervision available in prison. Although some of trial counsel's questions to Dr. Estrada were somewhat inconsistent with Bourgeois's theory of innocence, and thus did not fully support that part of trial counsel's rationale for not calling Dr. Cunningham as a witness, the record reflects that Tinker was quite clever in getting much of the mitigating evidence before the jury by asking Dr. Estrada – who was the government's expert – what he had told the prosecution.

The record supports the district court's finding that trial counsel had available to them evidence of brain damage but made a strategic decision not to use it. The defense proposed mitigation factors, filed under seal on March 17, 2004, include the following: (1) "Bourgeois suffers from a brain dysfunction which has impaired his ability to function under duress or extreme stress"; (2) "The stress endured by Bourgeois, combined with his organic brain disorder, played a role in causing the offense"; and (3) "Bourgeois' brain disorder, while not extreme, relates to his character, background, record, and to the circumstances of the offense." Those factors ultimately were not presented to the jury because counsel had decided not to present the testimony of Dr. Weiner. As the district court correctly observed, calling Dr. Weiner as a witness necessarily would have resulted in revealing to the jury that Bourgeois and his sister, Claudia Williams, had not been truthful when they reported that Bourgeois was in a coma after his three-wheeler accident. Furthermore, as the district court noted, the jury might have perceived the evidence of brain damage as solely aggravating because it would have supported a finding that Bourgeois was likely

102

to be violent in the future because his brain damage made him impulsive and reduced his ability to control his rages.

Counsel also had available to them, from Dr. Weiner's evaluation, evidence of Bourgeois's low intelligence. However, they were aware, as well, of Dr. Estrada's pretrial evaluation, in which he reported that Bourgeois appeared to be of above-average intelligence. Under these circumstances, and in the light of the jury's knowledge of Bourgeois's reasonable success in his career as a truck driver (he had been driving 18-wheel trucks across the country, working for different corporations for over 15 years), as well as the jury's observations of Bourgeois at trial, counsel reasonably could have decided that presentation of evidence of Bourgeois's low intelligence may well have fallen flat and thus may have undermined counsel's credibility.[52]

The supplemental mitigating evidence developed in the § 2255 proceeding also added evidence of sexual abuse and BPD. The sexual abuse evidence is the most troubling. The district court's finding that the evidence was not reasonably available to trial counsel because no one told them about it is not surprising in the light of the fact that, in closing arguments at the evidentiary hearing, Bourgeois's counsel and the government's counsel agreed that Bourgeois never mentioned sexual abuse to anyone on the defense team before trial. Our review of the record, however, indicates some question as to the accuracy of that representation.

---

[52] Although Bourgeois criticizes the district court's reliance on its own observations of Bourgeois to determine that trial counsel reasonably did not rely on evidence of low intelligence, the record contains numerous instances of interactions between Bourgeois and the court that fully support the district court's observations. For example, at an in camera meeting with defense counsel and Bourgeois on February 25, 2004 (the final day of jury selection) Bourgeois complained to the court about his lawyers. The court told Bourgeois it would not let him fire his lawyers during jury selection, but offered to let him fire them and represent himself. He responded: "Your Honor, I couldn't represent myself. That just wouldn't work."

No. 11-70024

Dr. Cunningham's testimony at the evidentiary hearing indicates that Bourgeois mentioned sexual abuse to him before trial, although Dr. Cunningham did not include that information in his report to trial counsel. The government exhibits at the § 2255 hearing also contain an undated, handwritten letter from Bourgeois to defense mitigation investigator Bierbaum, in which he provides "History on myself Alfred Bourgeois that I couldn't look you eye to eye to tell you." The letter describes in detail Bourgeois's sexual molestation by Ms. Clayton's son, Jacob, as well as by "neighborhood punk" Raymond Adam. Bourgeois also stated in that letter that his Uncle Isaac Bourgeois, Jr. beat up both of the molesters; that he became a police officer for a year so that he could get revenge on his molesters; that he spit in Jacob Clayton's casket when he died in April 2002; and that he caught Raymond Adam in a parking lot about a month before he was arrested, but AB1994 was with him, and that was the only thing that saved Adam. It is not clear from the record whether this letter was provided to trial counsel prior to trial. However, it apparently was available to Bierbaum, a member of the defense team.

Bourgeois's accounts of the alleged sexual abuse are not consistent. Dr. Cunningham testified that when he interviewed Bourgeois on February 7, 2004, Bourgeois told him that his nose was broken when his mother hit him with a mop handle for lying when telling her of the sexual abuse that he said was perpetrated by Ms. Clayton's son, Jacob. Three days earlier, however, in an interview with Bierbaum and Tinker, Bourgeois told them that his nose was injured when his mother slapped him off a swing. Bourgeois reported to Dr. Toomer, who evaluated him for habeas counsel during the § 2255 proceedings, that when he reported to his mother that he was sexually molested by a man in the neighborhood at about age seven, his mother chastised him for lying about it and beat him with a skillet and an extension cord. Bourgeois told Dr. Price, the government's neuropsychologist who evaluated him during the § 2255

proceedings, that Ms. Clayton's son, a gay pedophile, sexually abused him during the entire time he lived with Ms. Clayton and that he was also sexually abused by a Sunday school teacher in the church after choir practice, from age six until age fourteen. Gilmore testified in the § 2255 proceeding that he could not recall whether he had asked Bourgeois about sexual abuse but that he probably had done so.

It is not possible to determine from the record whether trial counsel were aware of the sexual-abuse evidence and chose not to present it or whether that evidence was unknown to them, as counsel for both parties represented to the district court at the § 2255 evidentiary hearing. In any event, a rational defense attorney reasonably might have decided not to present the evidence, for at least two reasons. First, if offered as an explanation or excuse for Bourgeois's abuse and murder of JG, it would have been inconsistent with the defense theory. Second, and more important, if offered as grounds for the jury to feel sympathy for Bourgeois and spare his life, the presentation of such evidence might have boomeranged inasmuch as the numerous inconsistencies in the allegations would have been brought out and the jury might well have concluded that the allegations were fabricated.

No reasonable jurist could debate the district court's decision that if trial counsel had obtained and presented the evidence of BPD, it might have done more harm than good because the jury could have perceived such evidence as solely aggravating in that it strongly supported a finding that Bourgeois would pose a risk of future violence. Dr. Estrada's testimony about BPD in the § 2255 proceeding – including the fact that Bourgeois's abuse and killing of JG is consistent with the type of rage attacks that a borderline patient might experience under extreme stress, such as that experienced by Bourgeois at the time of the offense – is the kind of testimony that a reasonable trial lawyer might well choose not to present. Moreover, Dr. Estrada's § 2255 testimony that

Bourgeois's BPD caused him to engage in "inappropriate behavior [that] took a violent sadistic form and sexual form" would not have helped the effort to rebut the government's evidence that Bourgeois sexually abused JG.

Contrary to Bourgeois's argument, the district court did not refuse to consider the mitigating value of any evidence that it believed might have an aggravating edge. The court's opinion clearly indicates that the court thoroughly and exhaustively considered the mitigating and aggravating value of all of the evidence, including that which the court found to be double-edged.

Finally, we reject Bourgeois's argument that the district court failed to apply the correct standard of prejudice when it concluded that "the jury" would not have responded favorably to the mitigating evidence presented at the § 2255 hearing. According to Bourgeois, the district court should have instead assessed whether there was a reasonable probability that the new evidence, when considered in totality, would have caused *at least one juror* to strike a different balance. As the government notes, if the additional mitigating evidence would have caused at least one juror to strike a different balance, then it naturally follows that the jury's decision would be a different, due to the requirement of unanimity. In any event, the district court's discussion of prejudice, considered in its entirety, reflects that the court was both aware of, and applied, the correct standard in assessing prejudice. *See* Dist. Ct. Op. at 145-48.

In sum, we conclude that no reasonable jurist would debate the district court's conclusion that Bourgeois was not prejudiced by trial counsel's failure to present the evidence developed by Bourgeois's habeas counsel.

### III. CONCLUSION

Bourgeois has not made a substantial showing of the denial of a constitutional right. The issues he presents are not adequate to deserve encouragement to proceed further, and no reasonable jurist could debate the

No. 11-70024

district court's assessment of his claims.  Accordingly, Bourgeois's request for a COA is

DENIED.